## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| **LISA T. JACKSON** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| | * | **CIVIL ACTION NO.:  4:12-CV-0139** |
| **v.** | * | |
| | * | |
| | * | |
| **PAULA DEEN, PAULA DEEN** | * | |
| **ENTERPRISES, LLC, THE LADY & SONS,** | * | |
| **LLC, THE LADY ENTERPRISES, INC.,** | * | |
| **EARL W. "BUBBA" HIERS, and UNCLE** | * | |
| **BUBBA'S SEAFOOD AND OYSTER** | * | |
| **HOUSE, INC.,** | * | **JURY TRIAL REQUESTED** |
| | * | |
| **Defendants.** | * | |
| | * | |
| | * | |

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff Lisa T. Jackson, by and through her undersigned counsel, and hereby files this, her Second Amended Complaint against the above-named Defendants, showing the Court as follows:

### NATURE AND PURPOSE

1.

This is an action for damages and injunctive relief arising out of personal injuries caused and perpetuated by Defendants in violation of Ms. Jackson's rights under applicable law.

2.

Ms. Jackson seeks redress for the violent, sexist and racist behavior by Bubba Hiers, including sexual harassment of Ms. Jackson and other female employees and assault and battery

1

EXHIBIT A

of Ms. Jackson. His conduct was so offensive that no reasonable person should be required to tolerate it as a condition of employment. However, the other Defendants not only tolerated, but actively enabled Mr. Hiers' tortious conduct.

3.

Defendants were not merely negligent in failing to correct or prevent Mr. Hiers' conduct, but have ratified it at every turn. Even to the present day, Mr. Hiers retains his position of authority with Defendants and he and the remaining Defendants have embarked on a campaign of intimidation of potential witnesses and Ms. Jackson. Current employees have been told not to speak to Ms. Jackson or provide information helpful to her case on pain of termination. Ms. Jackson and her counsel have been publicly threatened with retribution for daring to expose Defendants' misconduct.

4.

In violating Ms. Jackson's rights, the Defendants have engaged in the most heinous, abusive and disreputable conduct and have caused substantial financial and emotional harm to Ms. Jackson and have further caused embarrassment and shame to her within her chosen community.

**JURISDICTION AND VENUE**

5.

Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights) because the matters in controversy arise under the laws of the United States, and because the Court has concurrent jurisdiction of the claims made under state law.

EXHIBIT A

2

6.

Venue is proper in this Court under 28 U.S.C. § 1391 because it is a district where all Defendants reside or do business and where a substantial part of the events giving rise to Ms. Jackson's claims occurred.

7.

All conditions precedent to jurisdiction under the Civil Rights Act of 1964 have occurred, including Ms. Jackson's exhaustion of all applicable administrative remedies, including specifically, her filing of a timely charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), a copy of which is attached hereto as Exhibit 1, and issuance by the EEOC of a Notice of Right to Sue letter, a copy of which is attached hereto as Exhibit 2. Ms. Jackson has timely filed this Second Amended Complaint within ninety (90) days of receipt of the EEOC Notice of Right to Sue letter mailed on August 10, 2012.

## PARTIES

8.

Plaintiff Lisa T. Jackson is a female citizen of the United States. Except for the purpose of necessarily relocating to find work, as set forth in more detail below, at all times relevant to the matters set forth in this Complaint, Ms. Jackson was a resident of Savannah, Chatham County, Georgia.

9.

Defendant Paula Deen is a Georgia resident residing in Chatham County, Georgia and can be served with process by serving her personally, as follows: Paula Deen, 818 Wilmington Island Road, Savannah, Georgia 31410.

EXHIBIT A

3

10.

Defendant Paula Deen Enterprises, LLC is a Georgia corporation residing in Chatham County, Georgia and can be served with process by serving its registered agent for service of process, as follows:  Corporation Service Company, 74 West Montgomery Crossroads, Suite B1, Savannah, Georgia 31406.

11.

Defendant The Lady & Sons, LLC is a resident of Chatham County, Georgia and can be served with process by serving its registered agent for service of process, as follows:  Paula Hiers Deen, 102 West Congress Street, Savannah, Georgia 31401.  Upon information and belief, fifty-one percent (51%) of this corporation is owned by Paula Deen and the remaining interest is owned in equal shares by her sons, Jamie Deen and Bobby Deen.

12.

Defendant The Lady Enterprises, Inc. is a Georgia corporation residing in Chatham County, Georgia and can be served with process by serving its registered agent for service of process, as follows:  Paula Deen, 102 West Congress Street, Savannah, Georgia 31401.Upon information and belief, fifty-one percent (51%) of this corporation is owned by Paula Deen and the remaining interest is owned in equal shares by her sons, Jamie Deen and Bobby Deen.

13.

Defendant Earl W. "Bubba" Hiers is a Georgia resident residing in Chatham County, Georgia and can be served with process by serving him personally, as follows: Earl W. "Bubba" Hiers, 7004 Sandnettles Drive, Savannah, Georgia 31410.

14.

Defendant Uncle Bubba's Seafood and Oyster House, Inc. is a Georgia corporation

EXHIBIT A

4

residing in Chatham County, Georgia and can be served with process by serving its registered

agent for service of process, as follows:  Uncle Bubba's Seafood and Oyster House, Inc., c/o

James P. Gerard, 218 West State Street, Savannah, Georgia 31401.  Upon information and belief,

fifty-one percent (51%) of this corporation is owned by Paula Deen and the remaining interest is

owned by her brother, Earl W. "Bubba" Hiers.

15.

The referenced corporate parties form a single corporate enterprise, as demonstrated

herein or, in the alternative, are a joint employer of the employees of the corporations, and are

known internally within the corporate enterprise as the "Paula Deen Family of Companies."

**STATEMENT OF FACTS**

**INTRODUCTION**

16.

Ms. Jackson was subjected to violent behavior by Bubba Hiers, violent behavior that

included sexual harassment of Ms. Jackson and other female employees and assault and battery

of Ms. Jackson.  Mr. Hiers' violent behavior also included racial harassment, assault, battery and

other humiliating conduct practiced upon the employees managed by Ms. Jackson.  The conduct

described herein is no mere offensive utterance; the conduct was threatening, even physically

threatening, and universally humiliating.  The staff of Uncle Bubba's Seafood and Oyster House,

Inc. ("Uncle Bubba's restaurant") lived in fear of Bubba Hiers.

17.

In addition to being bigoted against African Americans and women, Bubba Hiers is well

known to have frequent violent outbursts, often while under the almost constant state of

EXHIBIT A

intoxication in which he lives his life. Nearly every day, at approximately 10:00 a.m., Mr. Hiers

would arrive at the work place and pour a large styrofoam cup almost full with whiskey,

whereupon he would begin his day of drinking and abusive behavior. This behavior is well

known to upper management, officers of the corporation, and Paula Deen, yet they have done

nothing to protect employees (including Ms. Jackson) from his depredations.

18.

For over five (5) years, Ms. Jackson made numerous and frequent complaints of racial

and sexual harassment and abusive treatment to the highest levels of corporate management and

ownership, including: Defendants Paula Deen and Bubba Hiers; Paula Deen Enterprises Chief

Operation Officer (COO) and Director of Operations, Theresa Fueger; the Certified Public

Accountant (CPA) for the Paula Deen Family of Companies, Karl Schumacher; and to the

attorney for Defendants, James P. Gerard. Hiers' conduct was universally known and tolerated

within the ownership and management levels of the corporate enterprise, and by corporate

counsel and no remedy was offered. Instead, his conduct was ratified both by inaction and by

numerous acts and statements indicating approval of or agreement with his discriminatory views.

19.

Ms. Jackson began employment with the Paula Deen Family of Companies on or about

February 2005 and continued employment until she could no longer bear the sexual harassment

and discrimination, racial harassment and discrimination, and abusive treatment as described

herein. She left employment with the Paula Deen Family of Companies on August 19, 2010.

20.

Ms. Jackson was first hired by Uncle Bubba's restaurant as a hostess. After six months,

she was promoted to General Manager. She remained in the position of General Manager from

EXHIBIT A

6

approximately August 2005 until August 19, 2010.

21.

Ms. Jackson replaced a General Manager that was allegedly having sexual relationships with servers, a matter disregarded by Bubba Hiers. In a meeting with that General Manager and Ms. Jackson, Paula Deen terminated that General Manager and stated to Bubba Hiers, "if you think I have worked this hard to lose everything because of a piece of pussy, you better think again." Paula Deen continued, "and now I am going to do something I have never done. I am going to put a woman in a man's job." Paula Deen gave Ms. Jackson six months to turn the restaurant from a failure to a success.

22.

Upon her promotion to General Manager, Bubba Hiers stated to Ms. Jackson, "you're everything I've never wanted but everything I need – a woman to clean my business up." Mr. Hiers suggested that Ms. Jackson "take it [this comment] as a compliment."

23.

From the beginning, the Certified Public Accountant (CPA) for the Paula Deen Family of Companies, Karl Schumacher, and other male managers made repeated comments denigrating her abilities, because of her gender, including stating that "she'll be down in a month."

24.

However, in six months, Uncle Bubba's was earning a profit.

25.

For these money-saving management efforts, Karl Schumacher referred to Ms. Jackson as "almost Jewish," and Bubba Hiers referred to her as "my little Jew girl."

EXHIBIT A

7

26.

At all times during her employment, Ms. Jackson performed her job well and faithfully, bringing Uncle Bubba's restaurant from circumstances of near financial collapse to a profitable enterprise. Her efforts were impeded by Mr. Hiers, who, inter alia, frequently took cash from the restaurant's receipts, sometimes as much as approximately $26,000 per month.

27.

Ms. Jackson also worked for and was paid by Paula Deen Enterprises, LLC (Paula Deen Enterprises), performing private catering and assisting with the opening of a restaurant in a Harrah's Casino located in Tunica, Mississippi. Towards the end of her employment with the Paula Deen Family of Companies, Ms. Jackson was tasked by Paula Deen with opening a restaurant in Harrah's Casino in Cherokee, North Carolina.

28.

Ms. Jackson also performed work for Lady & Sons Restaurant, which also operates under the corporate name and entity The Lady Enterprises, Inc. Defendants relied on Ms. Jackson to perform the more substantial and complex tasks which should have been performed by the Lady & Sons General Manager, Dustin Walls.

29.

In fact, in the context of discussing a position that would manage both restaurants, Ms. Jackson asked Paula Deen Enterprises Chief Operation Officer (COO) and Director of Operations Theresa Fueger and CPA Schumacher, if she (Ms. Jackson) was qualified for such a position.

30.

Both Ms. Fueger and Mr. Schumacher both responded that she was qualified for this

EXHIBIT A

8

position, but both stated that she would never receive such a position because the Lady & Sons

Restaurant General Manager Dustin Walls and Paula Deen's sons, Jamie Deen and Bobby Deen,

would never allow a woman to tell them what they need to do.

31.

Within the Paula Deen Family of Companies, Lady & Sons Restaurant is known as the

"Boys Club" where men occupy management positions and women are not invited to take on

substantial decision-making roles.  Uncle Bubba's was a part of the "Boy's Club" until Ms.

Jackson was hired as its General Manager.

## THE "PAULA DEEN FAMILY OF COMPANIES"

32.

The corporate Defendants comprise the "Paula Deen Family of Companies," the

management is centralized in that:

a.  Mr. Schumacher has day-to-day control of personnel management for all
employees of the "Paula Deen Family of Companies";

b.  Mr. Schumacher has approval authority for all decisions regarding employee pay
within the "Paula Deen Family of Companies";

c.  COO and Director of Operations Theresa Fueger is responsible for overall
management of the General Managers of both restaurants, while Mr. Schumacher
is responsible for direct, day to day supervision of the General Managers of both
restaurants;

d.  Paula Deen Enterprises provides substantial periodic financial support to both
restaurants;

e.  Mr. Schumacher keeps and maintains the financial and other books and records

EXHIBIT A

9

for all corporate Defendants, including payroll, at the offices of Paula Deen Enterprises;

f.    The entire Paula Deen Family of Companies has a coordinated and synchronized marketing program, including numerous strategies such as permitting discounts for Uncle Bubba's restaurant to be used by customers of Lady & Sons Restaurant, and trolley tour contracts which provide for lunch at Uncle Bubba's restaurant and VIP seating at the Lady & Sons Restaurant for dinner;

g.    Paula Deen Enterprises has paid for Uncle Bubba's restaurant expenses to remedy violations of the Occupational Safety and Health Act; to remedy City Health Code violations; and for restaurant fees, architectural drawings and other renovations and expenses;

h.    Ms. Jackson was appointed by Theresa Fueger and Karl Schumacher to work with corporate counsel, James P. Gerard, in drafting a new comprehensive human resource management policy applicable to the entire Paula Deen Family of Companies, although it was never adopted;

i.    Mr. Schumacher held joint meetings of the General Managers of both restaurants, which were held alternately on the premises of the respective restaurants;

j.    Bubba Hiers has made appearances on numerous television shows hosted by Paula Deen for the purpose of integrating the marketing of the restaurants.

33.

The management staff of the corporate Defendants perceived a tightly integrated nature of the Paula Deen Family of Companies, evidenced in part by Lady & Sons Restaurant General Manager Dustin Walls communicating an apology across the corporate enterprise for threatening

EXHIBIT A

to fire all the "monkeys" in his kitchen, a reference to the African-American kitchen staff. Another General Manager communicated to a broader management audience his apology for having exposed his fellow General Manager's racist comment and for having been too compassionate toward his employees.

34.

Paula Deen further stated in a managers' meeting that the Paula Deen Family of Companies was "one in the same business," stating further that "I owe just as much on this fucking restaurant, as I do on that fucking restaurant, so you need to work together."

35.

The corporate Defendants have a close interrelation of operations, as well as centralized control of personnel matters, common management and common ownership and financial control. The corporate Defendants are a single employer and/or joint employer, such that they may be held jointly liable for Ms. Jackson's claims herein.

## THE VALUE OF THE FEMALE WORKFORCE AT THE
## PAULA DEEN FAMILY OF COMPANIES

36.

Bubba Hiers stated to Ms. Jackson on more than one occasion, "If there's one thing I've learned from my sister, if it ever comes down to firing a guy or a girl, you let the girl go because they are a dime a dozen and you can always find a girl to come work for you, but it's hard to find good guys." The application of the discriminatory motivation disclosed in this statement was evidenced in Defendants treatment of Ms. Jackson, because of her gender.

37.

On numerous occasions, Ms. Jackson complained directly to Karl Schumacher and

EXHIBIT A

11

Theresa Fueger that Defendants did not compensate her in a manner equal to her male counterparts.

38.

After Ms. Jackson requested a raise in 2007, Mr. Schumacher told Ms. Jackson that Bubba Hiers would not permit a woman to be paid any more than she (Ms. Jackson) was already paid. In the words of Mr. Schumacher, "Bubba Hiers would have a heart attack if he knew you were being paid *this* much."

39.

In a meeting scheduled as a result of Ms. Jackson's expression of concerns over compensation, Paula Deen attended and pointed specifically and exclusively to the women managers at the meeting, including Ms. Jackson and others from Lady & Sons Restaurant, stating "you all need to learn to work together and become one." The male managers in the meeting were never addressed. When Mr. Schumacher weighed in to defend Ms. Jackson, stating that the male managers do not help her, Paula Deen told him to "shut up, I'm not talking to you about this. I pay you to handle that part of it."

40.

In 2007, Bubba Hiers offered a male vendor food representative the position of Kitchen Manager/Chef at a salary of $65,000 per year – working only 9:00 a.m. to 3:00 p.m., working no weekends, no nights, plus bonuses, plus vacation, plus retirement. This salary alone would only have been about $100 per week less than his prospective supervisor, Ms. Jackson, yet the position would require substantially less work. In addition, Ms. Jackson did not receive bonus payments, retirement, or holidays, such that the total compensation was significantly in excess of

EXHIBIT A

12

Ms. Jackson's compensation.  Ms. Jackson offered to take the job under those terms and was refused.

41.

The male General Manager of the Lady & Sons Restaurant, Dustin Walls, was paid substantially more than Ms. Jackson during the relevant time period.

42.

Mr. Walls was known by Defendants to be generally incompetent, to perform fewer and less complex duties than Ms. Jackson, and to have created an atmosphere of oppressive sexual and racial harassment of employees under his supervision.

43.

Indeed, there are male managers below the General Manager level at Lady & Sons Restaurant that are compensated more than Ms. Jackson and who received compensation in addition to salary, in the form of bonuses and retirement, which are not provided to Ms. Jackson.

44.

The male General Manager of the Paula Deen retail store, Jay Hiers, worked less and received more in compensation than Ms. Jackson, yet he possessed dramatically less responsibility.  Mr. Hiers received additional compensation in the form of bonuses, vacation pay, and retirement.

45.

Ms. Jackson received a bonus, as other managers did, for approximately 6 months, but Ms. Jackson's eligibility for bonus payments was withdrawn by Mr. Schumacher immediately upon her divorce.  Although this occurred in the context of numerous remarks by Mr. Schumacher regarding his religious views of marriage and the sin of divorce, no such action was

EXHIBIT A

13

taken towards male employees who were divorced.

46.

Mr. Schumacher, the individual in control of compensation for the corporate enterprise, stated in Ms. Jackson's presence, "women are stupid because they think they can work and have babies and get everything done.

47.

When Ms. Jackson complained to Theresa Fueger about compensation and on-going unlawful sexual and racial harassment, Ms. Fueger responded that "you know the family dynamics in the company . . . certain people are not going anywhere, and if you don't like it, you can go find another job."

## SEXUAL HARASSMENT IN THE WORKPLACE

48.

Bubba Hiers subjected Ms. Jackson to sexual harassment nearly every single day Ms. Jackson came to work for over five (5) years. In addition to the disgusting pornography he brought to the workplace and insisted on showing to Ms. Jackson, Mr. Hiers' harassing and abusive comments were often made loudly and without apparent concern for customers, vendors, staff or anyone else near him.

49.

Bubba Hiers is a frequent customer of pornography Web sites and would download and view such sites at work. In the small office he shared with Ms. Jackson, it was impossible for her to avoid viewing the pornography, which was exacerbated by his frequent demands that Ms. Jackson look at the pornography with him. He also visited those Websites on the kitchen

EXHIBIT A

14

computer, often forgetting to log out, whereupon other employees (including Ms. Jackson) were involuntarily exposed to hard core pornography. In addition, the one email address shared by Ms. Jackson and Bubba Hiers frequently received pornographic material transmitted to Mr. Hiers by his friends or relatives that was unavoidably viewed by Ms. Jackson and/or her staff.

50.

On more than one occasion, Bubba Hiers requested that Ms. Jackson bring pictures of herself when she was young for him to view. He told her "you have nice legs" and that two other employees were "fat girls," commenting that (because of their weight) they did not need to be wearing capri pants or skirts. He stated, "I can't have them walking around like that." He also did not approve of their arms, which he considered fat, so he instituted a requirement that female managers wear long sleeves. Mr. Hiers, who is himself obese, did not institute such requirements for male managers.

51.

During Ms. Jackson's employment, Bubba Hiers would frequently visit strip clubs and relate to Ms. Jackson and other staff regarding the highlights of his visits to those clubs.

52.

Bubba Hiers said to Ms. Jackson, in reference to a female employee who was married to a significantly younger man, "Can you imagine that man going to bed with her?" He did not make such disparaging remarks about significantly younger women having sex with older men and, in fact, pursued such relationships himself.

53.

In Ms. Jackson's presence, Bubba Hiers commented to another female employee after she received dentures, "I bet your husband is going to like that." He was referring to his perception

EXHIBIT A

15

that the employee in question would be more proficient at oral sex if she removed her dentures. This statement was offensive to both Ms. Jackson and, on information and belief, the employee in question.

54.

On another occasion, Bubba Hiers told a joke to the staff that described why men should have sex with women with flat heads, the punch line of which is that "you can sit your beer on top of her head while she is giving you a blow job." This statement was offensive to Ms. Jackson and, on information and belief, a number of other female employees.

55.

Bubba Hiers commented to Ms. Jackson and others that he would like to replace the female staff at Uncle Bubba's restaurant with "Hooter's Girls."

56.

At a weekly managers' meeting that included Ms. Jackson, Bubba Hiers brought printouts of an email that stated "Why Gay Marriage should be legal," and showed pictures of women having sex with other women. Mr. Hiers proceeded to pass these emails around the table for everyone to see, including to Mr. Schumacher, who was present. Neither Mr. Schumacher nor any other officer of Defendants took action to report, forbid, prevent or remediate this conduct.

57.

A meeting was arranged by Mr. Schumacher and Ms. Jackson, and attended by Paula Deen Family of Companies attorney James P. Gerard, for the purpose of addressing Bubba Hiers' frequent and outrageous sexual and racial comments. In this meeting in Mr. Gerard's office, Bubba Hiers not only did not deny such conduct, but even discussed his interest in Web

EXHIBIT A

16

site pornography, including directly stating to Mr. Gerard, "don't tell me you don't do that at night?"

## RACIAL DISCRMINATION IN THE WORKPLACE

### 58.

Ms. Jackson is a white female whose father is Sicilian. Because of his extremely dark complexion, Ms. Jackson's father has been mistaken for being African-American and Ms. Jackson has experienced prejudice and discrimination on account of this familial association. In fact, in one notable example, Bubba Hiers, upon viewing a picture of Ms. Jackson's father, exclaimed, "He looks like a nigger...."

### 59.

In addition, Ms. Jackson's nieces, with whom she has close ties, are biracial (African-American and white). Accordingly, derogatory remarks regarding African Americans are even more personally offensive to Ms. Jackson than they would be to another white citizen.

### 60.

Ms. Jackson was subject to racially discriminatory conduct nearly every single day she came to work for Defendants.

### 61.

The racially discriminatory attitudes pervade the work place. An example, showing that Paula Deen holds such racist views herself, occurred after Defendant Deen placed Ms. Jackson in charge of food and serving arrangements for the wedding of her brother Bubba Hiers in February 2007. When Ms. Jackson asked Ms. Deen what look the wedding should have, Ms. Deen replied, "I want a true southern plantation-style wedding."

EXHIBIT A

17

62.

When asked by Ms. Jackson what type of uniforms she preferred servers to wear, Paula Deen stated, "Well what I would really like is a bunch of little niggers to wear long-sleeve white shirts, black shorts and black bow ties, you know in the Shirley Temple days, they used to tap dance around." Paula Deen laughed and said "Now that would be a true southern wedding, wouldn't it? But we can't do that because the media would be on me about that."

63.

Ms. Jackson did not laugh, stating that "no, we can't do that;" a pregnant and uncomfortable pause followed, and the meeting ended shortly thereafter.

64.

The same racially biased attitude prevailed throughout and pervaded Defendants' restaurant operations, and was exhibited on a daily or near daily basis.

65.

African-American job applicants were held to different, more stringent, standards than white applicants and, once hired, white employees were held to a less stringent standard of performance that African-American employees. Ms. Jackson frequently opposed this racially discriminatory double standard, both protecting African American subordinate employees from unfair treatment and disciplining (or attempting to discipline) white employees for misconduct. By doing so, Ms. Jackson frequently came into conflict with Bubba Hiers and other members of upper management.

66.

During Ms. Jackson's employment, Defendants required African-American staff persons at Uncle Bubba's restaurant to use the back entrance for all purposes, including picking up their

EXHIBIT A

18

checks. They were prohibited from using the front entrance.

67.

During Ms. Jackson's employment, Defendants required African-American staff persons at Uncle Bubba's restaurant to use one restroom that is in the back of the restaurant and is not the customer restroom. White staff was allowed to use the customer bathroom.

68.

During Ms. Jackson's employment, Defendants prohibited African-American staff persons stationed at the back of Uncle Bubba's restaurant from sitting in the front of the restaurant.

69.

Ms. Jackson hired two African-American hostesses. Their position required them to be stationed in the front of the restaurant.

70.

Bubba Hiers complained repeatedly about one of these hostesses being out front and this hostess was later fired after being falsely accused of stealing a white customer's purse. The police were called and the young woman was searched, but she was not arrested and no charges were brought. Mr. Hiers then demanded that the other African-American hostess be moved to a position in the back of the restaurant where she could not be seen by customers, solely because she was black.

71.

Ms. Jackson and her employees were surrounded in the workplace with the most vulgar and obscene racial statements, including the following:

EXHIBIT A

19

a. Ms. Jackson was meeting with a vendor in her office at Uncle Bubba's restaurant when Bubba Hiers entered the office and slammed the door behind him, stating "I wish I could put all those niggers [in the kitchen] on a boat to Africa."

b. On approximately Friday, July 20, 2010, Bubba Hiers confronted an African-American male kitchen staff person and repeatedly screamed at him, and physically and violently shook him, as set forth in detail, below.

c. In Ms. Jackson's presence, Bubba Hiers said to his African-American security guard and driver, "don't you wish you could rub all the black off you and be like me?" The security guard responded, "I'm fine the way I am," whereupon Mr. Hiers replied that "you just look dirty, I bet you wish you could."

d. In the presence of Ms. Jackson and an Uncle Bubba's restaurant manager and a vendor, Bubba Hiers stated that "they should send President Obama to the oil spill in the Gulf [of Mexico] so he could nigger-rig it."

e. In the presence of a vendor who traps wildlife (e.g., raccoons) and Ms. Jackson, Bubba Hiers stated, "you also got a bunch of coons in this kitchen you can trap." The kitchen was primarily staffed with African-Americans.

f. Bubba Hiers told jokes using the word "nigger" in front of the coordinator of a fundraising event at the Bethesda Boys Home. The coordinator, not employed by Defendants, expressed to Ms. Jackson her discomfort with Mr. Hiers and his language.

72.

Mr. Schumacher, on multiple occasions, told jokes or ridiculed the President of the United States, referring to him as a "nigger."

EXHIBIT A

73.

Upon seeing a picture of Ms. Jackson's father, who was of Sicilian heritage and dark-skinned, Bubba Hiers stated to Ms. Jackson, "he looks like a nigger, where did you get that white skin from?" Upon her father's death, Ms. Jackson felt she could say nothing to Mr. Hiers for fear that he would make more insulting and racially offensive statements about her father.

74.

In March 2010, the General Manager of Lady & Sons Restaurant General Manager Dustin Walls, who is one of the best friends of Paula Deen's son Jaime Deen, threatened to fire all the "monkeys" in the kitchen, referring specifically to the African-American kitchen staff.

75.

Employees throughout the corporate enterprise became aware of the comment. Ms. Jackson's staff at Uncle Bubba's restaurant became aware of the comment, placing upon Ms. Jackson further significant personnel management challenges.

76.

At Paula Deen's direction, Mr. Walls visited Ms. Deen at her home whereupon she figuratively "slapped him on the wrist."

77.

Ms. Deen stated that she regretted disciplining Mr. Walls, but said she was concerned that otherwise the NAACP would become involved. According to Karl Schumacher, she said "we have to show we are doing something."

78.

In addition to being the personal target of sexually and racially harassing behavior, Ms. Jackson suffered from experiencing the same degrading and humiliating behavior directed at her

EXHIBIT A

21

staff. Ms. Jackson, who has nieces who are bi-racial, was personally offended by Bubba Hiers'

racially discriminatory acts and statements towards the African-American staff.

79.

During her tenure, Ms. Jackson built a family of committed staff for whom she cared

deeply. She felt, as their supervisor, that she was responsible for providing them a safe work

environment free from sexual and racial harassment. Despite many efforts to provide such a

work environment and her frequent opposition of Bubba Hiers' conduct and the conduct of other

members of upper management, she was unable to do so.

80.

Bubba Hiers' racially discriminatory conduct directly interfered with Ms. Jackson's

employment, disrupting relationships with the staff upon whom she relied to accomplish the

business of running a restaurant and causing her immense personal and work related emotional

and physical distress. Employees came to her to complain and for help, which she felt obligated

to give but was unable to fully provide, despite her best efforts.

81.

Ms. Jackson's efforts to prevent and remedy the racially and sexually discriminatory and

harassing environment included complaining to upper management, Mr. Gerard, as the attorney

for the Paula Deen Family of Companies, and directly approaching Paula Deen herself. Her

efforts were unavailing, as Defendants did nothing.

82.

Ms. Jackson was personally aggrieved and injured by the discriminatory harassment and

abusive treatment of her employees and the frequent racially discriminatory and offensive

conduct and statements that pervaded the work place.

EXHIBIT A

22

## VIOLENCE IN THE WORKPLACE

83.

During a meeting called by Bubba Hiers in the Uncle Bubba's restaurant kitchen one afternoon later in her tenure, Bubba Hiers, who was extremely intoxicated (a frequent occurrence), began beating on his chest and challenging anyone and everyone in the kitchen to fight him. He screamed so loud that spit was coming out of his mouth, as he said "Come get some. Come on, you want a piece of me? Meet me on the dock you mother fuckers."

84.

Ms. Jackson scanned the room in horror and saw the faces of her staff mirroring her own fear, disbelief, and helplessness. Mr. Hiers then stumbled out the back door to his truck and left.

85.

Ms. Jackson's job was then, as it was many times after this incident, to control the damage so that she could both comfort her staff, but also retain their services for the benefit of Paula Deen, Bubba Hiers and the restaurant.

86.

In July of 2010, Ms. Jackson terminated a white employee for a second offense of sexually harassing a black female employee. In front of the employees, Mr. Hiers objected to Ms. Jackson "firing the only white employee" working in the kitchen. Ms. Jackson informed him of the circumstances and the reason for her decision.

87.

Still dissatisfied, on or about July 20, 2010, Mr. Hiers insisted on interviewing two African-American employee witnesses to the sexual harassment incident.

EXHIBIT A

23

88.

Seething with anger and red in the face, Mr. Heirs confronted an African-American employee witness, repeatedly screaming at him to relate what he saw. The witness answered, "can I plead the 5th Amendment."

89.

Unsatisfied with that response, Mr. Hiers physically and violently shook him and stated, "fuck your civil rights . . . you work for me and my sister Paula Deen," saying further "you're not going to get me sued over some little bitch."

90.

Mr. Hiers proceeded to violently shake this individual. Ms. Jackson was in the small enclosed space with both Mr. Hiers and this witness at the time.

91.

Ms. Jackson and others nearby and in the kitchen feared for their physical safety, not knowing how far the physical violence might be taken by Mr. Hiers. Nonetheless, Ms. Jackson intervened, threatening to call the police if Mr. Hiers did not stop immediately, which apparently penetrated his alcoholic haze sufficiently to cause him to let go.

92.

The staff of Uncle Bubba's restaurant was in a constant state of fear, awaiting Bubba Hiers' arrival at the restaurant and any required interaction with him.

93.

The stress of repeatedly taking on the role of anticipating Bubba Hiers' violence, moderating it to the extent possible, and protecting herself and her staff from his misconduct caused Ms. Jackson enormous stress – stress that caused chest pains and evolved into panic

EXHIBIT A

24

attacks that would often begin when Bubba Hiers' truck pulled into the parking lot or upon appearance of his white cup full of whiskey. When the truck pulled up or the white cup appeared, staff would scatter, leaving Ms. Jackson to handle Bubba Hiers alone.

94.

Defendants' outrageous and unlawful conduct, including the ratification and toleration of such conduct, was extremely distressing to Ms. Jackson and other employees.

95.

Upon her promotion, she staffed the restaurant with honest, hard-working individuals who were committed to making the restaurant a success. Ms. Jackson, in turn, felt responsible for providing a safe and lawful work environment in which they could work.

96.

Despite Ms. Jackson's repeated complaints to every level of management and ownership, Defendants refused to take the actions necessary to provide that environment. Instead, both she and the employees under her supervision were forced to endure conduct which should not be tolerated in any civilized society.

## COMPLAINTS OF HARASSMENT AND ABUSIVE TREATMENT

97.

Ms. Jackson made frequent pleas for help to upper management, including Defendants' counsel, James P. Gerard. In fact, Mr. Gerard would frequently call Ms. Jackson at home in the evenings and on the weekend to discuss and sympathize with the discriminatory conditions and abusive treatment she confronted, yet he, too, appeared powerless to do anything to assist Ms. Jackson or to stop Bubba Hiers.

EXHIBIT A

25

98.

In February 2010, because of her complaints of harassment, discrimination and abuse, and as a tool to professionally address those complaints, Karl Schumacher placed Ms. Jackson in charge of working with corporate counsel James P. Gerard to draft a new employee handbook that would be applicable to the Paula Deen Family of Companies. Through Spring of 2010, with Mr. Gerard, Ms. Jackson performed that work and submitted the final draft to Mr. Schumacher on or about May 2010.

99.

However, even after numerous versions of the employee handbook were edited by Ms. Jackson, Karl Schumacher, and corporate counsel, James P. Gerard, the employee handbook languished without adoption or implementation on Mr. Schumacher's desk.

100.

In addition, as part of the sham effort to "show we are doing something" about Mr. Walls racist diatribe, Defendants brought in a human resources consultant shortly after the "monkey" incident. However, Mr. Walls was so rude to the consultant that she stopped her interview with him. Bubba Hiers did not show up for his interview with the consultant. Neither Mr. Walls nor Mr. Hiers experienced any consequences for their conduct.

101.

Ms. Jackson's pleas for relief to senior management about the harassment also took the form of requests made to Ms. Fueger and Mr. Shumacher for a transfer anywhere in the company, even if it required a cut in pay. However, they told Ms. Jackson that Paula Deen would never let her leave Uncle Bubba's restaurant.

EXHIBIT A

102.

Ms. Jackson made the same request directly to Paula Deen. For example, in May of 2010, after other efforts to prevent Bubba Hiers' abusive conduct had failed, Ms. Jackson sought to create a new enterprise, which would be responsible for event planning. Ms. Jackson believed that such an enterprise would allow her to remove herself from the toxic work environment created by Bubba Hiers.

103.

Ms. Jackson wrote directly to Paula Deen, pitching her proposal in the most obsequious and flattering manner possible, and asked to be allowed to spearhead this new endeavor. Instead, Ms. Deen told her directly that she would *never* allow her to leave the restaurant and go anywhere else within the Paula Deen Family of Companies.

104.

The harassment and abuse was severe in its form and pervasive in its application and patently illegal and tortious in nature. Despite her numerous and frequent complaints and despite the continuing knowledge of the behavior by the highest levels of management, ownership and corporate counsel, Defendants failed and refused to effectuate any remedy whatsoever.

## DISCHARGE FROM EMPLOYMENT

105.

In the Spring of 2010, Ms. Jackson had thought that there may be hope that Defendants would finally correct their behavior. Ms. Jackson and Mr. Gerard submitted a personnel handbook; she had discussed with Mr. Schumacher the prospect of hiring for the Paula Deen Family of Companies a full time human resource management professional that could address Ms. Jackson's complaints of harassment, discrimination and abusive treatment, and related

EXHIBIT A

27

issues; and she was hopeful that Defendants might be persuaded to operate more professionally, without the pervasive bias and harassment to which she and other employees were subjected. Instead, by the Summer of 2010, conditions became utterly intolerable.

106.

In June of 2010, Ms. Deen personally told Ms. Jackson that she would not be allowed to transfer away from her position as General Manager of Uncle Bubba's restaurant.

107.

On or about July, 2010, in the presence of a vendor, Karl Schumacher informed Ms. Jackson of his decision that there would be no hiring of a human resource management professional and that he (Mr. Schumacher) would be in charge of personnel management, as he had been for years.

108.

At this time, Mr. Schumacher offered Ms. Jackson a guide for his new human resource management strategies – a book by Christian evangelist author Zig Ziegler who writes, in part, of the subservient role of women.

109.

The vendor made the comment, "come on Karl, you know you can't make them read those Christian-inspired writings."

110.

Mr. Schumacher replied that he could do whatever he wanted to do.

111.

As a result of these events, Ms. Jackson was losing all hope that employment conditions would improve for her and her staff.

EXHIBIT A

28

112.

Shortly thereafter, on or about July 20, 2010, as described above, Mr. Hiers physically and violently shook an African-American staff person. Ms. Jackson was in the small office with both Mr. Hiers and this individual at the time. She and others nearby and in the kitchen feared for their physical safety, not knowing how far the physical violence might be taken by Mr. Hiers.

113.

Ms. Jackson complained immediately to corporate counsel James P. Gerard. Later, Mr. Gerard informed Ms. Jackson that, according to Paula Deen's agent, Barry Wiener, the solution was for someone to bring this individual to Paula Deen's $13,000,000 home to give him the feeling of being important and to "massage" him.

114.

"Massaging" is a term frequently used by Paula Deen. As stated by Ms. Deen to Ms. Jackson on other occasions when Ms. Jackson was repairing relationships torn by Bubba Hiers, "just massage them . . . even if you don't mean it, it will make them feel good . . . you've got to learn to massage them and make them feel good." It was apparent that effectively addressing Mr. Hiers' conduct was not an option, even in this circumstance.

115.

On August 10, 2010, at Uncle Bubba's restaurant, Ms. Jackson hosted a dinner for vendors of the restaurant. Bubba Hiers arrived late and entered the room during dinner. He walked up to Ms. Jackson in a drunken stupor, forcibly grabbed her face and kissed her cheek, and said loudly to the group, "I love her. She is my boss and she isn't going anywhere."

EXHIBIT A

29

116.

A comment was then made by a vendor "oh, I see how it is now," suggesting his false, and humiliating, interpretation of this conduct as evidence of a sexual relationship between Ms. Jackson and Mr. Hiers. The vendors were stunned by Mr. Hiers' behavior and expressed to Ms. Jackson disbelief that she would continue her employment.

117.

Ms. Jackson was extremely embarrassed and humiliated. She felt portrayed falsely as something other than the extremely competent manager of the restaurant, and as more in the nature of a person whose position and success is the result of having granted sexual favors to the restaurant owner.

118.

Her own experiences – including each of the events alleged above and her entire five years of experiencing and complaining about Mr. Hiers' conduct – caused her to believe that there was no recourse within her employment and that Defendants would neither take seriously nor do anything about Mr. Hiers' conduct.

119.

Later that evening, an even more intoxicated Bubba Hiers again physically pulled Ms. Jackson over to him, screaming at a loud volume in front of staff and customers so that he was spitting in Ms. Jackson's face, that he wanted to be served or the staff would be fired. He stated, as he had before, "Do you know who I am?"

120.

It was clear to Ms. Jackson that harassment, abuse and a hostile work environment – and the unresponsiveness of Defendants – were defining conditions of the workplace.

EXHIBIT A

30

121.

The harassment, assault, battery and other insults endured by Ms. Jackson so altered the conditions of employment that she suffered serious medical consequences which her doctor informed her were caused directly by her work environment, as described above. Her doctor insisted that she stay away from work and, during her last weeks of employment, requested that she allow him to admit her to the hospital. The doctor refused to treat her with medication, stating the only way for things to improve would be for her to quit her job.

122.

Ms. Jackson's working conditions were so severe, pervasive and objectively intolerable that no reasonable person could be expected to continue as an employee under those conditions. Like any reasonable person subjected to similar conditions, she had no choice but to end her employment with Defendants.

123.

On August 19, 2010, Ms. Jackson ended her employment with Defendants.

124.

Ms. Jackson endured, and continues to endure, immense emotional and psychological pain and has suffered greatly at the hands of Defendants' outrageous and intolerable conduct.

125.

After she left the employment of Defendants, Ms. Jackson could not find a job in the Savannah area. During her employment, some of those same vendors who praised her restaurant had also expressed strong interest in hiring Ms. Jackson. After she left the employment of Defendants, those same vendors would not take her phone calls or told her that they could no longer consider her for employment.

EXHIBIT A

31

126.

Ms. Jackson had no choice but to leave the Savannah area to find employment.

127.

Defendants' conduct demonstrates willful misconduct, malice, fraud, wantonness,

oppression, and that entire want of care which would raise the presumption of conscious

indifference to the consequences.

## CLAIMS FOR RELIEF

## COUNT ONE

## NEGLIGENT FAILURE TO PREVENT
## SEXUAL AND RACIAL HARASSMENT IN THE WORK PLACE

128.

The allegations set forth in paragraphs hereinabove and below are incorporated by

reference as though fully set forth herein.

129.

Applicable law, including Title VII of the Civil Rights Act of 1964, established a duty to

prevent and correct sexual and racial harassment in the work place, which duty Defendants owed

to Ms. Jackson under O.C.G.A. §§ 51-1-6 and 51-1-8.  Where such duty is breached, Ms.

Jackson is entitled to bring an action against Defendants.

130.

Defendants had a duty to know, should have known, and did actually know that the

persons responsible for the conduct alleged herein, including Defendant Hiers, were harassing

Ms. Jackson and/or had a reputation for sexual harassment and were not suitable for their

EXHIBIT A

32

particular employment with Defendants by virtue of their repeated violation and breach of the duties established for the protection of Ms. Jackson and those in her situation. As of the date of the actions complained of herein, it was foreseeable that upper management of Defendants, including Defendant Hiers, would engage in the sexual and racial harassment against Ms. Jackson about which she complains.

131.

In fact, Defendants knowingly permitted sexual and racial harassment, discrimination and retaliation prior to and after numerous complaints. In the case of Ms. Jackson, such negligence resulted in injuries caused, in part, by physical contact by Defendant Hiers.

132.

Where it was foreseeable that managers and supervisors of Defendants, including but not limited to Defendant Hiers, would engage or that they did engage in the sexual or racial harassment against Ms. Jackson, Defendants had a duty not to continue their employment or to take other means which were reasonably calculated to ensure that such harassment would not occur.

133.

Defendants continued the employment of managers and supervisors who participated in racial and sexually harassing behavior.

134.

At all relevant times, said managers and supervisors were subject to the direction and control of Defendants, including, but not limited to Defendant Deen.

EXHIBIT A

33

135.

Defendants owed Ms. Jackson a duty to exercise due skill, care and judgment not to employ in positions of authority those who had a reputation for sexually and/or racially harassing behavior or those employees who engaged in sexually and/or racially harassing behavior.

137.

Defendants were negligent in that they failed to exercise that degree of care followed by ordinary and prudent employers, corporations, and/or supervisors in providing management and supervision free from sexually and/or racially harassing behavior under the same or similar circumstances.

138.

Defendants failed to adequately supervise their managers and supervisors, including, but not limited to, Defendant Hiers, to make sure they were fulfilling their legal obligations not to sexually and/or racially harass their subordinates, including Ms. Jackson.

139.

Defendants failed to properly train their managers and supervisors, including, but not limited to, Defendant Hiers, concerning their legal obligations not to sexually and/or racially harass their subordinates.

140.

Defendants failed to properly evaluate and communicate such evaluations to managers and supervisors when making promotional or periodic compensation decisions. In that regard, Defendants failed to communicate that engaging in sexually and/or racially harassing behavior would have tangible adverse consequences and, instead, openly diminished the importance of

EXHIBIT A

34

corrective measures as merely constituting "massaging" the victims and openly threatened retaliatory and punitive consequences towards those who dared to complain.

141.

The actions and inactions of said Defendants and the employees and attorney for the corporate Defendants caused Ms. Jackson significant financial loss, physical injury, severe emotional distress, humiliation, embarrassment and other damages.

142.

As a direct, legal and proximate result of said Defendants' negligence and the violations of Ms. Jackson's rights by said Defendants, Ms. Jackson has been damaged in an amount to be proved at trial.

143.

Defendants Paula Deen, Earl W. "Bubba" Hiers, Uncle Bubba's Seafood and Oyster House, Inc., Paula Deen Enterprises, Lady & Sons Restaurant, LLC, and The Lady Enterprises, Inc. are jointly and severally liable for this conduct in an amount to be proven at trial.

144.

All conditions precedent to bringing this Count have been completed, performed and/or waived.

## COUNT TWO

### GROSS NEGLIGENCE AND NEGLIGENCE PER SE

145.

The allegations set forth in paragraphs hereinabove and below are incorporated by reference as though fully set forth herein.

EXHIBIT A

146.

Defendants had superior knowledge of their prior unlawful behavior and propensity to discriminate against Ms. Jackson and employees similar to Ms. Jackson.

147.

The harassment and the complaints regarding such sexual and racial harassment were not isolated incidents.

148.

Defendants showed willful misconduct, malice, wantonness, or that entire want of care, which would raise the presumption of a conscious indifference to consequences. Ms. Jackson therefore prays for additional exemplary and punitive damages in an amount to be determined by a jury to deter Defendants from such wrongful conduct in the future.

149.

Defendants' gross negligence constitutes willful and wanton conduct.

150.

Defendants failed to exercise even slight diligence to protect Ms. Jackson in violation of O.C.G.A. § 51-1-4.

151.

Defendants are guilty of negligence per se in violation of O.C.G.A. § 51-1-8.

152.

Defendant is guilty of negligence per se, as their sexual and racial harassment directed towards and in the presence of Ms. Jackson violates the duties established by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended.

EXHIBIT A

36

153.

The purpose of Title VII of the Civil Rights Act and the Civil Rights Act of 1866 are, inter alia, to prevent unlawful sexual and/or racial discrimination in the work place. These statutes create a duty which may be enforced through an action for negligence against these Defendants.

154.

Defendants all knowingly failed to satisfy their obligations under these statutes.

155.

The actions and inactions of said Defendants and employees and attorney for the corporate Defendants caused Ms. Jackson significant financial loss, physical injury, severe emotional distress, humiliation, embarrassment and other damages.

156.

As a direct, legal and proximate result of said Defendants' negligence and the violations of Ms. Jackson's rights by said Defendants, Ms. Jackson has been damaged in an amount to be proved at trial.

157.

Defendants Paula Deen, Earl W. "Bubba" Hiers, Uncle Bubba's Seafood and Oyster House, Inc., Paula Deen Enterprises, Lady & Sons Restaurant, LLC, and The Lady Enterprises, Inc. are jointly and severally liable for this conduct in an amount to be proven at trial.

## COUNT THREE

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESSS

158.

The allegations set forth in paragraphs hereinabove and below are incorporated by

EXHIBIT A

37

reference as though fully set forth herein.

159.

Ms. Jackson suffered financial losses and severe emotional distress as a result of the intentional, reckless and wanton conduct of Defendants. The conduct described herein is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency. Such conduct is atrocious and utterly intolerable in a civilized community and no reasonable person could be expected to endure it.

160.

The financial losses, physical and emotional distress, humiliation, embarrassment and related injuries suffered by Ms. Jackson are a direct, legal and proximate result of Defendants' extreme and outrageous conduct.

161.

The actions of Defendants herein were taken in furtherance of the Defendants' conscious, intentional, and deliberately discriminatory plan and purpose and, thus, were in furtherance of the business of the corporate employers, such that all Defendants are jointly and severally liable for this conduct in an amount to be proved at trial.

## COUNT FOUR

### ASSAULT

162.

The allegations set forth in paragraphs hereinabove and below are incorporated by reference as though fully set forth herein.

EXHIBIT A

38

163.

On numerous occasions, Defendant Earl W. "Bubba" Hiers placed Ms. Jackson in reasonable fear of bodily injury with the apparent ability to inflict such harm.

164.

Ms. Jackson's reasonable fear, emotional and physical distress, and related injuries were the direct, legal and proximate consequence of Defendant Bubba Hiers' intentional and illegal conduct of assault.

165.

Defendants were aware of and repeatedly ratified Defendant Hiers' use of physical force and threats of physical force as a means of controlling subordinate employees.  As a result, the actions of Defendant Hiers herein were taken in furtherance of the Defendants conscious, intentional, and deliberate plan and purpose and, thus, were in furtherance of the business of the corporate employers, such that all Defendants are jointly and severally liable for this conduct in an amount to be proved at trial.

## COUNT FIVE

### BATTERY

166.

The allegations set forth in paragraphs hereinabove and below are incorporated by reference as though fully set forth herein.

167.

Defendant Earl W. "Bubba" Hiers committed a battery upon Ms. Jackson by, among other actions, forcibly and unlawfully grabbing her face and kissing her and spitting upon her.

EXHIBIT A

168.

Ms. Jackson experienced physical pain, embarrassment, humiliation, emotional distress,

physical injury and other damages as the direct, legal and proximate cause of Defendant Bubba

Hiers' intentional and illegal conduct of battery.

169.

Defendants were aware of and repeatedly ratified Defendant Hiers' use of physical force

and threats of physical force as a means of controlling subordinate employees. As a result, the

actions of Defendant Hiers herein were taken in furtherance of the Defendants' conscious,

intentional, and deliberate plan and purpose and, thus, were in furtherance of the business of the

corporate employers, such that all Defendants are jointly and severally liable for this conduct in

an amount to be proved at trial.

## COUNT SIX

### CIVIL RIGHTS ACT OF 1866
### HOSTILE WORK ENVIRONMENT – RACIAL DISCRIMINATION

170.

The allegations set forth in paragraphs hereinabove and below are incorporated by

reference as though fully set forth herein.

171.

The actions of each Defendant to harass and perpetuate harassment against Ms. Jackson

denied her the rights enjoyed by her black, African-American counterparts to make and enforce

her contract of employment and to have the full and equal benefit of all laws as is enjoyed by

black, African-American citizens, as described above and to be further proved at trial, because of

her race, white, Caucasian, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

EXHIBIT A

173.

These discriminatory actions and inactions of Defendants were committed intentionally and, as a direct, legal and proximate result of this discriminatory conduct, Ms. Jackson has suffered significant financial loss, severe emotional distress and other injuries to be proved at trial.

174.

Accordingly, Ms. Jackson seeks compensatory, punitive and other damages and expenses allowed by law against each Defendant in an amount to be proved at trial.

175.

Ms. Jackson further seeks all available declaratory and equitable relief against all Defendants and for Ms. Jackson, as appropriate.

## COUNT SEVEN

### CIVIL RIGHTS ACT OF 1866
### DISPARATE TREATMENT IN TERMS AND CONDITIONS OF EMPLOYMENT, INCLUDING CONSTRUCTIVE DISCHARGE – RACIAL DISCRIMINATION

176.

The allegations set forth in paragraphs hereinabove and below are incorporated by reference as though fully set forth herein.

177.

Ms. Jackson's father is Sicilian, with an extremely dark complexion. In consequence, throughout her life, her father has been mistaken for African American and he, and she, have experienced prejudice as a result. In addition, Ms. Jackson has two nieces who are biracial, as their father is African American. Defendant Hiers directed racially derogatory comments towards Ms. Jackson, knowing the relationships in question. Further, Ms. Jackson, throughout

EXHIBIT A

41

her employment with Defendants, repeatedly opposed discrimination made unlawful under 42

U.S.C. § 1981 yet, because of Defendants' discriminatory harassment on the basis of race and

retaliatory discrimination against her and other employees, was deprived of harmonious working

relationships with her African-American subordinates.

178.

The actions and inaction of the Defendants denied Ms. Jackson the right to work free

from racial harassment and retaliation and to otherwise make, enforce, and enjoy the benefits of

her contract of employment and to have the full and equal benefit of all laws without the burden

and injury caused by Defendants' racial harassment and discrimination, as described above and

to be further proved at trial, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

179.

These discriminatory actions and inactions of Defendants were committed intentionally

and, as a direct, legal and proximate result of this discriminatory conduct, Ms. Jackson has

suffered significant financial loss, severe emotional distress and other injuries to be proved at

trial.

180.

Defendants' conduct was carried out by and with the knowledge of upper management

and was willful, deliberate, and in conscious derogation of Ms. Jackson's federally protected

rights, such that an award of punitive damages is appropriate.

181.

Accordingly, Ms. Jackson seeks compensatory, punitive and other damages and expenses

allowed by law against each Defendant in an amount to be proved at trial.

EXHIBIT A

42

182.

Ms. Jackson further seeks all available declaratory and equitable relief against all

Defendants and for Ms. Jackson, as appropriate.

## COUNT EIGHT

## RATIFICATION

183.

The allegations set forth in paragraphs hereinabove and below are incorporated by

reference as though fully set forth herein.

184.

With respect to all Counts of this Complaint, the corporate Defendants ratified the

conduct of their employees due to knowledge by the corporate Defendants of their employees'

unlawful intentional, reckless, wanton and negligent conduct as set forth hereinabove or to be

further proved at trial, and their subsequent actions or inaction, including the failure to take

measures necessary to remedy the employee conduct.

185.

As a direct, legal and proximate result of the stated conduct and ratification, Ms. Jackson

suffered financial losses, humiliation, embarrassment, physical injury, severe emotional distress,

related injuries and other damages to be proved at trial.

186.

The corporate Defendants are jointly and severally liable for their conduct in an amount to be

proved at trial.

EXHIBIT A

43

## COUNT NINE

### PUNITIVE DAMAGES

187.

The allegations set forth in paragraphs hereinabove and below are incorporated by reference as though fully set forth herein.

188.

Defendants engaged and continue to engage in discriminatory and unlawful conduct with malice or with a reckless indifference to the rights protected by Federal and Georgia law. Defendants' actions were willful, deliberate, and showed a conscious disregard for the harm caused to others, including Ms. Jackson, or, alternatively, showed a conscious desire to inflict such harm.

189.

Accordingly, Ms. Jackson is entitled to punitive damages.

## COUNT TEN

### CONTRACT

190.

The allegations set forth in paragraphs hereinabove and below are incorporated by reference as though fully set forth herein.

191.

The corporate Defendants have failed to pay Ms. Jackson all of the compensation she was due under the terms and conditions of her contract of employment, including vacation pay.

EXHIBIT A

44

192.

Ms. Jackson relied to her detriment on said Defendants' promise and obligation to pay her the amounts due under the terms and conditions of her contract of employment.

193.

The corporate Defendants are liable to Ms. Jackson in an amount to be proved at trial.

## COUNT ELEVEN

### ATTORNEYS' FEES AND COSTS

194.

The allegations set forth in paragraphs hereinabove and below are incorporated by reference as though fully set forth herein.

195.

The misfeasance and wrongful conduct of Defendants evidence such bad faith, vexatiousness, stubborn litigiousness and was carried out with such conscious and reckless disregard of the rights of Ms. Jackson that such conduct on the part of Defendants entitles Ms. Jackson to recover her reasonable costs and expenses, including, but not limited to, attorneys' fees, incurred in connection with this action.

196.

Ms. Jackson is therefore entitled to recover her reasonable attorneys' fees and other costs of litigation, pursuant to O.C.G.A. § 13-6-11 and 42 U.S.C. Section 1988, in an amount to be proved at the time of trial.

197.

All conditions precedent to bringing this Count have been completed, performed and/or waived.

EXHIBIT A

## COUNT TWELVE

### CIVIL RIGHTS ACT OF 1964
### HOSTILE WORK ENVIRONMENT – GENDER DISCRIMINATION

198.

The allegations set forth in paragraphs hereinabove and below are incorporated by reference as though fully set forth herein.

199.

Ms. Jackson's supervisors subjected her to harassment because of her gender, female, and that harassment was, objectively and subjectively, severe and pervasive such that it altered the conditions of her employment, creating a hostile and abusive work environment.

200.

Ms. Jackson utilized every possible employer-provided means of preventing and correcting the harassment by her supervisors and sought prompt remedial action, but no such remedial action was forthcoming.

201.

As a direct and proximate consequence of Defendants' actions or inactions, as described herein, Ms. Jackson was subjected to intentional and unlawful discrimination on the basis of her gender, female, in the terms and conditions of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S. C. § 2000e, *et seq.*

202.

Defendants knowingly, willfully and intentionally discriminated against Ms. Jackson, as set forth above and as further to be proved at trial, on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S. C. § 2000e, *et seq.*

EXHIBIT A

46

203.

As a direct, legal and proximate result of this discriminatory conduct, Ms. Jackson has

suffered significant financial loss, severe emotional distress and other injuries to be proved at

trial.

204.

Accordingly, Ms. Jackson seeks compensatory, punitive and other damages and expenses

allowed by law against the employer Defendants in an amount to be proved at trial.

205.

Ms. Jackson further seeks all available declaratory and equitable relief against the

employer Defendants and for Ms. Jackson, as appropriate.

## COUNT THIRTEEN

### CIVIL RIGHTS ACT OF 1964
### DISPARATE TREATMENT IN TERMS AND CONDITIONS OF EMPLOYMENT, INCLUDING CONSTRUCTIVE DISCHARGE – GENDER DISCRIMINATION

206.

The allegations set forth in paragraphs hereinabove and below are incorporated by

reference as though fully set forth herein.

207.

The gender-focused harassment perpetrated by her supervisors was not directed toward

similarly situated male employees.

208.

Ms. Jackson was further denied bonuses, vacation time and retirement and other benefits

that her similarly situated male co-workers received.  She was also paid a lower wage than the

EXHIBIT A

47

wages received by her similarly situated male co-workers.

209.

As a direct and proximate consequence of Defendants' actions or inactions, as described herein, Ms. Jackson was subjected to intentional and unlawful discrimination on the basis of her gender, female, in the terms and conditions of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S. C. § 2000e, *et seq.*

210.

Defendants knowingly, willfully and intentionally discriminated against Ms. Jackson, as set forth above and as further to be proved at trial, on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S. C. § 2000e, *et seq.*

211.

As a direct, legal and proximate result of this discriminatory conduct, Ms. Jackson has suffered significant financial loss, severe emotional distress and other injuries to be proved at trial.

212.

Accordingly, Ms. Jackson seeks compensatory, punitive and other damages and expenses allowed by law against the employer Defendants in an amount to be proved at trial.

213.

Ms. Jackson further seeks all available declaratory and equitable relief against the employer Defendants and for Ms. Jackson, as appropriate.

## COUNT FOURTEEN

## CIVIL RIGHTS ACT OF 1964
## HOSTILE WORK ENVIRONMENT - RACIAL DISCRIMINATION

EXHIBIT A

48

214.

The allegations set forth in paragraphs hereinabove and below are incorporated by reference as though fully set forth herein.

215.

Ms. Jackson's supervisors subjected her and the staff she hired and managed to harassment and unlawful termination of employment because of race. The harassment was, objectively and subjectively, severe and pervasive such that it altered the conditions of Ms. Jackson's employment, creating a racially hostile and abusive work environment from which she and her staff suffered.

216.

Ms. Jackson utilized every possible employer-provided means of preventing and correcting the harassment of her staff by her supervisors and sought prompt remedial action, but no such remedial action was forthcoming. Ms. Jackson, throughout her employment with Defendants, repeatedly opposed discrimination made unlawful under 42 U.S.C. § 2000e, *et seq.*, yet, because of Defendants' discriminatory harassment on the basis of race against her and other employees, she was deprived of harmonious working relationships with her African-American subordinates.

217.

As a direct and proximate consequence of Defendants' actions or inactions, as described herein, Ms. Jackson was subjected to intentional and unlawful racial discrimination in the terms and conditions of her employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S. C. § 2000e, *et seq.*

EXHIBIT A

49

218.

Defendants knowingly, willfully and intentionally discriminated against Ms. Jackson and

her staff, as set forth above and as further to be proved at trial, on the basis of her race in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S. C. § 2000e, *et seq.*

219.

As a direct, legal and proximate result of this discriminatory conduct, Ms. Jackson has

suffered significant financial loss, severe emotional distress and other injuries to be proved at

trial.

220.

Accordingly, Ms. Jackson seeks compensatory, punitive and other damages and expenses

allowed by law against the employer Defendants in an amount to be proved at trial.

221.

Ms. Jackson further seeks all available declaratory and equitable relief against the

employer Defendants and for Ms. Jackson, as appropriate.

## **COUNT FIFTEEN**

### **CIVIL RIGHTS ACT OF 1964**
### **DISPARATE TREATMENT IN TERMS AND CONDITIONS OF EMPLOYMENT, INCLUDING CONSTRUCTIVE DISCHARGE – RACIAL DISCRIMINATION**

222.

The allegations set forth in paragraphs hereinabove and below are incorporated by

reference as though fully set forth herein.

223.

Ms. Jackson's father is Sicilian, with an extremely dark complexion. In consequence,

EXHIBIT A

throughout her life, her father has been mistaken for African American, and he and she have

experienced prejudice as a result. In addition, Ms. Jackson has two nieces who are biracial, as

their father is African American. Defendant Hiers directed racially derogatory comments

towards Ms. Jackson, knowing the relationships in question. Further, Ms. Jackson, throughout

her employment with Defendants, repeatedly opposed discrimination made unlawful under 42

U.S.C. § 2000e, *et seq.*, yet, because of Defendants' discriminatory harassment on the basis of

race and retaliatory discrimination against her and other employees, Ms. Jackson was deprived of

harmonious working relationships with her African-American subordinates.

224.

The actions and inaction of the Defendants denied Ms. Jackson the right to work free

from racial harassment and retaliation. Similarly situated employees outside Ms. Jackson's

protected class did not suffer the burden and injury caused by Defendants' racial harassment and

discrimination, as described above and to be further proved at trial, in violation of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

225.

These discriminatory actions and inactions of Defendants were committed intentionally

and, as a direct, legal and proximate result of this discriminatory conduct, Ms. Jackson has

suffered significant financial loss, severe emotional distress and other injuries to be proved at

trial.

226.

Defendants' conduct was carried out by and with the knowledge of upper management

and was willful, deliberate, and in conscious derogation of Ms. Jackson's federally protected

rights and those of her subordinates, such that an award of punitive damages is appropriate.

EXHIBIT A

51

227.

Accordingly, Ms. Jackson seeks compensatory, punitive and other damages and expenses allowed by law against each employer Defendant in an amount to be proved at trial.

228.

Ms. Jackson further seeks all available declaratory and equitable relief against all employer Defendants and for Ms. Jackson, as appropriate.

## **PRAYER FOR RELIEF**

WHEREFORE, PLAINTIFF prays that this Court:

(a)     Take jurisdiction of this matter and declare Ms. Jackson's rights under the laws violated by Defendants;

(b)     Permanently enjoin Defendants from further unlawful conduct;

(c)     Award Ms. Jackson compensatory damages, including without limitation, all back pay, benefits, and other forms of compensation lost as a result of Defendants' unlawful conduct;

(d)     Award Ms. Jackson front pay, as just, equitable and appropriate;

(e)     Award Ms. Jackson other nominal, general, special and consequential damages incurred as a result of Defendants' conduct;

(f)     Award Ms. Jackson prejudgment and postjudgment interest;

(g)     Award Ms. Jackson punitive damages;

(h)     Award Ms. Jackson her costs and expenses of this action, including reasonable attorney fees as authorized by law;

(i)     Grant a trial by a jury of twelve persons; and

EXHIBIT A

(j)     Award such other and further legal and equitable relief as will effectuate the

purposes of Georgia law, or as the Court deems just and proper.

RESPECTFULLY SUBMITTED, this 9th day of November, 2012.

*/s/ Matthew C. Billips*
Matthew C. Billips, Esq.
Georgia Bar No. 057110
*Attorney for Plaintiff*

BILLIPS & BENJAMIN, LLP
One Tower Creek
3101 Towercreek Parkway, Suite 190
Atlanta, Georgia 30339
(770) 859-0753 (telephone)
(770) 859-0752 (facsimile)
Billips@bandblawyers.com

*/s/ S. Wesley Woolf*
S. WESLEY WOOLF
Georgia Bar No. 776175
*Attorney for Plaintiff*

S. WESLEY WOOLF, P.C.
408 East Bay Street
Savannah, Georgia  31401
T:  (912) 201-3696
F:  (912) 236-1884
woolf@woolflawfirm.net

EXHIBIT A

53

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | | ☐ FEPA ☒ EEOC | 415-2011-00030 |
| | | | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Lisa T. Jackson | ▇▇▇▇▇▇▇▇ | ▇▇▇▇▇▇▇ |

| Street Address | City, State and ZIP Code |
|---|---|
| ▇▇▇▇▇▇▇▇▇▇▇▇ | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| PAULA DEEN ENTERPRISES, LLC d/b/a Uncle Bubba's | 101 - 200 | (912) 233-6300 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2391 Downing Ave., Savannah, GA 31404 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE ☐ COLOR ☒ SEX ☒ RELIGION ☐ NATIONAL ORIGIN
☐ RETALIATION ☐ AGE ☐ DISABILITY ☐ GENETIC INFORMATION
☒ OTHER (Specify) **Equal Pay**

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **06-01-2005**   Latest **08-18-2010**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. I began my employment on March 18, 2005 as a Hostess. I was promoted to the position of General Manager in September 2005. Beginning in September 2005, I was sexually harassed and subjected to a hostile work environment by Earl (Bubba) Hiers. This harassment includes, but is not limited to, unwarranted criticism about my physical appearance, and interference with my management duties. I complained about my harassment, and the harassment of other employees to Karl Schumacher, Chief Financial Officer in September 2005, and regularly throughout my employment. While employed, I was denied bonuses, paid a lesser wage, denied paid vacation time, and denied retirement benefits that my similarly situated Male co-workers received. During my employment, I was subjected to Mr. Schumacher imposing his religious beliefs on me. Mr. Schumacher recommended books written by religious leaders, and suggested that I implement more Christian beliefs in the restaurant. On August 16, 2010, in a meeting with Mr. Schumacher, and Theresa Fuger, Operations Manager, I discussed my complaints and requested to transfer to another restaurant within the company. I was told by Ms. Fuger, "nothing was going to change in the company, and if I didn't like it, I should seek different employment." I resigned on August 18, 2010.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| Oct 08, 2010 _____ _____ Date   Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)   **OCT 08 2010** |

**RECEIVED**

EEOC-SLO
EXHIBIT 1

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 415-2011-00030 |
| | | and EEOC |

State or local Agency, if any

THE PARTICULARS ARE (if additional paper is needed, attach extra sheet(s)):

II. No reason was provided for the sexual harassment and disparate treatment I suffered.

III. I believe I have been discriminated against because of my gender, female, and my religion, Buddhism, in violation of Title VII of the Civil Rights Act of 1964, as amended. I also believe I have been paid lesser wages because of my gender, in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Equal Pay Act of 1963, as amended.

IV. I believe females as a class are being sexually harassed because of their gender, in violation of Title VII of the Civil Rights Act of 1964, as amended. African-American employees as a class are being harassed, subjected to a hostile work environment, and discharged because of their race, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Oct 08, 2010**<br>Date          Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>(month, day, year) |

EEOC Form 161-B (11/09)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To:  Lisa T. Jackson

From:  **Savannah Local Office**
**410 Mall Blvd**
**Suite G**
**Savannah, GA 31406**

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 415-2011-00030 | Diego Torres, Investigator | (912) 652-4448 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X] More than 180 days have passed since the filing of this charge.

[ ] Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X] The EEOC is terminating its processing of this charge.

[ ] The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[ ] The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ] The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

**AUG 1 0 2012**

Enclosures(s)

**Derick L. Newton,**
**Director**

*(Date Mailed)*

cc:  James P. Gerard, Esq.
OLIVER & MANNER, LLP
P.O. Box 10189  WESLEY WOOLF, P.C.
Savannah, GA 31412

S. Wesley Woolf, Esq.
LAW OFFICES OF STEFFEN WOOLF
213 West York Street
Savannah, GA 31401

AUG 1 6 2012

**RECEIVED**

EXHIBIT 2

Enclosure with EEOC
Form 161-B (11/09)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed within 90 days of the date this Notice was *mailed* to you (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred more than 2 years (3 years) before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 – in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, please make your review request within 6 months of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*