# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

LISA T. JACKSON,                          )
                                          )
     Plaintiff,                          )
                                          )
v.                                        )    Case No. CV412-139
                                          )
PAULA DEEN,                               )
PAULA DEEN ENTERPRISES, LLC,  )
THE LADY & SONS, LLC,                )
THE LADY ENTERPRISES, INC.,      )
UNCLE BUBBA'S SEAFOOD AND     )
OYSTER HOUSE, INC., and            )
EARL W. HIERS,                          )
                                          )
     Defendants.                         )

## SEALED ORDER

Before the district judge in this employment discrimination case are defendants' motions to dismiss and plaintiff's motion to dismiss a counterclaim. Docs. 57, 58 & 64. Before the undersigned are defense motions for a medical examination of the plaintiff, doc. 70, for leave to take excess depositions, doc. 85, for protective orders, docs. 93 & 108, and to compel. Docs. 107, 110 & 112. Plaintiff has filed two motions to compel. Docs. 92 & 111. Finally, all defendants move to sanction and

disqualify one of plaintiff's lawyers, doc. 101, but that will be addressed in a separate order.

## I. BACKGROUND

Defendant Paula Deen is a "celebrity chef" who owns and controls certain corporate entities through which she vends, *inter alia*, restaurant dining services. She co-owns one such entity, "Uncle Bubba's Oyster House," with her brother and co-defendant, Earl W. Hiers. Doc. 92. In 2005, Hiers employed plaintiff Lisa T. Jackson as a restaurant manager. Jackson, a white female, doc. 47 at 17 ¶ 58,[1] quit in 2010 and brought this case against Deen, Hiers, and their business entities, doc. 47, alleging that Hiers "was the purveyor of day-to-day sexually charged and harassing conduct in the [Uncle Bubba's] workplace," doc. 92 at 5, and that Hiers' unremitting violent, sexist, and racist behavior violated her rights under both federal and state law. Doc. 47 at 5-6, 32-40, 43-45.

Jackson alleges that her complaints to management fell on deaf ears. Doc. 47 at 6 ¶ 18; *see also* doc. 101-1 at 162-69, 271-72. She complained "to the highest levels of corporate management and

---

[1] The Court is citing to the page numbers created by its electronic docketing software. They may not always line up with the actual, printed-page numbers.

ownership: Defendants Paula Deen and Bubba Hiers; Paula Deen Enterprises Chief Operation Officer . . . Theresa Fueger[, etc.]." Doc. 47 at 6 ¶ 18. Management knew of but failed to interdict Hiers' conduct, *id.,* which included abusive drunkenness. *Id.* at 5-6 (he "would arrive at the work place and pour a large Styrofoam cup almost full of whiskey, whereupon he would begin his day of drinking and abusive behavior.").

Hiers' violent behavior "included racial harassment, assault, battery and other humiliating conduct practiced upon the employees managed by [plaintiff]." *Id.* at 5 ¶ 16. Jackson's unaddressed complaints and belief that a duplicitous Chief Financial Officer (and company accountant) was going to assume Human Resources department responsibility (hence, do nothing about her complaints) caused Jackson to give up hope and thus quit. Doc. 101-1 at 244. The defendants deny her allegations and deny liability. Doc. 56; doc. 109 at 2; doc. 59 at 21.

## II. ANALYSIS

Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. . . ." Fed. R. Civ. P. 26(b)(1). "Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.*; *see also Zorn v. Principal Life Ins. Co.*, 2010 WL 3282982 at * 2 (S.D. Ga. Aug. 8, 2010) (shifting burdens of relevancy showings); *Southard v. State Farm Fire & Cas. Co.*, 2012 WL 2191651 at * 2 (S.D. Ga. June 14, 2012) ("the relevancy standard for discovery is not the same as for at-trial evidence. For discovery it is more liberal, though not a fishing license.").

### A. Fed. R. Civ. 35 Motion

Citing plaintiff's claims of mental and emotional distress,[2] the defendants move the Court to order her to submit to an independent

---

[2] "To recover on such a claim, a plaintiff must show evidence that: (1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the emotional distress; and (4) the emotional harm was severe. *Abdul–Malik v. AirTran Airways, Inc.*, 297 Ga. App. 852, 855–56, 678 S.E.2d 555 (2009)." *Haugabrook v. Valdosta City Schools*, 2012 WL 1014789 at * 11 (M.D. Ga. Mar. 22, 2012). Emotional

mental examination (IME) to be performed by L. Randolph Waid, Ph.D. Doc. 70. They point out that she alleges *continuing* "immense emotional and psychological pain" caused by the defendants, so it's only fair to examine her for that. *Id.* at 1-2; *see also* doc. 101-1 at 205-06. They remind that Jackson claims to be receiving mental health care and has been treated for stress. Doc. 70. at 2; *see also* doc. 101-1 at 205-06.

To obtain an IME under Fed.R.Civ.P. 35(a), the defendants must establish both that the Plaintiff has put her mental condition "in controversy" and that there is "good cause" for the IME. Courts have found "good cause when questions arise regarding the substantial cause and extent of emotional problems." *Laney v. Hospital Bd. of Directors of Lee County*, 2010 WL 2540598 at * 2 (M.D. Fla. Jun. 22, 2010); 1 DISCOVERY PROCEEDINGS IN FEDERAL COURT § 18:5 (3d ed. Mar. 2013).

Plaintiff "does not dispute that she has put her mental condition in issue, but does dispute that 'good cause' has been shown for an IME

---

distress claims can be supported by sexual harassment evidence. *H.J. Russell & Co. v. Jones*, 250 Ga.App. 28, 31 (2001).

or that the Motion is otherwise adequate." Doc. 76 at 3. She further objects because: (1) the IME would occur outside the geographic jurisdiction of this Court and 350 miles from her Atlanta residence; (2) the exam would be uninformed by her medical records or her deposition testimony;[3] and (3) the defendants have failed to specify the time, place, manner, conditions, and scope of the examination desired by them, as required by Rule 35(a)'s text. Doc. 76 at 2-11.

Jackson says she has offered to sign authorizations so that defendants may subpoena her medical records, and she has agreed that her doctors may be deposed. Doc. 76 at 4. She also reminds that a Rule 35 exam should not be reduced to a cover for an *ex parte* deposition. *Id.* at 7. She wants to know up front what sort of testing would be applied, and the Rule requires that. *Id.* at 8. Nor does the IME motion state who will or may be present at the examination, or to whom the information obtained from the examination would be disseminated. *Id.* at 9.

_____

[3] Her deposition has been taken since this brief was filed. Doc. 101-1. However, it is not a complete copy. It has been redacted at various points. *See, e.g.*, *id.* at 212. The defendants are directed to ensure that a complete copy is before the Court (*e.g.*, replace any and all redacted pages with unredacted pages).

Jackson also objects because the motion itself is untimely. The Scheduling Order gave defendants until January 16, 2013 to file an expert witness report. Doc. 40 at 1. They filed a report that day, as part of their IME motion. Doc. 70-2. But it is obvious, plaintiff says, that the report is *pro forma* and that defendants will beef it up once Dr. Waid examines her. Doc. 76 at 12. And discovery closed March 7, 2013, so there would be no time for plaintiff to depose Dr. Waid. *Id*. at 16. Defendants, she concludes, therefore should not be permitted to use Rule 35 to compensate. Doc. 76 at 11. Finally, should the Court permit the exam, she requests a laundry list of conditions, such as a bar on any questions about her sexual behavior or predisposition. *Id*. at 20-21.

Defendants reply that an IME is separate from an expert witness report because it is a "discovery motion in that it seeks discovery, and it was made well within the time frame for discovery set by the Court." Doc. 80 at 1. Plus Jackson herself has been lax in fully responding to their medical record document request. *Id*. at 2. Short-timed, they deposed Dr. Zia Abdi, one of Jackson's doctors, and claim that plaintiff's counsel had documents that could have been part of Jackson's medical

chart but were not -- text messages between her and Dr. Abdi that go to a medical board complaint she filed against him.  Doc. 80 at 2-3.[4]  Dr. Abdi testified that Jackson had told him that she had been raped by her employer -- an explosive charge *not* in Jackson's Amended Complaint,

---

[4]  Jackson's counsel denies this, and represents that Dr. Abdi himself had failed to produce documents from Jackson's medical file.  In fact, at the Abdi deposition, plaintiff's counsel asked Dr. Abdi to let him review the file.  Abdi complied. Counsel then discovered and disclosed

> numerous documents which Dr. Abdi had not produced, either to Plaintiff's counsel or in response to subpoena, including correspondence with the Medical Board.  These documents related to Dr. Abdi's inappropriate advance toward Plaintiff and his response to her Medical Board complaint. It was Plaintiff's counsel who reviewed the original file and pointed out that Dr. Abdi had not produced these documents in response to the subpoena; had the undersigned not done so, Plaintiff and Defendants would never have been aware of their existence.

> Further, Dr. Abdi did not mention this conflict with Ms. Jackson during Defendants' questioning, falsely claiming he had never been the subject of a Medical Board complaint and that his only concern was for her well-being.  Again, it was Plaintiff's counsel who corrected the record, questioning Dr. Abdi about his inappropriate conduct, showing him the text message he had sent to her . . . and noting the Medical Board complaint and the response that was in his file. Again, but for the fact that Plaintiff ensured that the record was complete and accurate, Defendants would not have been aware of this issue at all.

Doc. 90 at 6-7 (footnotes omitted); *see also id.* at 13 (Abdi's text message to Jackson).

doc. 47. Doc. 80 at 3; *see also* doc. 101-1 at 212.[5] Nor was it in the medical records from Jackson's gynecologist. Doc. 80 at 4.

On top of that, defendants further point out, Jackson herself deposed that she had never been raped by an employer. Doc. 80 at 4; *see also* doc. 101-1 at 212. "These inconsistencies," defendants conclude, "support a basis of good cause for a mental examination to be performed by Dr. Waid." Doc. 80 at 4. And Jackson's drive from her Atlanta residence to this Court, defendants remind, is already 3 hours and 48 minutes; her drive to Dr. Waid's office would be just over an hour more than that (4 hours and 53 minutes). *Id.* at 4-5.

Finally, defendants insist that they have not been lax in conducting discovery here. Prior to removal of the case to this Court, they explain, the state court judge stalled discovery to give her a chance to narrow it when reaching a then-pending discovery motion. Jackson amended her complaint post removal, and the parties jointly moved to stay discovery

---

[5] Jackson apparently was asked this in her deposition but, inexplicably, part of the *question* has been redacted. Doc. 101-1 at 211-212. The Court directs the defense to re-file this deposition with *no* redactions.

(a motion denied by the district judge on January 14, 2013, doc. 69), so both sides were interested in cost avoidance here. Doc. 80 at 5-6.

The IME arguments beckon examination of the

> relationship between the [Fed. R. Civ. P. 26] expert disclosure deadline and the timing for a Rule 35 examination and report. The few courts that have addressed the interplay between Rules 26 and 35 address the issue in an inconsistent manner. Some district courts assert that Rule 26 and Rule 35 operate completely independent of each other. For example, the [court in *Waggoner v. Ohio Cent. R.R., Inc*., 242 F.R.D. 413 (S.D. Ohio 2007)], held that the deadline for disclosure of expert witness reports did not apply to defendant's issuance of a Rule 35 report. *Waggoner*, 242 F.R.D. at 414. However, the *Waggoner* court did not specifically address the proper timing for filing a motion to compel a Rule 35 examination or for conducting the examination itself. *Id*. Adopting the *Waggoner* approach, [another] . . . court concluded that the deadline set forth in the scheduling order for expert reports under Rule 26(a)(2) does not apply to a Rule 35 examination or the issuance of a Rule 35 report. *Bush v. Pioneer Human Serv*., 2010 WL 324432 at * 5 (W.D. Wash. Jan. 21, 2010).

*Diaz v. Con-Way Truckload, Inc*., 279 F.R.D. 412, 416 (S.D. Tex. 2012).

The *Diaz* court concluded that the Rule 26(a)(2) expert witness report deadline and Rule 35(a) should be read together when determining the proper timing for an IME and subsequent disclosure of the related report. *Id*. at 418-420. The IME rule is a discovery tool not unlike depositions or interrogatories, and it is likely that a party would attempt

to use IME results as an opportunity to obtain additional discovery to bolster their testifying expert's opinion. *Id.*

The *Diaz* plaintiff showed defendant's lack of diligence in seeking the examinations. Still, good cause existed to extend the expert designation and discovery deadlines in *Diaz*, which was a personal injury action arising from a motor vehicle accident. *Id.* at 422. The testimony of each party's expert was important because plaintiff had not been examined in months and damages was the sole issue at trial. *Id.* at 423-24.

This Court is inclined to agree with the *Diaz* court's reasoning, but it is not necessary to resolve Rule 26/Rule 35 timeliness issue if it is assumed that the defendants can meet the "good cause" requirement of Fed. R. Civ. P. 16(b)(4), which applies to "past-deadline" efforts to employ an expert witness:

> The following four factors are to guide a court's determination of good cause: "(1) the explanation for the failure to adhere to the deadline; (2) the importance of the proposed modification to the scheduling order; (3) potential prejudice in allowing the testimony or the supplement; and (4) the availability of a continuance to cure such prejudice." *Diaz v. Con–Way Truckload, Inc.*, 279 F.R.D. 412, 422 (S.D. Tex.2012).

*Marlow LLC v. BellSouth Telecommunications, Inc.*, 2013 WL 30123 at * 1 (S.D. Miss. Jan. 2, 2013).

Rule 16(b)(4) good cause exists here. This is an extraordinary case, with plenty of mudslinging by both sides. And it cannot be overlooked that the parties sought to conserve resources (abiding the state court judge's slow-down directive and their joint stay motion here). Plus, even if defendants were lax in rounding up an expert and seeking an IME, the core of plaintiff's damages claim here is based on her emotional distress. She repeatedly cites the stress of working under Bubba Hiers, and the "rape" allegation discrepancy at least supports the assertion that perception and memory can be warped by the mental distress being alleged to exist in support of plaintiff's damages.

Jackson, for that matter, does not dispute that her intentional emotional distress claim fits hand-in-glove with a hostile (sex) work environment claim, where it is argued that no reasonable person should have to tolerate the extremely offensive and harassing behavior of their employer, and mental health damage is attributed to that.[6]  It thus is

---

[6] In raising a "Hostile Work Environment -- Gender Discrimination" claim,  doc. 47 at 46, Jackson says her "supervisors subjected her to harassment because of her gender, female, and that harassment was, objectively and subjectively, severe and pervasive such that it altered the conditions of her employment, creating a hostile and abusive work environment." *Id.* ¶ 199.  "[A]n objectively hostile sexual environment is an environment that a reasonable person would find hostile or abusive." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1272 (11th Cir. 1999) (quotes &

fair to inquire, as was done during her deposition, *see, e.g.*, doc. 101-1 at 246, how much of her present mental health injury may be attributable to the defendants as opposed to pre-job events and realities in her life (adoption and parental abandonment issues, dropping out of high school due to teen pregnancy, a series of marriages that failed, with each husband aware of her lesbianism, etc.). Doc. 101-1 at 7-9, 14-15, 117, 247-49.

On balance, the proximate cause of plaintiff's emotional distress damage claim is important enough to cut defendants some slack even if it could be said that they have not been diligent enough. The Court therefore grants their IME motion (doc. 70). *See Simpson v. University of Colorado*, 220 F.R.D. 354 (D. Colo. 2004) (good cause existed to permit mental examination of female student in her action against university for alleged indifference to sexual harassment in athletic department. The student alleged specific psychiatric injury, post–traumatic stress disorder, and intended to offer expert testimony to that effect); *see also*

---

cite omitted). "The employee must subjectively perceive the harassment as sufficiently severe and pervasive," and "this subjective perception must be objectively reasonable." *Id.*, at 1246; *see also Owens v. Omni Hotels Management Corp.*, 2012 WL 1454082 at *11 (N.D. Ga. Mar. 27, 2012) (the "severe or pervasive" requirement that "tests the mettle of most sexual harassment claims.").

8B W<small>RIGHT</small> & M<small>ILLER</small>, F<small>EDERAL</small> P<small>RAC.</small> & P<small>ROC.</small> § 2234.1 n. 14 (2012) (collecting cases).

Some sub-rulings are warranted here. It is established that

> [t]he party seeking an independent medical examination is entitled to choose the physician absent valid objections to the selection. *Drigger's v. Vezer's Precision Indus. Constr. Int'l*, 2007 WL 1655612 (N.D. Fla.). Even with the availability of a plaintiff's medical records, a defendant generally deserves "the benefit of an examination by a physician whose judgment [that defendant's] counsel knows and respects." *Bennett v. White Laboratories, Inc.*, 841 F. Supp. 1155, 1158 (M.D. Fla.1993). The ultimate determination with respect to the proposed parameters of the exam is left entirely to the Court's sound discretion. *Stuart v. Burford*, 42 F.R.D. 591, 592 (N.D. Okla.1967). To satisfy Rule 35, the Court may place special conditions on an examination by entering a protective order pursuant to Rule 26(c). *Calderon v. Reederei Claus–Peter Offen GmbH & Co.*, 258 F.R.D. 523, 525 (S.D. Fla. 2009).

*Woodard v. Wal-Mart Stores East, LP*, 2010 WL 3455342 at * 2 (M.D. Ga. Aug. 26, 2010). As with the *Woodard* court, Jackson has shown no binding authority limiting IME's to this District,[7] and any legal

---

[7] *Compare Barcia v. ENI US Operating, Co., Inc.*, 2006 WL 1236053 at * 2 (E.D. La. 2006) (overruling plaintiff's objection to location of examination at his residence in the Middle District of Louisiana and ordering plaintiff to travel to podiatrist's office in Eastern District where case was pending), *with Driggers v. Vezer's Precision Indus. Const. Int'l.*, 2007 WL 1655612 at * 1-2 (N.D. Fla. 2007) (there is no hard line rule

protection Dr. Waid may have from this Court's subpoena and contempt power may be waived by him. Short of that defendants may select an examiner located within the Atlanta or Savannah area, or points in between.

Next, defendants shall pay plaintiff's reasonable travel expenses, to include overnight lodging expenses. While the general rule is that "a plaintiff is required to pay his own travel expenses for an examination in the forum state," *Page v. Hertz Corp.*, 2011 WL 5553489 at *6 (D.S.D. Nov. 15, 2011), the defendants propose an out-of-state examination at considerable distance from plaintiff's residence, which is in a city where there are numerous, more conveniently located experts who could conduct the IME. Defendants can avoid this expense if they choose an expert located in Atlanta.

Also, the exam shall take no more than eight hours. *Simonelli v. University of California-Berkeley*, 2007 WL 1655821 at * 3 (N.D. Cal.

establishing the location of the examination, ordering examination to take place in adjacent district, where it was closer to plaintiff's residence in any event), *cited in Woodard v. Wal-Mart Stores East, LP*, 2010 WL 3455342 at * 1-2 (M.D. Ga. Aug. 26, 2010) (directing personal-injury plaintiff to drive from Macon to Atlanta, Georgia for defense-requested IME).

2007) (eight-hour psychological examination is reasonable), *cited in Newman v. San Joaquin Delta Community College Dist.*, 272 F.R.D. 505, 513 (E.D. Cal. 2011) (two five-hour testing sessions over two-day period, inclusive of breaks in action arising from alleged assault by college police officers).  It shall go unrecorded.  HANDBK. FED. CIV. DISC. & DISCLOSURE § 10:15 (3d ed. Mar. 2012) ("As a general rule, courts have forbidden examinees from recording examinations, particularly those involving mental or emotional conditions."); *Heath v. Isenegger*, 2011 WL 2610394 at *2 (N.D. Ind. 2011) (general rule is that Rule 35 medical examinations are not recorded other than for good cause shown); *but see Kuslick v. Roszczewski*, 2012 WL 899355 at *6 (E.D. Mich. Mar. 16, 2012) (plaintiff allowed to tape record her mental examination where defendant did not show it would interfere with examination).  And no counsel or anyone beyond the doctor's staff shall be present during the examination. HANDBK. FED. CIV. DISC. & DISCLOSURE § 10:15 ("federal courts have generally barred the examinee's attorney from the examination on the ground that the attorney's presence is not 'necessary or proper.'"); *see also id.* ("As a general rule, courts have refused to allow the examinee's own psychiatrist or other medical expert to be present during a mental

examination."); *but see id.* ("there are a few decisions granting the examinee's observer or expert limited access to a mental examination.").

Finally, since mental distress injury can be far ranging and variably sourced, there will be no limits on Dr. Waid's range of inquiry about any legitimate medical cause. It is fair and logical to inquire of any other contributing factors, if only to rule them out, and this includes past traumas that may have rendered plaintiff underequipped to handle the range of human interaction that the law contemplates before a judge deems conduct outrageous enough to carry an emotional distress claim to trial.[8] No cause has been shown to require the doctor to pre-disclose what sort of testing he may care to employ.

---

[8] A reasonably high threshold exists. *Compare Guthrie v. Waffle House, Inc.*, 460 F. App'x 803, 809 (11th Cir. 2012) (black male supervisor's alleged racial and sexual behavior and comments to white female employee were not extreme and outrageous, as required to support employee's claim against employer for intentional infliction of emotional distress, under Georgia law; supervisor's conduct was boorish, rude, unwelcome, and insensitive, but not so outrageous in character and so extreme in degree as to go beyond all bounds of decency and to be regarded as atrocious and utterly intolerable in civilized community), *with Jones*, 250 Ga. App. at 31 (evidence was sufficient to support finding in employee's negligent supervision and retention action against employer that employer knew supervisor harassed employee, and employer knew it had not protected her from supervisor, and thus supported verdict that employer's actions were willful, wanton, or malicious, and directed towards employee, which allowed emotional distress damages, although supervisor was removed as employee's supervisor; supervisor visited employee's work, and he continued to harass employee when she visited main office where main harassment had taken place prior to removal).

## B. Defense Motion for a Protective Order

Defendants concede that once a defendant invokes the *Ellerth/Farragher* defense,[9] how the employer handles employee complaints about supervisor harassment is relevant. But plaintiff goes too far here, they contend, by subpoenaing the corporate defendants' outside counsel, James P. Gerard. Doc. 93. Jackson wants to re-depose him (the first terminated upon privilege-based objections), and the

---

[9] The "defense comprises two necessary elements: (1) that the employer exercised reasonable care to prevent and promptly correct harassing behavior and (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or to otherwise avoid harm." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), interpreting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (requiring a significant change in employment status).

Two recent Eleventh Circuit cases demonstrate how the defense works. *Compare White v. Creative Hairdressers Inc.*, 2013 WL 203312 at * 2 (11th Cir. Jan. 18, 2013) (even if male hairdresser had been subjected to sexual harassment by his manager at salon, hairdresser's failure to use employer's procedures to remedy offensive conduct precluded his Title VII and state law claims pursuant to the *Faragher–Ellerth* defense; employer had promulgated and disseminated sexual harassment policies and complaint procedures, yet hairdresser failed to promptly take advantage of the policies by notifying employer of alleged harassment), *with Kurtts v. Chiropractic Strategies Group, Inc.*, 481 F. App'x 462, 465-66 (11th Cir. 2012) (genuine issues of material fact, as to whether employer exercised reasonable care in responding to employee's complaint of supervisor's sexual harassment, precluded summary judgment for employer on constructively discharged employee's claim on basis of *Ellerth/Faragher* affirmative defense to vicarious liability).

subpoena she served on him directs him to produce "documents reflecting draft and final billing work done by, or under the supervision of, Mr. Gerard and related to complaints relating to personnel matters made by [defendants'] employees. . . ." *Id.* at 2. Plus she wants documents "related to [defendants'] human resource management issues. . . ." *Id.* Jackson, in the meantime, moves to compel defendants to produce those documents. Doc. 111.

Insisting that they have only *preserved* the right to raise the *Ellerth/Farragher* defense,[10] "do not intend to rely on any documents generated by Gerard to defend their case," doc. 93 at 3, and will not "present Gerard as a witness to support" that defense, *id.* at 8, defendants seek a protective order limiting Gerard's deposition to only three areas: "1) to rebut Jackson's claims that she complained directly to

---

[10] The deposition testimony before this Court shows that defendants have affirmed the existence of a complaint mechanism which, until the defense is formally withdrawn, plaintiff is permitted to litigate as if they will rely upon it at trial to insist that they did everything they reasonably could do with what information Jackson presented. *See* doc. 116-10 at 9-10 (Gerard deposed that Jackson complained to Schumacher, who then kept him "in the loop"). To "reserve" a defense is, functionally speaking, no different from asserting it in a case. To conclude otherwise would permit defendants to hedge their defenses for the purpose of curtailing discovery, then spring them at trial. The days of trial by ambush, however, are over.

him about sexual or racial harassment; 2) to testify about complaints of 4 EEOC claimants in early 2009 who allegedly directed complaints toward Jackson, not Hiers; and 3) to speak to two meetings held with Jackson, Hiers, and CFO Karl Schumacher (one following the 2009 EEOC mediations and one in 2010)." Doc. 93 at 8.

Jackson wants more -- the records specified in her written discovery, as noted *supra*. Doc. 116 at 8. They will contain, she contends, "the best summary of the date, amount of time, and persons with whom he communicated in either passing complaints along within the Deen hierarchy or investigating them himself. These records will provide a road map of whether [d]efendants -- as they claim -- actually attempted in good faith to enforce a non-discrimination policy or, as [p]laintiff contends, did nothing because they knew or believed that Paula Deen would do nothing to her baby brother, no matter how bad his conduct." *Id.*

And the defendants, Jackson insists, simply ignore the very corporate design *they* implemented, one which placed Gerard into the very center of the disputed issues here. Doc. 116 at 2. She cites Gerard's own testimony on that score, where he confirmed that Jackson usually

complained to CFO Karl Schumacher, who would then keep Gerard in the loop. *Id.* at 2-3; *see also* doc. 119-10 at 13-14. Plaintiff also points out that her discovery quest is not limited to the evidence *defendants* seek to adduce, but also to what she intends to prove her case or use to impeach their defense. *Id.* at 3. She is entitled to prove that management deliberately ignored her complaints and thus intentionally or negligently exposed her to the "Hiers" harm recounted above. *Id.* at 3-5.

Jackson also illuminates the fact that defendants have "steadfastly denied that [she] made any complaints. . . ." Doc. 116 at 5. She insists she is "not limited to discovery of [d]efendants' cherry picked information for the purpose of rebutting the affirmative defense. [She is] entitled to full information regarding all complaints of harassment and discrimination and [d]efendants' response, even if such information might otherwise be privileged." *Id.* at 16.

Finally, Jackson reasons that defendants' assertion of the *Ellerth/Faragher* affirmative defense effective waived both the attorney-client privilege and the attorney work-product doctrine as to any information pertinent to the validity of the defense. Doc. 116 at 10-18.

Jackson's motion carries the day here.  Courts have applied the waiver

doctrine in this context because they

> have found it unfair and illogical to allow an employer to assert the
> reasonableness of an investigation as an affirmative defense, and,
> at the same time, withhold relevant evidence under the guise of
> privilege or work product protection. In such situations, courts
> have found implied waivers as to documents generated in a sexual
> harassment investigation, where the employer asserts as an
> affirmative defense that it exercised reasonable care to prevent and
> correct promptly any discriminatory or sexually harassing
> behavior. *See Angelone v. Xerox Corp.*, No. 09–cv–6019–CJS, 2012
> WL 537492, *3 (W.D.N.Y. Feb. 17, 2012).

*Walker v. N.H. Admin. Office of the Courts*, 2013 WL 672584 at * 6

(D.N.H. Feb. 22, 2013); *see also McGrath v. Nassau County Health Care

Corp.,* 204 F.R.D. 240, 243–44 (E.D.N.Y. 2001) (privileges as to

investigation were waived when the investigation's sufficiency or

adequacy is placed in issue by the defendant).   Defendants cannot

"merely preserve" this defense.  If they reserve the right to use it at trial

then it is in play during the discovery phase of this case.  *See supra* n. 11.

Also, where an employer fuses his attorney's role as a legal adviser

with that of an investigator/monitor, then the attorney-client privilege

and work product privileges are waived as to any evidence relevant to

that attorney's investigation and monitoring of compliance with the

company's *Ellerth-Farragher* procedures (including documents counsel generated, and his personal recollection testimony). *United States v. Dish Network, L.L.C.*, 283 F.R.D. 420, 423-24 (C.D. Ill. 2012) (in suit against telecommunications provider for allegedly making improper telephone solicitations to telephone numbers that were on National Do Not Call Registry, in which provider asserted, by way of defense, that it had procedures in place to prevent such improper telemarketing and used its attorneys to investigate and monitor compliance with these procedures as required by "safe harbor" provision of federal telemarketing regulations, provider waived attorney-client privilege as to evidence relevant to attorneys' investigation and monitoring of compliance with its procedures by using its attorneys both as legal advisors and as investigators/monitors).  As that court explained, after noting the above Title VII waiver upon the advancement of the *Ellerth/Farragher* defense: "One cannot assert the attorney/client privilege to keep an opponent from discovering facts about an investigation when the investigation is to be used at trial as a defense to defeat the opponent's allegations."  *Id.* at 424 (quotes and cite omitted). Still, once any corporate investigation of an employee's complaints shifts

to defending against her EEOC claims, the resulting documents became privileged. *Angelone*, 2012 WL 537492 at * 3.[11]

Meanwhile, "communications between a client and an attorney made in the presence of third parties are usually not privileged as the presence of the third parties may undermine the confidentiality requirement for the attorney-client privilege or waive the privilege, and similarly, a client's disclosure to a third party of a communication made during a confidential consultation with his or her attorney eliminates whatever attorney-client privilege that the communication may have originally possessed." Ann., *Applicability of Attorney-Client Privilege to Communications Made in Presence of or Solely to or by Family Members or Companion, Confidant, or Friend of Attorneys or Client or Attesting Witnesses for Client's Will*, 67 A.L.R.6th 341 (2011). "On the other hand, certain peoples' presence, especially relatives, friends, or the like, may not affect the privileged nature of the discussion because these persons are necessary to the success of the consultation." *Id.*; *see also Morgan v. Morgan*, 288 Ga. 417, 420 (2011) (attorney removed privilege by

---

[11] So far as this Court can tell, all of what Jackson seeks here is pre-EEOC phase information.

publishing cover letter to non-client); *Hanson v. U.S. Agency for Intern. Dev.*, 372 F.3d 286, 294 (4th Cir. 2004) ("Implied waiver occurs when a party claiming the privilege has voluntarily disclosed confidential information on a given subject matter to a party not covered by the privilege."); 81 AM. JUR. 2D WITNESSES § 336 (Feb. 2013) ("If the client discloses attorney-client communications to unnecessary third parties, the client manifests an intent to waive confidentiality.").[12]

Under these guiding principles, the Court **DENIES** defendants' motion for a protective order (doc. 93), and **GRANTS** plaintiff's motion to compel, doc. 111, to this extent: Gerard may be re-deposed, and prior to his re-deposition defendants shall comply with Jackson's written discovery requests. Jackson is free to depose Gerard on these areas: (1)

---

[12] Much debate during the Gerard deposition, which was terminated in contemplation of rulings on the instant motions, turned on whether Gerard waived any privilege by communicating with one Barry Weiner and others in the room with his clients or by copying him on written attorney-client communications. *See* doc. 111 at 4-6. The Court rules that, unless any such individual was a direct *employee* (hence, not a mere independent contractor "consultant") of a defendant or attorney Gerard, their presence waived the privilege asserted, and discovery shall therefore proceed accordingly (i.e., defendants shall produce all requested paper-based discovery and provide deposition answers heretofore blocked by objection). Jackson has also shown enough evidence that Gerard acted as management as much as he did corporate counsel when it came time to address employee complaints (Jackson's, primarily) about Hiers' conduct. *See* doc. 116 at 10-11, 14-15.

to rebut Jackson's claims that she complained to him or others in management about her claims of discrimination and sexual harassment; (2) to testify about complaints of four EEOC claimants in early 2009 who allegedly directed complaints toward Jackson, not Hiers; (3) to speak to any meetings held with Jackson, Hiers, and Schumacher (one following the 2009 EEOC mediations and one in 2010); and (4) to address any other instances involving Gerard, including discrimination complaints from other employees, so long as they are related to his "in the loop" role in application of the defendants' *Ellerth-Farragher* defense machinery. Exempted from this is any portion of any document containing Gerard's legal opinion in anticipation of EEOC administrative action or litigation, and any of Gerard's testimony relating to same.

Defendants must also produce, ahead of his re-deposition, Gerard's billing and legal opinion documents (including the portions of any emails, memos, etc.), related to any "fused" role[13] that he played. He also may be asked about any opinions or advice he gave to any of the defendants

---

[13] That is, in performing as an attorney *and de facto* Human Resources Department.

when a non-client was present (again, the presence of a non-client neutralizes the attorney-client privilege).

## C. Jackson's Motion to Compel -- "Blooper Videos"

Jackson moves this Court to compel Paula Deen to produce "blooper" or out-take videos she made in another commercial pursuit now tied up in a sealed "Celebrity Chef's" litigation settlement pending in another district. Doc. 92 at 3; doc. 123. Citing the liberal relevance standard for obtaining discovery,

> Ms. Jackson alleges numerous facts supporting her claims of gender-based hostile work environment, gender discrimination in compensation, negligent failure to prevent sexual harassment and ratification of harassing conduct. *See* Second Amended Complaint [Doc. 47, Second Amended Complaint, ¶¶ 16-127] Defendant Earl W. "Bubba" Hiers is the subject of most of those allegations, but discriminatory conduct based on gender and negligent failure to prevent such conduct is also alleged on behalf of Defendant Paula Deen. [*Id*. at ¶¶ 18, 21, 27, 32, 34, 39, 61, 62, 76, 81, 85, 89, 101, 102, 103, 113, 114] Moreover, there exist numerous videos of Ms. Deen engaging in sexually suggestive conduct in public appearances across the nation.

Doc. 92 at 4; *see also* doc. 60 at 4-25 (lengthy factual narrative asserted in plaintiff's portion of the parties' Joint Status Report); doc. 123 at 3 ("[t]he videotapes were made under the auspices of Paula Deen

Enterprises, LLC, one of two defendants in Celebrity Chef's litigation and a [d]efendant in this litigation.").

Jackson wants those videos, she explains, because they are believed to contain Deen's "sexually suggestive comments with a live audience" and thus are relevant here. Doc. 92 at 4-5. "The relevance of Ms. Deen's conduct," she further explains, "arises from her co-ownership of Ms. Jackson's primary work place, Uncle Bubba's Seafood & Oyster House, Inc. (Uncle Bubba's restaurant), and from her authority and control over Bubba Hiers who was the purveyor of day-to-day sexually charged and harassing conduct in this workplace." *Id.* at 5. A corporate CEO has testified, Jackson says, that only Deen could control her brother, and thus "evidence tending to show that she is as openly foul-mouthed with, and accepting of, sexually charged comments as him is relevant to rebut Defendants' defenses to claims of negligence under state law and Defendants' affirmative defenses to Title VII and § 1981 – defenses stating that Paul Deen Enterprises, Inc., exercised reasonable care to prevent and promptly correct the behavior." *Id.* at 5-6.

Finally, "Jackson was present in the workplace of Uncle Bubba's restaurant when Ms. Deen was engaging in the same sort of conduct

alleged in the Celebrity Chef's litigation." Doc. 123 at 3-4. Plaintiff points out that "Ms. Deen will also have a full opportunity to explain why her videotaped conduct in the Celebrity Chef's litigation submitted for publication to numerous audiences [Doc. 92, Exhibit B, Counterclaim ¶ 45, p. 23], is conduct she might condone (or prohibit) in the workplace of Uncle Bubba's Seafood & Oyster House, Inc. as co-owner of that restaurant and as the only one who could control the alleged (and admitted) conduct of her brother and co-owner, Earl W. 'Bubba' Hiers." *Id.* at 4.

Jackson thus wants to exploit the "aided-by-agency" concept expressed in cases like *Mikels v. City of Durham*, 183 F.3d 323, 332 (4th Cir. 1999) ("Any harassing conduct that culminates in a tangible employment action against the victim is necessarily conduct aided by the agency relation, since it can only be taken by supervisory employees empowered by their employers to take such action.") (quotes and cite omitted). Doc. 92 at 7. Plus, the wantonness plaintiff must show to recover punitive damages[14] makes relevant Paula Deen's conduct to the

---

[14] The defendants move to dismiss Jackson's negligence and emotional distress claims because, they contend, she has failed to allege facts meeting the physical impact rule -

extent it may be shown to be cut from the same cloth as her brother's, and this would help prove to the factfinder that Hiers' ill behavior was consciously tolerated, rather than meaningfully interdicted. Doc. 92 at 6-7.

Paula Deen's conduct in the subject videos, Jackson concludes, "is relevant to explain conduct of other supervisory employees in other parts of the integrated [Deen] corporate enterprise, and is certainly relevant to the conduct of Mr. Hiers, over whom [Deen] has substantial and control

---

- the alleged misconduct was directed at others, she otherwise suffered no physical or tangible loss, and these two facts combine to doom her negligence and emotional distress claims. Doc. 57 at 1, 5-10; doc. 58 at 9-15; *see also* 56 AM. JUR. PROOF OF FACTS 3D 1 (Feb. 2013) ("The physical impact need not be great in order to satisfy the physical impact rule requirement. Under the rule, there must, however, be some level of physical contact resulting in physical injury in order to sustain a recovery under a pure negligence theory. Absent physical impact and injury, a plaintiff can recover for emotional distress only under the more rigid theory of intentional infliction of emotional distress in those states that follow the doctrine.") (footnotes omitted).

Defendants thus contend that Jackson is not entitled to discovery on that score. But Jackson is alleging intentional emotional distress and wanton conduct, thus obviating the need to show physical impact. Doc. 47 at 38 ¶ 159. Defendants insist she has not pled enough facts to show wanton conduct. Doc. 57 at 7; doc. 58 at 13. Again, the dismissal motion is before the district judge, but it is sufficient to note here that Jackson's "wanton" conduct allegations are not facially fantastic (thus, immediately dismissible), and that is sufficient to support discovery requests in search of "wantonness" evidence which, in turn, supports punitive damages. O.C.G.A. § 51–12–5.1(b) (noting that punitive damages are available in tort only where defendants' actions showed "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences"), *cited in Fields v. Atlanta Independent Sch. Sys.*, ___ F. Supp. 2d ___, n. 44, 2013 WL 69212 at * 23 n. 44 (N.D. Ga. Jan. 4, 2013).

and with whom she shares equal ownership in the corporate entity Uncle Bubba's Seafood & Oyster House, Inc." Doc. 92 at 8. "An individual accepting of sexually charged conduct in a public forum and among those working around her is less likely to perceive a need to correct similar conduct of those over whom she might exercise authority and control." *Id.* "Ms. Deen's conduct," Jackson emphasizes, "is relevant not only to [d]efendant['s *Ellerth/Faragher*] defenses" but also to defendant's defenses to state law claims like negligence,[15] along with plaintiff's ratification contention. Doc. 120 at 8-9.

Finally, plaintiff cites Fed. R. Evid. 401 (defining evidential relevancy as anything having "any tendency to make a fact more or less probable than it would be without the evidence"), and Fed. R. Evid. 404(b)(2) in arguing that the videos constitute evidence of conduct

---

[15] "A plaintiff states a claim for negligent hiring and retention if the employer, in the exercise of reasonable care, should have known of an employee's reputation for [gender and racial] harassment and that it was foreseeable that the employee would engage in [gender and racial] harassment of a fellow employee but he was continued in his employment." *Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d 1280, 1329 (N.D. Ga. 2009) (quotes and cite omitted; brackets original); *see also id.* (negligent hiring and retention claims are derivative and cannot survive without an underlying tort); *Hajhossein v. Mayor and City Council of Statesboro, GA*, 2010 WL 2179147 at * 2 (S.D. Ga. May 28, 2010); 56 AM. JUR. PROOF OF FACTS 3D 1, *Proof of Employer Negligence in Hiring and Supervision of Employee with Propensity Toward Workplace Sexual Harassment* (2013).

"relevant to show motive, intent, and plan with respect to denigration of women in the workplace of the corporate enterprise." Doc. 92 at 8. "In summary, yes, the videotape would reflect exactly how Ms. Deen's company, Paula Deen Enterprises LLC is managed, and the images and other components of the videotape offer evidence demonstrating how Ms. Deen, a controlling corporate officer of a single employer 'Family of Companies,' manages that family of companies, including [Uncle Bubba's]." Doc. 123 at 4.

Defendants oppose the motion, doc. 109, and move for a protective order against having to respond to any further such video inquiries. Doc. 108. They insist that Jackson did not cite the videos in her Amended Complaint and never expresses any offense by them. *Id.* at 2-3. They emphasize Deen's litigation efforts to keep the video reel "under lock and key in a corporate office." *Id.* at 5. They remind that it was not shot at Uncle Bubba's and that Jackson has never even seen the video. *Id.* Finally, they emphasize that Deen is not accused by Jackson of participating in any sexual harassment against her. *Id.* at 6. Plaintiff's quest here, they contend, is mere "pretext for her continued efforts to

pressure a public figure." *Id.* In short, this discovery is irrelevant and harassing. *Id.* at 7-21.

Jackson prevails here. Even a casual internet surfer "Googling" "Paula Deen Video" can quickly find an online video of her exhibiting similar behavior, most notably the New York Post's September 22, 2012's "exclusive" online video of her "bloopers." *See* http://www.nypost.com/p/news/local/manhattan/the_main_coarse_RqZDJ FR0qg3K44owIwcHxO (site last visited April 3, 2013). That video depicts Ms. Deen engaging in a mock sex act with a chocolate éclair and making a crude reference to the female genitalia. It may be used to impeach any denial that she passively fostered, much less failed to interdict, a pervasively hostile sexual environment.[16] Arguably the Post's

---

[16] As noted *supra,* plaintiff has raised a sexual harassment claim against the Bubba Hiers defendants, along with Paula Deen to the extent Deen co-owns Uncle Bubba's and is alleged to have been in a position to control him: "Bubba Hiers subjected [Jackson] to sexual harassment nearly every single day [that she] came to work for over five (5) years." Doc. 47 at 14 ¶ 48. He frequented porn sites on the internet and left viewable porn on his computer screen in a shared work area for plaintiff and others to see. And, he frequently demanded that she watch it with him. Plus the email address that the two shared fetched porn emails. *Id.* ¶ 49; *see also* doc. 120-1 at 4-5.

"On more than one occasion, Bubba Hiers [asked Jackson to] bring pictures of herself when she was young for him to view. He told her 'you have nice legs' and that two other employees were 'fat girls,' commenting that (because of their weight)

publicly available video ought to be ample enough, rendering the instant videos cumulative. But that is an at-trial, not a discovery standard, and it cannot be denied that the video sought here may contain even more compelling information leading to admissible evidence that management here openly tolerated (*i.e.*, it could not be bothered to prevent) a hostile sexual environment, which otherwise demands a reasonably heavy layer of proof to survive dismissal.[17] Jackson is **DIRECTED** not to disclose the video or file it in the Court's record absent further Court order. Defendants' motion for a protective order, in turn, is **DENIED**. Doc. 108.

---

they did not need to be wearing capri pants or skirts." Doc. 47 at 15 ¶ 50. He made them wear long sleeves but did not alter the dress code for males. *Id.* Jackson also lists a series of offensive comments (oral sex, etc.) Hiers made in her presence. *Id.* ¶¶ 51-57. Jackson cites several factors that formed the climactic moment when she quit, including the moment Hiers, then visibly drunk, accosted her during a dinner she had put on for the Uncle Bubba's restaurant vendors. Hiers entered the room and kissed her on the cheek and announced to the group, "I love her. She is my boss and she isn't going anywhere." Doc. 47 at 29 ¶ 115. Plaintiff was personally and professionally embarrassed. *Id.* at 30 ¶ 116.

[17] *See Guthrie v. Waffle House, Inc.*, 460 F. App'x. 803, 809 (11th Cir. 2012); *Moore v. Corporate Facilities Management, L.L.C.*, 2012 WL 4329288 at * 9 (N.D. Ala. Sep. 17, 2012) (collecting cases); *Breda v. Wolf Camera, Inc.*, 148 F. Supp. 2d 1371, 1378-79 (S.D. Ga. 2001); *Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004).

**D. Excess Depositions**

Defendants move the Court for leave to take more than the ten depositions authorized by Fed. R. Civ. P. 30(a)(2) and Local Rule. 7.7. Doc. 85. They say that plaintiff has identified over 50 witnesses and some have not panned out for her, *id.* at 2, 6, while others simply will not speak to defense counsel, *id.* at 3-4, and federal law prohibits them from contacting the five physicians she identified as having provided her with medical care. *Id.* at 4. Defendants say that Jackson at first refused to consent to that contact but then conditionally granted them. *Id.* at 4-5. She also continued to identify new witnesses late in discovery. *Id.* at 5. Worse, she misrepresented some of the witnesses' knowledge concerning her claims. *Id.* at 5-6. And, defendants insist, she just plain lied. *Id.* at 7 ("Plaintiff also falsely asserted in her pleading and deposition numerous other circumstances regarding the Big Will Incident."). She has forced defendants to chase a lot of rabbits, and "mini-try" incendiary allegations that they insist they can prove to be largely false. *Id.* at 8. They also note that there are six defendants, so it is fair to allow them to exceed the "ten-deposition" collective limit imposed by Rule 30. *Id.*

Jackson accuses the defendants of bad faith because the parties had already agreed to 18 depositions, doc. 94 at 3-4, and defendants have selectively cited from existing depositions to suggest falsity when in fact they bear "strong evidence supporting [Jackson's] claims." Doc. 94 at 4-5 (she claims that Hiers has admitted to viewing pornography on premises, to having been in rehab for alcohol and cocaine addiction, and to using the word "nigger" in the workplace; "He has even admitted to be a thief, stealing $30[,]000 from his own sister, a theft which he had no intention of revealing, until he got caught by Ms. Jackson, who reported it to the corporate CPA. . . ."). In short, Jackson accuses the defendants of "Play[ing] Fast and Loose With The Facts." *Id.* at 7. And, a large portion of the witnesses they seek to depose are defendants' own employees. *Id.* at 8. Defendants thus have not engaged in a good faith effort to resolve this particular discovery dispute, Jackson concludes. *Id.* at 9. She wants her costs and attorney fees from them. *Id.*

Defendants reply that they thus far have taken 14 depositions and three of those deponents "provided testimony that did not match the disclosures made by [p]laintiff." Doc. 100 at 2. Defendants want to depose 6 more. *Id.* at 2-3. "The vast majority of the depositions that the

defendants have taken thus far," say the defendants, as well as the next 6, "are of witnesses that are either unavailable to defendants by law or have made themselves unavailable to defendants through their refusal to speak with defense counsel." *Id.* at 3.

Defendants remind the Court that it was Jackson who filed a 53-page Second Amended Complaint and who "has identified over 50 persons as having knowledge or information that would support her claims (when subsequent discovery efforts have revealed that some of these persons lacked the information Jackson claimed they had)." Doc. 100 at 5. They reiterate that they cannot know who will cooperate and who will not until they contact individuals disclosed by Jackson, so they would prefer no cap at this time but request, in the alternative, leave to take the 20 depositions identified in their latest brief plus any Jackson may identify but are revealed to be "unavailable" (via legal privilege or simply refused to communicate informally).

This exceptional case has involved a *lot* of acrimony, even between the lawyers (the disqualification brief, doc. 101, plaintiff's responses, doc. 117 & 129, and defendants' reply, doc. 130). And from the deposition excerpts cited thus far, it seems likely that any trial in this case will

reveal some painful truths, especially if the district judge denies the pending dismissal motions and the race-based claims go to trial. A full and fair opportunity to sift and sort the truth, especially since time erodes all human memory, can trump the otherwise important, docket-managing task of enforcing time deadlines. The defendants' motion (doc. 85) is **GRANTED**, and the Court authorizes up to 25 depositions in this case. That number will be reduced should the district judge dismiss any substantive claims during the next discovery period discussed below.

### E. The Schumacher Recording

In July 2010, Lisa Jackson recorded her telephone conversation with Karl Schumacher, the Deen companies' CPA and also Jackson's superior. Doc. 47 at 6 ¶ 18; doc. 101-1 at 219. She has agreed to disclose it to the defendants as soon as a third party service could retrieve it off of her phone system. Doc. 101-1 at 219-220. During her February 11, 2013 deposition she thought that might take "another 24 hours. *Id.* at 220. On March 7, 2013 -- with discovery closing that day -- the Deen defendants protectively moved to compel her to turn the recording over to them. Doc. 107. They "do not believe that Plaintiff has willingly or intentionally attempted to hide the tape." *Id.* at 2.

Jackson says the image of the document she possesses exists on electronic form on her computers "but the inner contents of the document appear to have been wiped clean by a hacker, mistake or otherwise." Doc. 124 at 1. To date, her efforts to have the recording professionally restored have been unsuccessful. *Id.* at 1-2. She has kept defendants informed of this, and even put them in touch with the professional technician. *Id.* at 2. She complains that the defendants have since hounded that technician with a deposition subpoena and contempt motion. She assures that she wants the lost audio file perhaps even more than the defendants do. *Id.* at 2-3. Her counsel has contacted another technician, and plaintiff will promptly turn over any productive yield. *Id.* at 3-4. This motion is **DENIED** as moot. Doc. 107.

## F. Text and Social Media Messages

Defendants move to compel Jackson to produce certain text messages in her possession. Doc. 110. During her deposition Jackson testified that she had had contact with defendants' employees since she quit. Doc. 110-4 (deposition excerpts from her full deposition at doc. 101-1). Defendants sent her Fed. R. Civ. P. 33 interrogatories and Fed. R. Civ. P. 34 document requests aimed at preserving and obtaining copies of

those communications, including any electronic text messages. Doc. 110 at 1-2. Jackson responded by invoking the attorney client privilege and otherwise asserting that the request is, *inter alia*, overbroad. *Id.* at 2. Subject to those objections, she insisted that she had no documents not already produced. *Id.*

Defendants, in turn, objected because she failed to verify her interrogatory response, so they move to compel her to do so now. *Id.* at 2-4. They also appear to disbelieve her document-production response. *Id.* at 7-9. Jackson says defendants misread her documentation, and that she in fact did verify her discovery response. Doc. 127 at 2-3. The Court accepts that. To that extent, then, the defendants' motion to compel is **DENIED**.

But Jackson also stands on her overbroad objection, contending that defendants' "request is unlimited in time" and "subject matter." *Id.* at 3. It would cover, she says, "over 500 employees." *Id.* And the request is not qualified "regarding relevance to the harassment or relevance to the emotional or other damages [plaintiff] suffered as a result of the conduct alleged by her." *Id.* at 3-4.

The Court agrees with Jackson that defendants want documentary communications "sent to or received from any employee of any Defendant to this action," doc. 110 at 3; *see also* doc. 127 at 3, and that that request is overbroad. The Court also agrees that discovery "is not so liberal as to allow a party to roam in the shadow zones of relevancy and to explore a matter which does not presently appear germane on the theory that it might conceivably become so." *Collins v. Worley Catastrophe Response, LLC*, 2012 WL 1447592 at * 2 (M.D. Fla. Apr. 26, 2012) (quotes and cite omitted). A request so broad could easily ensnare information that is simply not relevant to Jackson's claims.

The motion (doc. 110) is therefore **DENIED**. However, within 7 days the defendants may more narrowly re-request the documents consistent with the foregoing parameters, and Jackson shall respond within 7 days. To the extent she in good faith claims *party* work product privilege,[18] and has *not* waived it by "electronically airing" (tweeting,

---

[18] The work product privilege is not limited to lawyers, but instead extends to parties who take steps (e.g., collecting and assembling information) in anticipation of litigation. *See, e.g.*, *Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1023 (7th Cir. 2012) (government consultant's reports on paper companies' responsibility for contamination of river were work product protected from discovery under Freedom of Information Act).

Facebook-publishing, etc.) her communications with third parties, she may object. But she may not block discovery to the extent she merely assembled information. *Riddell Sports Inc. v. Brooks*, 158 F.R.D. 555, 559 (S.D.N.Y. 1994) ("But the collection of evidence, without any creative or analytic input by an attorney or his agent, does not qualify as work product."); *Fed. Housing Finance Agency v. UBS Am., Inc.*, 2013 WL 1234947 at * 5 (S.D.N.Y. Mar. 26, 2013); S.*R. Int'l Bus. Ins. Co. v. World Trade Ctr. Props. LLC*, 2003 WL 193071 (S.D.N.Y. Jan. 29, 2003) (holding that "it is the thought processes of the attorney that are entitled to protection; underlying facts are always discoverable. Thus, if a document . . . merely sets forth facts that were reported to the attorney, and there is no realistic way that their disclosure would create 'a real, nonspeculative danger of revealing the lawyer's thoughts,' that document is not protected as work product.") (cites omitted).[19]

---

[19] Relatedly, defendants seek the same from Jackson's partner, Priscilla Summerlin, who appeared for a subpoenaed deposition without any documents or objections thereto (defendants thus want to have the Northern District hold her in contempt). Doc. 110 at 6. Jackson relates that that court denied the motion. Doc. 127 at 7 n. 4. Hence, defendants' motion to compel on that score is denied as moot. Doc. 112.

## G. Sealed Court Records

The record in this case is burdened with sealed documents. Docs. 80, 90, 101, 108, 109, 117, 129, 130, & 131. To enable filings for expeditious ruling, the Court has permitted them. Docs. 97 & 104. And because the Court has recapitulated information from some of those records here, it has sealed this Order. Yet "a common law right of access exists as to civil proceedings. What transpires in the courtroom is public property. And open proceedings may be imperative if the public is to learn about the crucial legal issues that help shape modern society. Informed public opinion is critical to effective self-governance." *Fed. Trade Comm'n v. Abbvie Products LLC*, ___ F.3d ___, 2013 WL 1149311 at * 14 (11th Cir. Mar. 21, 2013) (quotes, cites and alterations omitted).

That is why there is a presumption of public access to court records, *IDT Corp. v. eBay*, ___ F.3d ___, 2013 WL 490751 at * 2 (8th Cir. Feb. 11, 2013), which is conjoined with "a presumption of openness in all legal proceedings." *United States v. Ignasiak*, 667 F.3d 1217, 1238 (11th Cir. 2012); *see also id.* at 1237-39 (upholding defendant's First Amendment right of access to government's post-trial pleading, which

revealed impeachment information of one of its key witnesses, rejecting government argument that the witness's privacy interest justified keeping the information under seal); *In re Access to Jury Questionnaires*, 37 A.3d 879, 885–87 (D.C. 2012) (there is a First Amendment right of access to written juror questionnaires).

That also is why only the most extraordinary circumstances and compelling reasons justify sealing any court record. *Brown v. Advantage Engineering, Inc.*, 960 F.2d 1013, 1015-16 (11th Cir. 1992); *Bright v. Mental Health Resource Center, Inc.*, 2012 WL 868804 at * 3-4 (M.D. Fla. Mar. 14, 2012) (settlement does not justify sealing); *Brown v. United States*, 2008 WL 4593386 at * 4 (S.D. Ga. Oct. 14, 2008) (enforcing Eleventh Circuit "open records" policy); *Snethen v. Bd. of Public Educ.*, 2007 WL 2345247 at * 1 (S.D. Ga. Aug. 15, 2007) ("Specifically, parties must provide grounds for why they want something kept from the public, as there is a presumption against secrecy"). And outside of legislatively drawn boundaries (e.g., medical records), an adult's personal

embarrassment is simply not a compelling enough reason to seal a court record.[20]

Within 14 days of the date this Order is served, any party with standing may show why this Order should not be unsealed, as well as the other sealed filings (docs. 80, 90, 101, 108, 109, 117, 129, 130, & 131). The Court is aware that personal, intimate matters have been discussed here, but they are relevant to the plaintiff's claims, it is reasonably likely (given the mental-stress based claims animating the core of this case) that they will be illuminated at trial, and unless the parties believe that they can also close the trial to the public -- an even more rare and extraordinary event than sealing court records -- it contravenes

---

[20] *See Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1246-47 (11th Cir. 2007); *United States v. Bradley*, 2007 WL 1703232 at * 4 (S.D. Ga. June 11, 2007) ("'informational oxygen' is indispensable to a court system that cannot function without public trust and respect."); *United States v. Sattar*, 471 F. Supp. 2d 380, 385 (S.D.N.Y. 2006) (letter from defendant's counsel transmitting psychiatric report concerning defendant, as well as report itself, were "judicial documents," to which common-law presumption of public access attached, notwithstanding that court did not find such documents to be useful and did not rely on them, where they were submitted to court to provide information with respect to crucial judicial function of sentencing); Stephen Wm. Smith, *Kudzu in the Courthouse: Judgments Made in the Shade,* 3 FED. COURTS L. REV. 177, 215 (2009) ("A court's inherent power to supervise its own records does not include the power to undermine the source of its own legitimacy. Transparency is the *sine qua non* of the common-law tradition we have inherited; without it, the snakes come.").

established precedent to seal such matters up here.  Plaintiffs who place their past and private personal affairs in issue by seeking damages for mental health injuries must bear the burden of exposure in a court system premised on *public* access.[21]

## III. CONCLUSION

The Court **GRANTS** defendants' IME motion, doc. 70, as well as their motion for leave to take excess depositions.  Doc. 85.  Plaintiff's motions to compel (docs. 92 & 111) are **GRANTED** and the defendants'

---

[21] "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *United States v. Big Leggins*, 375 F. App'x 692, 693 (9th Cir. 2010) (quotes, alteration and cite omitted); *Milam v. Dominick's Finer Foods, Inc.*, 567 F.3d 830, 831 (7th Cir. 2009) (unsealing of affidavit submitted in support of plaintiffs' motion to set aside dismissal because of excusable neglect was warranted on appeal of judgment in favor of defendants, even if affidavit would potentially cause embarrassment and affect counsel's personal and professional reputation by disclosing personal matters); *United States v. Foster*, 564 F.3d 852, 855 (7th Cir. 2009) (risk of embarrassment and effect on plaintiff counsel's personal and professional reputation by disclosing personal matters was not a sufficient reason to maintain secrecy of affidavit submitted under seal to support motion to set aside dismissal for excusable neglect, even though plaintiffs claimed that grant of motion to set aside dismissal was not an issue on appeal; just what the neglect entailed and why it was excusable were questions in which public had legitimate interest and defendants needed to address issue of whether prior motion was relevant to appeal); *Huntington Nat. Bank v. Greenwood Place, LP*, 2012 WL 692601 at * 3 (S.D. Ind. Mar. 2, 2012) ("potential embarrassment to a stakeholder in a lawsuit does not warrant maintaining information under seal.").

motions for protective orders (docs. 93 & 108) are **DENIED**. The defendants' motions to compel (docs. 107, 110 & 112) are **DENIED**.

Finally, some housekeeping points. The Court stayed discovery. Doc. 103. At the Friday, April 5, 2013 hearing, the parties shall be prepared to hammer out a 45-day discovery schedule, consistent with a summer trial in this case. Meanwhile, any party who has filed an incomplete document (*e.g.*, a deposition "to be filed" or a deposition transcript with redacted information) shall ensure that the record is complete.[22]

This 3rd day of April, 2013.

*J.R. Smith*
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

[22] All parties shall file "final print" versions of any "draft" depositions in the record. To cut down on record confusion, they are directed to work with the Clerk in filing, within docket entries currently bearing "draft" or "to be filed" deposition transcripts, the final version of same. If that cannot feasibly be done, then they shall make an effort to file the updating documents in the least confusing manner. The goal is for anyone to be able to review a brief and access the finalized version of a transcript without having to go looking for it.