# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

LISA T. JACKSON,                          )
                                        )
        Plaintiff,                       )
                                          )
v.                                        )          Case No. CV412-139
                                          )
PAULA DEEN,                               )
PAULA DEEN ENTERPRISES, LLC,              )
THE LADY & SONS, LLC,                     )
THE LADY ENTERPRISES, INC.,               )
UNCLE BUBBA'S SEAFOOD AND                 )
OYSTER HOUSE, INC., and                   )
EARL W. HIERS,                            )
                                          )
        Defendants.                      )

## <u>ORDER</u>

In this employment-discrimination case against celebrity chef Paula Deen, her brother Earl W. Hiers, and their corporate entities, the Court temporarily sealed its last order and directed the parties to show why it and other documents should not be unsealed. Doc. 132 at 45-46.[1] In response, plaintiff Lisa T. Jackson moves to keep some documents sealed. Doc. 144. Hiers wants all of the documents unsealed. Doc. 147

---

[1] The Court is citing to the page numbers created by its electronic docketing software. They may not always line up with the actual, printed-page numbers.

at 2.   But he also wants to "redact" (hence, seal) currently unsealed references to his past medical treatment, including ten words in that order.   *Id*.   The remaining defendants have not responded and thus do not object to any unsealing.   Both sides, meanwhile, move to compel discovery.   Docs. 140 & 141.   The defendants move to withdraw a "reserved" defense.   Docs. 133 & 134.   They also move for reconsideration of parts of the April 3rd order.   Doc. 135.

# I. ANALYSIS

## A. Sealed Records

### 1. The April 3, 2013 Order

The April 3, 2013 order quoted from sealed records.   Rather than issue it with parts redacted, the Court tentatively sealed it, cited transparency precedent, then directed the parties to show why the order and various other sealed filings should not be unsealed.[2]   Doc. 132 at 43-

---

[2]   Pursuant to Fed. R. Civ. P. 5.2(d), a court "may order that a filing be made under seal without redaction," but "may later unseal the filing. . . ."

46.  In that no one objects,[3] the Clerk is **DIRECTED** to unseal that order.

### 2. Other Filings

Jackson wants the Court to continue sealing -- at least "until this case is resolved" -- the defendants' disqualification filings and other matters located at docs. 101, 109, 117, 129, & 130.  Doc. 144 at 3.  Some background: The defendants moved to disqualify Matthew Billips, one of Jackson's two lawyers, because of internet comments ("Twitter tweets")[4] he made about, *inter alia*, Paula Deen and this case.  They filed their motion "on 3/1/2013 at 5:20 PM EST," doc. 101, thus after the Clerk's office closed on a Friday afternoon, which meant that Jackson had to wait until Monday, March 4, 2013 to file "Plaintiff's Emergency Motion to Seal and Request for Immediate Conference," doc. 102 in which defendants declined to join.  Doc. 102-1 at 2-3.

---

[3]  By separate motion, Hiers would like the Court to redact part of one sentence within that Order, doc. 147 at 3 (citing doc. 132 at 36), but the Court is denying that motion. *See infra* Part I(A)(3).

[4]  "Twitter is an online social networking service and microblogging service that enables its users to send and read text-based messages of up to 140 characters, known as 'tweets.'"  http://en.wikipedia.org/wiki/Twitter (site last visited May 8, 2013).  "Unregistered users can read tweets, while registered users can post tweets through the website interface." *Id.*

In his motion requesting further sealing, Billips did not invoke his own privacy interest but instead cited the disqualification motion's reliance on a substantial amount of his own, internet-retrievable communications with others about matters both related *and* unrelated to the case.[5] That was so prejudicial, he contended, that it should be sealed to protect against "any possibility that this proceeding may be materially prejudiced, either as a result of the conduct of counsel for both Plaintiff or Defendants." Doc. 102 at 3. Hence, fear of jury-pool taint constituted the sole ground for the sealing motion.

In ruling on the disqualification motion, the Court reminded the parties of the public's presumptive right of access to all judicial records and documents.[6] Doc. 104 at 1 n. 1. *Vasquez v. City of New York*, 2012

---

[5] At a hearing days later, Billips represented that he had shut down his "Twitter" account and that these communications would no longer be internet-retrievable (i.e., "permanently deleted") within 30 days of account deactivation. Doc. 149 at 29. The defendants have not shown otherwise.

[6] As the Eleventh Circuit explains:

> The common-law right of access "establish[es] a general presumption that criminal and civil actions should be conducted publicly" and "includes the right to inspect and copy public records and documents." *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001) (per curiam). It is "an essential component of our system of justice" and "is instrumental in securing the integrity of the process." *Id.*

4

WL 4377774 at * 3 (S.D.N.Y. Sep. 24, 2012) ("access to written documents filed in connection with pretrial motions is particularly important in the situation . . . where no hearing is held and the court's ruling is based solely on the motion papers.") (quotes, alteration and cite omitted); Local Rule 79.7 (parties cannot "self-seal" documents filed with this Court but must first seek permission).  Given the disqualification

---

*F.T.C. v. AbbVie Products LLC*, ___ F.3d ___, 2013 WL 1149311 at * 5 (11th Cir. Mar. 21, 2013).  "The consent of the parties is not a valid basis to justify sealing, as the rights involved are the rights of the public." *Dandong v. Pinnacle Performance Ltd.*, 2012 WL 6217646 at * 2 (S.D.N.Y. Dec. 3, 2012) (quotes and cite omitted).  "[C]ivil proceedings cannot effectively operate if huge swaths of judicial opinion and hearing transcripts are subject to redaction; ... [i]n order for the courts to 'talk' to litigants and for the public to fully understand a court's precedent courts need to disclose the information, even if confidential, that is [the] subject of the adjudication." *Carnegie Mellon University v. Marvell Technology Group, Ltd.*, 2013 WL 1674190 at * 2 n. 3 (W.D. Pa. Apr. 17, 2013) (quotes and cite omitted).  "The publicity of a trial and the release of information therein is the price paid for open trials." *Id.* at * 4.

Finally, where sealing is warranted, redaction should be deployed first, and sealing of entire documents second.  *Vision Bank v. Horizon Holdings USA, LLC*, 2011 WL 4478772 at * 5 n. 11 (S.D. Ala. Sep. 27, 2011) ("If the privileged information that might have justified the filing of the invoices under seal has been redacted, then there is no discernable need for sealing those exhibits, particularly given the vital importance of the public's right of access to judicial proceedings."); *see also In re: Alexander Grant & Co. Litigation*, 820 F.2d 352, 357 (11th Cir. 1987) ("Efficiency should never be allowed to deny public access to court files or material of record unless there has been an appropriate predicate established.").

motion's sheer density, polemical contents, and filing circumstances,[7] the

Court *tentatively* sealed it:

> [E]ven though it has been E-filed and is now on the Court's publicly
> accessible docket ("PACER"), the Clerk informs the Court that
> docketing emails announcing its existence have been sent only to
> the parties. There is a reasonable chance that the media has not yet
> seen the motion. Out of an abundance of caution, the Court
> GRANTS the motion (doe. 102) pending further briefing.

*Id.*

The Court further noted that personal embarrassment and general,

reputation-damaging information typically do not justify sealing.   Doc.

132 at 46 n. 21 (collecting cases); *see also Oberstein v. United States*, 2013

WL 951354 at * 2 (Fed. Cl. Mar. 12, 2013) ("The mere fact that the

production   of   records   may   lead   to   a   litigant's   embarrassment,

---

[7] Defendants have repeatedly complained about plaintiff's exploitation of the media
(*see, e.g.*, doc. 101 at 2-4; doc. 130 at 20), yet, as noted above, they *themselves* filed an
attention-getting motion *after* hours on a Friday night, insisting that they were only
trying to protect their client and the court system itself from abusive attorney
conduct. They then refused plaintiff's request to join in sealing their motion, doc.
102-1, despite the risk that, until it was sealed, anyone on the planet could view the
motion's "[e]xplosive and disturbing assertions" (doc. 103 at 2) through the Court's
public access docket system, "PACER." *But see* doc. 155 at 3-4 (defendants insists
that "[t]he timing of the motion was purely coincidental. . . ."). Meanwhile,
defendants evidently have not filed a complaint with the state bar, nor sought Fed. R.
Civ. P. 11 or any other litigation-misconduct sanction. And their motion in fact did
embarrass Billips with tweets he later claimed he never expected would surface here.
*See* doc. 149 at 12 ("Your Honor, I am thoroughly embarrassed to be standing here
under these circumstances, I want there to be no mistake about that.").

incrimination, or exposure to further litigation will not, without more, compel the court to seal its records.") (quotes and cite omitted).[8]

In Jackson's latest brief Billips cites his personal embarrassment, but his *raison d'etre* for continued sealing of doc. 101 (defendant's motion to sanction and disqualify Billips), doc. 117 (plaintiff's response brief), doc. 129 (plaintiff's supplemental brief in opposition to defendants' disqualification brief) and 130 (defendants' reply brief), remains the possibility of jury tainting: "The public disclosure of these records could only engender the very publicity which Defendants themselves claim would have a substantial likelihood of materially prejudicing an adjudicative proceeding in this matter."   Doc. 144 at 3 (quotes omitted).

---

[8]  *See also Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1246-47 (11th Cir. 2007); *Huntington Nat. Bank v. Greenwood Place, LP*, 2012 WL 692601 at * 3 (S.D. Ind. Mar. 2, 2012) ("potential embarrassment to a stakeholder in a lawsuit does not warrant maintaining information under seal."); *United States v. Sattar*, 471 F. Supp. 2d 380, 385 (S.D.N.Y. 2006) (letter from defendant's counsel transmitting psychiatric report concerning defendant, as well as report itself, were "judicial documents," to which common-law presumption of public access attached, notwithstanding that court did not find such documents to be useful and did not rely on them, where they were submitted to court to provide information with respect to crucial judicial function of sentencing).

Of course, the taint of those tweets must be viewed in context of what is already public *and* internet-retrievable by any potential juror summoned for jury selection in this case. Even a casual internet search immediately reveals that the jury-taint horse has already left the barn. First, there has been plenty of media coverage of plaintiff's original and amended complaint against Hiers about his alleged drunken behavior, racist remarks, and sexual harassment, in addition to management's (hence, Paula Deen's) alleged failure to stop it. Those documents *remain* public on this Court's docket.[9]   Doc. 1-1 at 86-132, *as amended*, doc. 47. Also unsealed for the past two months is this brief:

---

[9]   A sampling of her amended complaint's allegations: She started out at Uncle Bubba's as a hostess but within six months was promoted to General Manager (GM), and remained in that position until she quit. Doc. 47 at 6 ¶ 20. The previous GM had allegedly been having sexual relationships with subordinates (servers), "a matter disregarded by Bubba Hiers" but rectified by Paula Deen, who fired the GM and gave Jackson the job. Deen gave her six months to turn the restaurant from a failure to a success. *Id.* at 7 ¶ 21. After Jackson succeeded in doing that, Hiers referred to her as "my little Jew girl," and company CPA Karl Schumacher[9] referred to her as "almost Jewish." *Id.* at 7 ¶ 25. Bubba Hiers frequented porn sites on the internet and left viewable porn on his computer screen in a shared work area for plaintiff and others to see. And, he frequently demanded that she watch it with him. Plus the email address that the two shared fetched porn emails. *Id.* ¶ 49; *see also* doc. 120-1 at 4-5.

And there are plenty of other embarrassing if not disturbing matters. *See, e.g.,* doc. 143-3 at 3-4 (unsealed deposition excerpt showing defendant Hiers admitting that he viewed pornography on a computer inside his restaurant). The exposure has been so intense that law firms are using summarizations of the complaint's allegations while advertising employment-discrimination legal services.

Mr. Hiers has now admitted his offensive and derogatory use of the word "nigger" in the work place (Exhibit K: Hiers Dep., p. 52), conduct which he stated he has only begun to regret during this lawsuit (*Id.*, p. 190). Mr. Hiers admitted telling a "joke" in which he referred to the President of the United States as a "nigger"; he has admitted watching pornography on several different computers at work (and at home) and letting kitchen employees take the fall on at least one occasion (*Id.*, pp. 62-66); he has admitted that viewing pornography was sometimes the first thing he did when he got to work in the morning (*Id.*, pp. 161-162); he has both admitted and denied his alcohol addiction, testifying that he spent 30 days in rehabilitation for alcohol and cocaine addiction, yet denying that he has ever believed that he had an alcohol problem. (*Id.*, p. 10-13). Mr. Hiers has admitted his extraordinary *present* consumption of alcohol, with his home consumption constituting a gallon and a half of Jack Daniels every month, in addition to what he drinks in the restaurant. (*Id.*, pp., 14, 19-20). He has admitted to being a thief, stealing $30,000 from his own sister, a theft which he had no intention of revealing, until he got caught by Ms. Jackson, who reported it to the corporate CPA, Karl Schumacher. (*Id.*, pp. 85-87).

Doc. 111 at 10-11 (emphasis added).

There is more.  As the Court itself found on its own "Paula Deen Video" Google search, doc. 132 at 33, anyone can watch her engaging in mock oral sex with an éclair and uttering a crude comment involving female genitalia.  For that matter, the April 3, 2013 Order illuminates facts about *plaintiff* which she may find embarrassing.  Unsealing Billips'

---

http://www.employeerights.net/blog/2013/03   celebrity-paula   deen-hit-with-sexual-harassment-lawsuit.shtml (site last visited May 8, 2013); http://www.employment-lawyer-blog.com/race-discrimination/ (site last visited May 7, 2013).

case-related tweets and the parties' sanctions motions, then, at *worst* will add an indistinguishable squirt of black ink into already blackened, jury-prejudice waters.  So, the "jury-taint" rationale fails.

Nevertheless, defendants filed other Billips' tweets that are simply *not* related to this case.  By any objective measure, those filings were aimed at simply embarrassing Billips under the pretense of enforcing an ethics rule in a motion denied (on April 5, 2013) by this Court.  Under the First Amendment and common law standards applicable to judicial records,[10] those unrelated "tweets" warrant different treatment.

In that regard, the right of the public to have access "to judicial records is not absolute.  Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978).  The *Nixon* Court drew no line here, but noted that sealing has long been a matter of judicial discretion, then cited examples where lower courts sealed records after, for instance, a party filed something to "gratify private spite or promote

---

[10]  *See generally* 8 FED. PROC., L. ED. § 20:240 (Mar. 2013).

public scandal through the publication of the painful and sometimes disgusting details of a divorce case." *Id*. at 598 (quotes and cite omitted); *see also Allergan, Inc. v. Apotex Inc*., 2013 WL 1750757 at * 6 (M.D.N.C. Apr. 23, 2013).

The Court has sifted the filings and **GRANTS** in part and **DENIES** in part plaintiff's continued-sealing motion. Doc. 144. Applying the above standards, the Court is unsealing the Billips tweets that directly and arguably relate to this lawsuit (hence, where Billips references the defendants personally and this case generally). Those statements were the legitimate subject of a disqualification motion under the rules of professional conduct, which prohibit extrajudicial statements by a lawyer who reasonably believes that his comments will be made public and are likely to materially prejudice an adjudicative proceeding. Ga. Rule of Prof'l Conduct 3.6(a); LR 11.2. At the public hearing on the disqualification motion, the Court referenced these tweets[11] and found that they constituted improper comment about the merits of pending

---

[11]  Billups had commented to his limited number of Twitter followers that he was engaged in the "good fight" against "evil sexism and racism" by Paula Deen and her brother, that Deen had herself engaged in "racist behavior toward employees," that Billips planned on "doing" and "undressing" her during discovery, and that suing her was a "real hoot."

litigation -- essentially stating as *fact* what his client was *alleging*. While the Court noted that the ethics code presumes that such demeaning comments tend to prejudice the proceedings, it determined that the disqualification of counsel was not an appropriate sanction under the circumstances of this case. But because the Court analyzed Billips' extrajudicial comments about this case in assessing the merits of a nonfrivolous motion to disqualify him due to their improper nature, *and* because defendants have never sought to have those comments shielded from public view, the Court finds that they should no longer be sealed. A further relevant consideration: Mr. Billips' comments add little, if anything, to the rather incendiary allegations set out in plaintiff's amended complaint, a document already a part of the public record. That no doubt explains why defendants not only never sought to seal these extrajudicial statements, but, after discovering their existence, *themselves* placed the tweets in the record of these proceedings.

Billips' tweets about matters entirely unrelated to this case (or any other litigation) rest on a very different footing. The Court is satisfied that those tweets were filed simply to embarrass Billips, and for no other purpose. Those tweets reveal that Mr. Billips frequently uses profane,

obscene, bawdy, and racially-charged language when conversing with his Twitter followers.  Unable to find *any* rule of professional conduct that condemned such use of language by a lawyer in his private life, defense counsel fixed upon the oath of admission to practice before this Court, which required Billips to swear that he would "demean [himself] uprightly and according to the law and the recognized standards of ethics of the legal profession." LR 83.3(c).  The Court challenged defendants to point to any case in the last 200 years that has relied upon this, or similar language, to disqualify or otherwise sanction a lawyer because of his profanity, coarseness, or crudity in his non-case-related communications, be they public or private.  Defendants conceded that they had found no such case.  As the Supreme Court noted in *In re Snyder*, 472 U.S. 634 (1985), in order to sanction a lawyer for "conduct unbecoming a member of the bar" -- language very akin to this Court's admission oath -- a court must look to "case law, applicable court rules, and the 'lore of the profession,' *as embodied* in codes of professional conduct."  *Id*. at 645 (emphasis added).  The Eleventh Circuit has interpreted *Snyder* as standing for the proposition that courts can't sanction lawyers for violating some "transcendental code of conduct"

13

that exists only in the subjective opinion of the court and is divorced from the *specific guidance* provided by case law, rule, or ethics code. *In re Finklestein*, 901 F.2d 1560, 1565 (11th Cir. 1990) ("the conduct prohibited must be ascertainable"). Defendants' disqualification brief is devoid of any such reference.   Had defendants consulted these authorities, they could not in good faith have sought Billips' disqualification on the ground that his use of profane and lewd language in a non-litigation context violated some transcendental obligation to demean himself uprightly, an obligation unmoored from any law or rule specifically proscribing the particular conduct deemed to be reprehensible.

The motion to disqualify Billips on this theory was baseless, and thus the defendants used this record as a mere garbage dump for material designed to embarrass opposing counsel.   Such materials do not constitute legitimate judicial records. *See In re Policy Management Systems Corp.*, 677 F.3d 296, 1995 WL 541623 (4th Cir. Sept. 13, 1995) (unpublished) ("we hold that the mere filing of a document with a court does not render the document judicial.  [It] becomes a judicial document when a court uses it in determining litigants' substantive rights . . . . [A]

14

document must play a relevant and useful role in the adjudication process" before the public's right of access attaches.).  The documents foisted by defendants into this record bear no relation to any issue in this case, and the normal presumption of public access to judicial records does not apply in this context.  Accordingly, the Court declines to unseal these materials.

The Clerk therefore is **DIRECTED** to leave doc. 101 sealed but print it out, then file all of it unsealed in a new docket entry, *except* for the following portions of it: doc. 101-21 (Exh. U) (Billips' tweet with a third party that has no arguable connection to this case); doc. 101-22 (Exh. V) (same); doc. 101-23 (Exh. W) (same); doc. 101-24 (Exh. X) (same); doc. 101-25 (Exh. Y) (same); doc. 101-26 (Exh. Z) (same); doc. 101-27 (Exh. AA) (same); doc. 101-28 (Exh. BB) (same); doc. 101-29 (Exh. CC) (same); doc. 101-30 (Exh. DD) (same); doc. 101-31 (Exh. EE) (same); doc. 101-32 (Exh. FF) (same); doc. 101-33 (Exh. GG) (same); doc. 101-34 (Exh. HH) (same); doc. 101-35 (Exh. II) (same); doc. 101-36 (Exh. JJ) (same); doc. 101-37 (Exh. KK) (same); doc. 101-38 (Exh. LL) (same); doc. 101-39 (Exh. MM) (same); doc. 101-40 (Exh. NN) (same); doc. 101-41 (Exh. OO) (same); doc. 101-42 (Exh. PP) (same); doc. 101-43 (Exh. QQ)

(same); doc. 101-44 (Exh. RR) (same); doc. 101-45 (Exh. SS) (same); doc. 101-46 (Exh. TT (same); doc. 101-47 (Exh. UU) (same); doc. 101-48 (Exh. VV) (same); doc. 101-49 (Exh. WW) (same).

The following portions of doc. 101 shall also be re-filed *unsealed*: doc. 101-1 (Jackson's deposition, as re-filed at docs. 145 & 146, which shall *also* be unsealed); doc. 101-2 (Exh. B) (Jackson's May 27, 2010 letter to Paula Deen); doc. 101-3 (Exh. C) (defendants' internet-downloaded articles and statements about Deen and this lawsuit); doc. 101-4 (Exh. D) (defense counsel's communication to the state court judge); doc. 101-5 (Exh. E) (Billips' tweet touting his employment-lawyer reputation); doc. 101-5 (Exh. F) (Billips' tweet bragging about his aggressive advocacy in this case); doc. 101-6 (Exh. F) (same); doc. 101-7 (Exh. G) (same); doc. 101-8 (Exh. H) (same); doc. 101-9 (Exh. I) (same); doc. 101-10 (Exh. J) (same); doc. 101-11 (Exh. K) (same); doc. 101-12 (Exh. L) (same); doc. 101-13 (Exh. M) (same); doc. 101-14 (Exh. N) (same);  doc. 101-15 (Exh. O) (vacant deposition transcript cite); doc. 101-16 (Exh. P) (same); doc. 101-17 (Exh. Q) (McCurry deposition transcript); doc. 101-18 (Exh. R) (vacant deposition cite), *see also* doc.

154; doc. 101-19 (Exh. S) (same); doc. 101-20 (Exh. T) ("duty to confer" correspondence).

Next, the Court is re-filing, unsealed, the disqualification motion/brief itself (doc. 101), but is redacting the portions which align with the "still-sealed" matters set forth above.  Those redacted portions, along with the sealed matters denoted above, shall remain sealed pending further order of this Court.

Citing the same twitter account matters, plaintiff also asks the Court to continue sealing defendants' response brief (doc. 109) on the "blooper reel" controversy resolved by the April 3, 2013 order, *see* doc. 132 at 27-3, wherein defendants illuminate plaintiff's pre-filing settlement demand letter.  Doc. 144 at 2.  She also notes defendants' "improper commentary and use of settlement communications" that "may have already caused such prejudice," and so "further prejudice may require the Court to consider ameliorative measures."  *Id.* at 3.

That motion is denied.  While it is true that doc. 109 gratuitously illuminates plaintiff's pre-lawsuit settlement demand letter to the defendants, doc. 109 at 12, that horse likewise has left the barn, as the local media prominently reported on that letter, and it remains easily

accessible on the internet.  *See* http://savannahnow.com/news/2012-03-07/former-manager-sues-paula-deen-brother-workplace-abuse# (site last visited May 8, 2013).  The response brief also describes some of Billips' "tweets," doc. 109 at 15-16, and even reproduces some as attachments, doc. 109-15; doc. 109-16; doc. 109-17; doc. 109-18; doc. 109-19; doc. 109-20; doc. 109-20; doc. 109-21; doc. 109-23, but they are only the "case-related" tweets to be unsealed above.   Accordingly, the Clerk is **DIRECTED** to unseal all of the defendants' response brief (doc. 109), including all of its attachments.

Next, plaintiff wants to continue the sealing of her own disqualification motion response brief (doc. 117) for the same (jury taint, embarrass Billips) reasons, but nothing up to page 10 of that document spills over the lines drawn in the foregoing sealing/unsealing analysis.  So that much therefore will be unsealed.  In contrast, all of "Part 5" (pages 10-14) of that brief (doc. 117) shall be redacted, as that portion conveys Billips' defense against the above discussed, unrelated tweets that shall remain under seal.  The remainder of the brief -- which, incidentally, assisted Billips in *winning* the disqualification motion --

shall be unsealed, along with the brief's exhibits, doc. 117-1 & 117-2. The Clerk will re-file the brief (doc. 117) with "Part 5" redacted.

Plaintiff also wants her own supplemental brief -- aimed at vindicating counsel Wesley Wolf's integrity -- sealed for the same jury-prejudice and embarrassment reasons. Doc. 144 at 3. The same "left-the-barn" reasoning applies here. This brief shall also be unsealed directly by the Clerk, as no partial redaction is warranted.

Finally, plaintiff requests -- also for the same two reasons -- that defendants' reply brief (doc. 130) remain sealed. Doc. 144 at 3. The Clerk shall re-file that brief unsealed, except that the first paragraph of page 16 will be redacted because it discusses the "unrelated" tweets. The brief's attachment, doc. 130-1, however, shall be unsealed, as it consists of a law review article and matters freely accessible on the internet.

To enable plaintiff to invoke her Fed. R. Civ. P. 72(a) objection rights, however, the Court **STAYS** this particular ruling for 14 days from the date this Order is served. Should plaintiff timely object, this **STAY** will continue pending disposition of the objection by the district judge. Absent any timely filed objection, the unsealings shall be made.

But the Court's April 3, 2013 order shall be unsealed *now*, irrespective of any Rule 72(a) objection.

Defendants, meanwhile, filed an Fed. R. Civ. P. 72(a) objection to this Court's disqualification ruling, doc. 148, and they filed it under seal *after* this Court's April 3rd show-cause order.  That they filed it under seal, despite the Court's unsealing, show-cause order, is understandable because the Court had not yet ruled on the unsealing of the disqualification matters, so the latest filing (doc. 148) was simply honoring the sealing protocol to that point.[12]

That objection (doc. 148) is now subject to this unsealing ruling -- plaintiff has filed no request to keep it sealed and defendants favor unsealing all currently sealed matters.  So if plaintiff files the afore-mentioned, Rule 72(a) objection or a separate motion to seal, then doc. 148, too, shall remain under seal pending the district judge's ruling.  If not, then it shall be unsealed after 14 days have elapsed.

### 3.  Hiers' Redaction Request

---

[12] Note that no one is seeking to seal the transcript of the hearing that preceded that ruling.  *See* doc. 149 ("Release of Transcript Restriction set for 7/18/2013").

In an unsealed brief filed February 25, 2013, plaintiff cited to Hiers' deposition, where he "has both admitted and denied his alcohol addiction, testifying that he spent 30 days in rehabilitation for alcohol and cocaine addiction, yet denying that he has ever believed he had an alcohol problem. (Hiers Dep., p. 10-13)." Doc. 94 at 4-5. In March 2013, defense counsel asked plaintiff's counsel "to redact the reference to the drug and alcohol treatment from [plaintiff's] pleadings" and he agreed, but the matter was "overlooked by both counsel" due to "the press of work." Doc. 147 at 3. Hence, the Court was unaware of that agreement when it cited to that line in its April 3, 2013 ruling. Doc. 132 at 36.

Now -- in a sealed motion, doc. 147 -- Hiers wants the Court to go back and redact (hence, *seal*) every "reference to the drug and alcohol treatment" from the following still-public records: Doc. 94 at 4; doc. 111 at 10 & doc. 116 at 7. Doc. 147 at 3. He would also like it redacted from the April 3rd order. *Id.* He cites state and federal privilege law in that regard. *Id.* at 3-5; *see also Hopson v. Kennestone Hosp., Inc*., 241 Ga. App. 829, 829 (1999) ("Communications between a patient and psychiatrist are absolutely privileged and not discoverable unless the patient affirmatively waives the privilege.") (footnote omitted).

21

The motion, though unopposed,[13] must be denied as baseless because that horse also has left the barn.  First, no one moves to seal what has remained *unsealed* for over two months: Hiers' deposition, where he freely details his 1986 alcohol and cocaine treatment.  Doc. 94-1 at 5-6.  Second, it is highly likely that his inebriation history will be explored and thus fully exposed at trial, upon the reasonable assumption that he will deny many if not all of Jackson's charges[14] and thus invite cross-examination of any memory-eroding, substance abuse behavior.  In that respect, ample grounds exist to admit *decades* of substance abuse as substantive evidence of impeachment.  (Jackson is pressing a case in no small part built on alleged drunken behavior that fueled legally actionable racism and sexism.)

For that matter, the time for Hiers to block discovery of this aspect of his medical past was *before* (or at least *at*) his deposition, not months

---

[13] As noted above, this Court has an independent duty to keep its records open to the public.   To that end, the Court promulgated Local Rule 79.7 to uphold the presumption of public access as articulated by, *inter alia*, the *Nixon* court.  *Nixon*, 435 U.S. at 597-98. Thus, under Local Rule 79.7, parties may neither self-seal documents nor consent to same. *See supra*, n. 6.  Instead, all must affirmatively seek the Court's approval to file a record under seal.

[14] During his deposition, for example, he denied ever going to work under the influence of alcohol.  Doc. 94-1 at 4.  It appears highly likely that plaintiff will cite *layers* of evidence showing otherwise in cross-examining him on that point.

later, when bits of it began to routinely surface in public filings that have remained unsealed for months. *Cf. Scruggs v. Int'l Paper Co,* 278 F.R.D. 698, 700 (S.D. Ga. 2012) (when a party fails to timely object to discovery efforts, his objections are deemed waived, and he may waive any general privileges in this manner). At best he has been unpardonably lax in seeking to *retroactively* redact (hence, partially seal) public records through a motion filed after: (a) plaintiff thrice cited that medical history in public filings, and did so over the course of several weeks; and (b) this Court cited it. That laxity speaks volumes, if not his recognition that this particular revelation constitutes but another dark, yet inconsequential, squirt in a deeply blackened well.

Hiers thus patently fails to meet his burden to "articulate a real and substantial interest that justifies depriving the public of access to the records that inform [a court's] decision-making process." *Helm v. Kansas*, 656 F.3d 1277, 1292 (10th Cir. 2011); *see also Carnegie Mellon University v. Marvell Technology Group, Ltd.,* 2013 WL 1336204 at * 4 (W.D. Pa. Mar. 29, 2013) ("Generally, a party wishing to seal a judicial record must demonstrate that good cause exists for the sealing. Good cause can be established by showing that disclosure will work a clearly

defined and serious injury to the party seeking closure") (quotes and cite omitted). Because he has failed to show a substantial interest, much less good cause, his redaction motion (doc. 147) is **DENIED**, and the Clerk shall likewise unseal it.

### 4. Directions to the Clerk

To summarize thus far, the Clerk shall unseal docs. 132 & 147 *now*. But the Court **STAYS** its remaining unsealing directives (Part I(A)(2)) to enable plaintiff to invoke her Fed. R. Civ. P. 72(a) objection rights. Absent any timely filed objection, the foregoing unsealings shall be made the day after the 14-day objection period. Finally, there shall be *no further* filings under seal absent compliance with Local Rule 79.7.

### B. *Ellerth/Faragher* Defense

As the Court's April 3rd Order noted, defendants' invocation of the *Ellerth/Faragher* defense[15] rendered discoverable information about how

---

[15] The "defense comprises two necessary elements: (1) that the employer exercised reasonable care to prevent and promptly correct harassing behavior and (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or to otherwise avoid harm." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), interpreting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) (requiring a significant change in employment status).

management handled employee complaints against harassment. Doc.
132 at 18-27. Defendants argued, however, that plaintiff went too far by
subpoenaing records from and questioning (during a deposition) the
corporate defendants' outside counsel, James P. Gerard. Doc. 132 at 18-
27. The Court for the most part ruled in favor of plaintiff to the extent
defendants had fused Gerard's counsel role with a management
("Human Resources" or "HR") function. Also, to the extent Gerard had
communicated with third parties in the process, he waived any attorney-
client and work-product privileges. *Id.*[16]

---

[16] Specifically, the Court granted plaintiff's motion to compel (doc. 111) to this
extent:

> Gerard may be re-deposed, and prior to his re-deposition defendants
> shall comply with Jackson's written discovery requests. Jackson is free
> to depose Gerard on these areas: (1) to rebut Jackson's claims that she
> complained to him or others in management about her claims of
> discrimination and sexual harassment; (2) to testify about complaints of
> four EEOC claimants in early 2009 who allegedly directed complaints
> toward Jackson, not Hiers; (3) to speak to any meetings held with
> Jackson, Hiers, and Schumacher (one following the 2009 EEOC
> mediations and one in 2010); and *(4) to address any other instances
> involving Gerard, including discrimination complaints from other
> employees, so long as they are related to his "in the loop" role in
> application of the defendants' Ellerth-Faragher defense machinery.*
> Exempted from this is any portion of any document containing Gerard's
> legal opinion in anticipation of EEOC administrative action or litigation,
> and any of Gerard's testimony relating to same.

Doc. 132 at 26 (emphasis added).

In response, the defendants move to withdraw their *Ellerth/Faragher* defense, docs. 133 & 134, which is unopposed by operation of Local Rule 7.5 ("Failure to respond within the applicable time period shall indicate that there is no opposition to a motion."), and thus is **GRANTED**.  As will be seen below, that withdrawal is strategic. With such withdrawal defendants now contend that plaintiff's quest for Gerard's communications must now be barred as privileged.

## C. Privileges

### 1. Attorney-Client Privilege

In their motion for clarification and reconsideration (doc. 135), defendants request that, since they withdrew their *Ellerth/Faragher* defense, they be relieved from producing Gerard's testimony plus "documents related to '4) . . . address any other instances involving Gerard, including discrimination complaints from other employees, so long as they are related to his 'in the loop' role in application of the Defendants' *Ellerth/Faragher* defense machinery' as set forth in the Court's Order.  (Doc. 132, p. 26-27)."  Doc. 135 at 8; *see also supra* n. 16. In their follow-up brief they clarify that they want all of Gerard's communications blocked: "Gerard should not be exposed to time

consuming discovery and depositions concerning his attorney-client relationship[17] with Defendants.  Plaintiff has stated no valid reason for her continuing to pursue these communications now that the *Faragher/Ellerth* defense has been withdrawn."  Doc. 153 at 12 (footnote added).

Plaintiff correctly responds that her discovery of Gerard's communications is not terminated by the *Ellerth/Faragher* defense withdrawal.  Doc. 143 at 12-13.  As the Court's last Order spelled out, plaintiff advances *non*-Title VII claims, including negligence, which by definition involves scrutiny of management's response (e.g., how appropriately it responded to Jackson's complaints about Hiers).  Doc.

---

[17] To invoke attorney-client privilege, a claimant must establish:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) *without the presence of strangers* (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) *not waived* by the client.

*United States v. Noriega*, 917 F.2d 1543, 1550 (11th Cir. 1990) (emphasis added). The privilege is construed narrowly and those invoking it must prove its applicability. *In re Vioxx Products Liability Litigation*, 501 F. Supp. 2d 789, 799 (E.D. La. 2007).

132 at 31. Under the liberal discovery (as opposed to trial) standard, Gerard's testimony is relevant to the extent the employer corporation, as co-owned by Deen and Hiers, had notice of the alleged tortious acts (negligence, battery, etc.), and what efforts it made to interdict them. That figures into the core essence of such claims.

In reply, defendants offer to stipulate away Gerard's trial testimony. Doc. 153 at 11. That dog won't hunt, however, since this case is *not* at the trial, but discovery stage, and his testimony is not in issue. What is in issue is what information can come from Gerard that may reasonably lead to evidence helpful to Jackson's case. She points out, in that regard, that defendants have cited to things like her May 2010 letter to Paula Deen -- to imply that she is fabricating or exaggerating her claims. *See* doc. 56 at 13-14 ¶ 102; doc. 109-4 at 1-2. Hence, discovering what Gerard -- in his HR management role -- did to address plaintiff's complaints before and after that letter is relevant to her interest in proving that she in fact is *not* fabricating or exaggerating her complaints.

In that respect, Jackson and her partner have testified that Jackson had multiple workplace-grievance conversations with Gerard, so

it is not unreasonable to suppose he investigated her complaints.[18] His

testimony on that is relevant and discoverable,[19] as it is entirely plausible

---

[18] She testified that she complained to *Gerard* about Hiers' misconduct "multiple times" because "the chain of command was to go through [company CPA] Karl [Schumacher]," doc. 146-2 at 66, then to Gerard, who "would call [plaintiff] every week and ask me how things were." *Id.*

   Q. And Mr. Gerard when calling you, you were talking to him about racially discriminatory conduct of Mr. Hiers?

   A. That and the sexual conduct and the hostile environment.

*Id.* at 67; *see also id.* at 68 (she remembers no emails to him but "[p]robably around five" phone calls to him); *see also* doc. 146-4 at 16 (Jackson's domestic partner recalled being present for "more than five" Jackson/Gerard phone conversations wherein Jackson complained about Hiers' misconduct to Gerard).

   That is enough evidence, despite Gerard's denials, doc. 153 at 8-9, to show that he maintained a "fused" lawyer/H.R. role, so the Court reaffirms the attorney-client and work-product privilege waiver analysis set forth in its April 3, 2013 Order, doc. 132 at 18-27, even with the *Ellerth/Faragher* defense gone from the case.   Diligence (to rebut the negligence charge) and denial-based defenses remain, and it is clear that the defendant employer intends to use those defenses (e.g., claim that its management properly addressed Jackson's complaints) at trial.  Assuming the district judge does not rule the negligence claim out of this case, *see* doc. 132 at 29 n. 14, that opens to discovery the sufficiency of counsel's investigation in refuting plaintiff's claims.

[19] What is determinative here is not a particular defense like *Ellerth/Faragher*, but a range of defenses.  Boiled down, the defenses raised here range from: (1) the offensive conduct never occurred (hence, plaintiff is lying or exaggerating about it); (2) if it did, plaintiff never complained about it to management; (3) it did occur and plaintiff complained but management non-negligently addressed it; or (4) it did occur but supports no recovery because, for example, it crossed no legal line.  Doc. 56 (Answer); doc. 101 at 8-9 ("The defendants have strongly disputed Jackson's claims. . . .").

   But to raise those defenses, of course, is to engage in a subject-matter waiver, as the cited record evidence (*see, e.g.*, doc. 143-3 at 2; doc. 116 at 10-11, 14-15) shows

that he compiled his factual findings, which in turn could be provided to another defense witness to testify at trial in defense against Jackson's claims.   Hence, his *fact*-investigation efforts (including his discussions with Hiers and Deen about Hiers' behavior) would be discoverable, even if (as will be further discussed *infra*) deemed work product.   And if Gerard denies such conversations occurred or did not involve any of Jackson's harassment complaints, then that factual conflict in and of itself is discoverable: Jackson has the right to try and prove that he is misremembering or being untruthful as to this matter.

Next, Gerard waived the attorney-client privileges for any emails sent beyond his client.[20]   *United States v. Martha Stewart*, 287 F. Supp.

---

that Gerard reasonably likely was involved in the actions supporting defenses (2) & (3).   That, in turn, waives the privilege.   *See Cox*, 17 F.3d at 1422 ("The subject-matter waiver doctrine provides that a party who injects into the case an issue that in fairness requires an examination of communications otherwise protected by the attorney-client privilege loses that privilege."), quoted in *Belmont Holdings*, 2012 WL 6430598 at * 4.   Here the defendants deny negligence and even cite to Jackson's above-mentioned letter to Deen in insisting that they created no hostile environment. By definition, they injected into this case all of their HR responses, including Gerard's to the extent it is shown (and two witnesses say it occurred) he wore an "HR hat" in addition to an outside-counsel hat.

[20]   To reiterate, the Court ruled that,

> unless any such individual was a direct *employee* (hence, not a mere independent contractor "consultant") of a defendant or attorney Gerard, their presence waived the privilege asserted, and discovery shall therefore proceed

2d 461, 464 (S.D.N.Y. 2003) (Stewart, charged with securities fraud, waived her attorney-client privilege by sending her daughter a copy of an e-mail earlier sent to her attorney, giving details regarding the sale of stock which was central to the fraud charge against her).   Whether Gerard's "client" extended beyond corporate management and employees to outside agents is addressed in the next section of this Order.

### 2. Work-Product

Work product[21] may be shared within a tight circle without causing waiver.   *Stewart*, 287 F. Supp. 2d at 468 (Stewart did not waive work

---

accordingly (*i.e.*, defendants shall produce all requested paper-based discovery and provide deposition answers heretofore blocked by objection).   Jackson has also shown enough evidence that Gerard acted as management as much as he did corporate counsel when it came time to address employee complaints (Jackson's, primarily) about Hiers' conduct.   *See* doc. 116 at 10-11, 14-15.

Doc. 132 at 25 n. 12.

[21]   As another court explains:

A privilege against disclosure also exists for attorney-work product. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1421 (11th Cir. 1994). Materials prepared by a party's representative, including his or her designated agent, to aid in anticipated or pending litigation will be protected from disclosure unless the privilege is waived or the party seeking discovery shows substantial need for the materials and cannot acquire a substantial equivalent without undue hardship. *See* Fed. R. Evid. 502; Fed. R. Civ. P. 26(b)(3)(A); *Hickman v. Taylor,* 329 U.S. 495, 511, 67 S. Ct. 385, 91 L. Ed. 451 (1947). For the work-product doctrine to apply, a party "must show that the documents were prepared for

product privilege by sending copy of e-mail addressed to her attorneys, detailing sale of securities which was allegedly fraudulent, to her daughter; there was close personal relationship between family members, shareholder could be sure confidentiality would be preserved, and disclosure did not affect interests of either side); *see also Schanfield v. Sojitz Corp. of America*, 258 F.R.D. 211, 216 (S.D.N.Y. 2009) (e-mail

---

litigation purposes and not merely in the ordinary course of business." *St. Joe Co. v. Liberty Mut. Ins. Co.*, No. 3:05–cv–1266–J–25MCR, 2006 WL 3391208, at *8 (M.D. Fla. Nov. 22, 2006) (holding that a defendant insurance company failed to provide evidentiary proof of objective facts, via affidavits or deposition testimony, that reasonable anticipation of litigation existed at the time the documents were produced or that the documents were prepared for the purpose of litigation). The work-product doctrine protects documents "prepared by the party or his representative because of the prospect of litigation." *Joiner v. Hercules. Inc.*. 169 F.R.D. 695, 698 (S.D. Ga. 1996) (quoting *Shipes v. BIC Corp.*, 154 F.R.D. 301 (M.D. Ga. 1994)); *see also* Fed. R. Civ. P. 26(b)(3).

*Belmont Holdings Corp. v. Suntrust Banks, Inc.*, 2012 WL 6430598 at * 3 (N.D. Ga. Nov. 19, 2012).  "A party must anticipate litigation at the time the documents were drafted for these protections to apply. Materials or documents drafted in the ordinary course of business are not protected. Ordinarily, therefore, one must focus on when the document was created, and why it was created." *Kallas v. Carnival Corp.*, 2008 WL 2222152 at * 3 (S.D. Fla. May 27, 2008) (quotes and cites omitted); *accord Fulton DeKalb Hosp. Authority v. Miller & Billips*, 293 Ga. App. 601, 603-04 (2008) (no work product protection for hospital authority's legal department' investigation, since it commenced it not in response to any claim or threat of litigation, but because it received several anonymous complaints, and those complaints contained pleas for help rather than references to litigation).

Finally, "[l]ike the attorney-client privilege, the party invoking the protections provided by the work-product doctrine bears the burden of establishing its applicability." *Belmont Holdings,* 2012 WL 6430598 at * 3.

communications between managerial employee and family members who were attorneys, located on employee's personal computer, were protected by work product doctrine; first set of communications shared underlying facts of employee's racial discrimination lawsuit against former employer and initial ideas about legal strategy and then sought advice from family members, while second set sought assistance with negotiating engagement agreement with current counsel).

The *Stewart* and *Schanfield* courts applied what may be thought of as a "common interest doctrine," under which "privileged communications may be disclosed without waiver if the party claiming an exception to waiver demonstrates that the parties communicating (1) have a common legal, *rather than commercial*, interest; and (2) the disclosures are made in the course of formulating a common *legal* strategy." 1 RECORDS RETENTION § 1:37 (Nov. 2012) (quotes and cite omitted; emphasis added).

### 3. Third-Party Waiver

Jackson argues that defendants must turn over to her, despite any attorney-client privilege or work product claim, all Gerard emails and communications which included in the communications loop Paula Deen

assistants Barry Weiner, Lucie Salhany, and Jeff Rose. Doc. 143 at 2. Those assistants constitute third parties with *commercial* interests, she contends, and they formed no such "tight circle."

Opposing, the defendants rely on Paula Deen's affidavit. Doc. 135 at 6. She attests that Barry Weiner is her "agent and business adviser."[22] Doc. 135-1 at 1 ¶ 3. Lucie Salhany is "a business consultant for" Paula Deen Enterprises, LLC (PDE)), *id.* at 2 ¶ 8, and she works "with designated PDE personnel on staffing and salary issues, and the improvement of hiring practices," plus marketing and public relations functions. *Id.* ¶ 9. She is "an integral person in a group dealing with issues that are completely intertwined with PDE's litigation and legal strategies." *Id.* ¶ 11. And Jeff Rose is affiliated with "The Rose Group," which is a "brands relation agency." *Id.* at 3 ¶ 13. That group provides "marketing and public relations services for PDE." *Id.* Rose thus is an integral part of the Weiner-Salhany-Rose cluster that gathers "to discuss litigation and legal strategies." *Id.* ¶ 16. Rose, then, "must hear the advice of legal counsel regarding these matters." *Id.* ¶ 16.

---

[22] In his deposition Weiner testified: "We negotiate television contracts. We secure licensing deals. We do personal appearances." Doc. 143-1 at 2-3.

Those three contractors, Deen concludes, "are indistinguishable from my employees because each, in their individual capacity, acts for me and my business entities and possesses the information needed by attorneys in rendering legal advice." *Id.* ¶ 18. Defendants thus contend that those three individuals "bore the relationship necessary to fall within the umbrella of the attorney-client privilege," and thus Gerard's work product. Doc. 135 at 7.

Plaintiff insists that the documents Gerard copied to them are discoverable because Deen's affidavit at most speaks of her general reliance on them, while they themselves have not provided affidavits showing they possess sufficient, specific knowledge of this case to place them within that protection zone. Doc. 143 at 2-3; doc. 157-1 at 4. Jackson cites, for example, Weiner's deposition testimony showing that he owns "Artist Agency," and performs only work "related to [Paula Deen's] career." Doc. 143 at 3-4.

Hence, plaintiff concludes, Weiner is basically a general outside agent, not the functional equivalent of an employee. *Id.* at 4. He in no way influences HR matters. *Id.* And Weiner himself, plaintiff reminds, testified that he was not hired for the purpose of preparing a litigation

strategy.  *Id.* at 8-9.   Emails sent by these people to Gerard were evidently sent, Jackson concludes, "as an effort to manufacture a basis for claiming the attorney client privilege." *Id.* at 9.

Jackson prevails here. It is true that there is no *per se* rule restricting a corporation's assertion of its attorney-client based privilege to employees, as it is common to seek legal assistance from third parties who are neither employees nor lawyers.  *See, e.g., In re Application Pursuant to 28 U.S.C. Section 1782, Etc.,* 249 F.R.D. 96, 101 (S.D.N.Y. 2008) (to avoid waiver of the attorney-client privilege by the voluntary disclosure of otherwise privileged material to a third party, the proponent of the privilege must show that: (1) the client had a reasonable expectation of confidentiality in the disclosure of the material to the third party, and (2) that disclosure to the third party was necessary for the client to obtain informed legal advice); *see also id.* (attorney-client privilege was waived with respect to emails and attachments which reflected legal advice by law firm which represented buyer of sculpture when they were disclosed to art broker).

Those third parties, however, must be nearly indispensable to that effort. *Allied Irish Banks v. Bank of America, N.A.,* 240 F.R.D. 96, 103

(S.D.N.Y. 2007) ("[T]he involvement of the third party [must] be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications.").   General, conclusory assertions will not suffice.  *See, e.g.*, *Freiermuth v. PPG Industries, Inc.*, 218 F.R.D. 694, 699 (N.D. Ala. 2003) (affidavit containing mere conclusory statements that document was prepared for purpose of obtaining legal advice will not suffice in meeting proponent's burden of establishing applicability of attorney-client privilege).

Significant here is what the defendants do *not* say.  They do not supply: (a) any affidavit from any of the agents showing what specific role they have played with respect to this case; and (b) what communications in fact were sent to them and for what purpose.  There is a difference, for example, between helping to formulate and factually support a legal strategy versus damage control-based, *publicity* management -- a patently commercial endeavor.[23]

------------------------------------

[23]  It is undisputed that (a) long before this case began, Paula Deen "branded" her name and thus commercialized it; and (b) she has used these individuals to accomplish that end.  Merely attesting in a general sense that she relies on them for their advice is *not* the same as claiming that using them "was necessary for the client to obtain informed legal advice." *In re Application*, 249 F.R.D at 101.

Deen's affidavit, meanwhile, speaks only in general terms. Nothing approaching the "nearly indispensable role" is described. *Allied Irish Banks* 240 F.R.D. at 103. Her affidavit fails to meet defendants' burden. And as Jackson points out, Weiner's deposition testimony shows that he has had almost *no* involvement with this lawsuit, was only vaguely aware of the allegations, and was simply kept in the loop.[24]  Doc. 143-1 at 8-9, 14-16. Neither of the other two agents say anything to place them beyond that realm, either. In fact, they say nothing (again, no affidavits have been tendered by them).

Waiver thus has occurred, so defendants must disclose all of Gerard's communications regarding Jackson's complaints, where these

---

[24]  Plaintiff argues that all the defendants are trying to do here is conceal their public relations efforts. Doc. 143 at 12. And she "strongly *suspects* that the emails in question will show that the 'public relations' campaign has crossed over into an effort which may well violate [Georgia Bar] Rule of Professional Conduct 3.6. There is no basis upon which to withhold these emails from Plaintiff and there is every reason to require their production." Doc. 143 at 12 (emphasis added).

The Court need not pass on that suspicion, for it has now ruled on what documents are discoverable. But both sides, having now flown the ethics-code flag, *see* doc. 101, are free to file a bar complaint. *See* GA. R. BAR RULE 4-102, RPC Rule 8.3(a) ("A lawyer having knowledge that another lawyer has committed a violation of the Georgia Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, should inform the appropriate professional authority."). And if they do not then that says something, as ethics accusations should never be used as a litigation tactic.

individuals were in the loop. *See Chubb Integrated Systems, Ltd. v. Nat'l Bank of Washington, D.C.*, 103 F.R.D. 52, 66 (D.C.D.C. 1984) (*Upjohn Co. v. United States*, 449 U.S. 383 (1981), which limited an attorney's "corporate client" to employees of corporation, did not apply to independent contractors; foreign patent agent was not an employee of the corporation, but was more akin to independent contractor, so his communications with principal's United States counsel were not covered by attorney-client privilege).

Defendants' clarification/reconsideration motion (doc. 135), then, is **DENIED** on those grounds.  Defendants shall produce to plaintiff all recorded Gerard communications to any Deen defendant *except* those containing legal advice to management only (i.e., not to management plus privilege-neutralizing third parties) directly relating to Jackson's EEOC proceedings and, of course, the instant proceedings.  Plaintiffs are free to re-depose Gerard accordingly.

Because, as plaintiff points out, doc. 157-1 at 4 n. 2, the Court does not have the defendants' privilege log and withheld documents before it, it will provide some additional guidance: Also exempt from disclosure, and thus plaintiff's inquiry of Gerard upon re-deposition,

are any (oral or written) communications from Gerard to all HR management level employees *after* Jackson initiated this litigation (first by EEOC proceedings, and second by filing this case), but only if those communications were not "third-party-waived" as described above. *See, e.g., Edelen v. Campbell Soup Co.*, 265 F.R.D. 676, 682-83 (N.D. Ga. 2010) (documents concerning e-mail communications between employer's in-house counsel and human resources management level employees were protected by the attorney-client privilege or work product doctrine in employment discrimination lawsuit, where each of the communications were made for the purpose of rendering sought legal advice), *cited in* 24 WRIGHT & MILLER: FEDERAL PRAC. & PROC. § 5483 ("*Representative of the Client*") (2013).[25]

---

[25] This is a spongy area of law to say the least. Corporations can only act through human beings, and thus it is easy for a corporation to claim that a broad range of individuals are protected by the attorney-client privilege it has with its counsel. But courts, an encyclopedist warns, should

be alert to the possibilities of "papering-up the privilege"; this will insure that decisions on the scope of the privilege reflect some institutional reality and are not based upon some bureaucratic Potempkin village. [Also,] the corporation should be required to be consistent in ascription of status to its employees. It should not be permitted to claim that the person in question is a corporate "representative" for the purpose of the privilege, then turn around and claim the same or a similar employee is not authorized to speak on behalf of the corporation when the issue is the admissibility of his hearsay statements

Likewise exempt from the *subject matter* waiver discussed *supra* (but not the third-party waiver) is any of Gerard's communications bearing pure opinion work product, as opposed to factual-investigation matters.  "[A] subject matter waiver of the attorney-client privilege or work-product doctrine does not extend to *opinion* work product, which is defined as material that reflects an attorney's mental impressions, conclusions, opinions, or legal theories."' *Belmont Holdings*, 2012 WL 6430598 at * 4 (quotes and cites omitted; emphasis added); *see also Cox*, 17 F.3d at 1422.[26]  By way of example, if Jackson complained to

---

under the admissions doctrine. Finally, care must be taken in the procedures used to adjudicate claims of corporate privilege. For example, the corporation should not be permitted to use a claim of privilege to prevent access to facts bearing on the existence of the privilege.

24 WRIGHT & MILLER: FEDERAL PRAC. & PROC. § 5483 (footnotes omitted).

[26] As one encyclopedist explains:

If a showing is made that the material must be provided despite its being trial preparation material, then the court must *nevertheless* protect against the disclosure of mental impressions, conclusions, opinions, or legal theories. Included among the mental impressions, etc., which must be protected when discovery is allowed are an attorney's legal strategy, intended lines of proof, evaluation of the case's strengths and weaknesses, and the inferences drawn from interviews of witnesses.

Ga. Civil Discovery § 6:4 (6th ed. Nov. 2012) (footnotes omitted).  Again, "[t]he information is protected if reasonable grounds exist to believe that litigation is probable, or even that a claim may be filed. For example, statements of witnesses

41

Gerard about Hiers' abusive conduct and Gerard made a file note about the complaint, then that is discoverable, but if he researched discrimination law and jotted down on that same note his legal advice to Paula Deen about how to address potential legal exposure, then that advice shall be redacted from the note prior to disclosure.   In contrast, 100% of that communication must be disclosed if it was emailed to any or all of the third-party agents or any other third party.

### D.  The Blooper Reel

The Court **GRANTS** defendants' clarification motion (doc 135; *see also* doc. 153 at 12-13) to this extent: plaintiff is directed to return to Paula Deen or destroy the "blooper reel" at the conclusion of this litigation, including all appeals.  *See* doc. 132 at 34 (prior Order directing Deen to turn over a copy to plaintiff but forbidding plaintiff from disclosing or filing it absent further Court order).  The Court agrees with

---

taken immediately after the incident can be protected if a showing can be made that litigation was obvious at that time.   However, accident reports prepared in the regular course of business are not considered to be prepared in "anticipation of litigation," and therefore are not protected.  *Id.* (footnotes omitted).  "Nor does the direct supervision of an attorney demand the investigation's classification as work product."  *Id.*

the defendants (doc. 153 at 12-13) that plaintiff has shown no valid reason to retain a copy beyond that point.

Plaintiff complains that defendants "have steadfastly refused to obey this Court's [April 3, 2013] Order and produce the video, even after Plaintiff agreed to return or destroy the video unless it is admitted into evidence." Doc. 157-1 at 3.   In fact, she moves for contempt and sanctions.   Doc. 163.   The Court **ORDERS** defendants to promptly deliver a copy of the blooper reel to plaintiff's counsel, who are entrusted with its confidentiality (hence, they may use it only in this litigation, such as during depositions, at trial, or on appeal) and are also **DIRECTED** to return or destroy any copy left in their possession after the conclusion of all appeals.[27]   To that extent only, Jackson's contempt/sanctions motion is **GRANTED**.  Doc. 167.

## E.  Spoliation

Emphasizing the fact that defendants have been on notice of her claims since she filed her EEOC charge on October 8, 2010, doc. 141 at 2, Jackson moves to compel and sanction them for "losing" pornographic

---

[27]  Should a copy be admitted at trial *and* a disk copy is filed in the record, then it will be up to the district judge, upon the defendants' appropriate motion, to decide whether to retain it as a court record or destroy it.  *See* Local Rule 79.4.

emails collected on her ex-employer's computers.  Doc. 141.  Referencing her sexual harassment claims and allegations that Hiers received pornographic emails on his restaurant's computer(s), she says that she in due course sought access to stored emails through discovery, and that defendants agreed to provide her with some after initially objecting based on what would turn out to be an exaggerated production cost.  *Id.* at 1-2.

But "[u]pon reviewing [them], Plaintiff noticed that none of the pornographic emails were produced."  Doc. 141 at 2.  In "well over 50,000 documents produced, not one such email is to be found.  *Id.*  She pressed further and received 13 pornographic images but "no indication that they were part of an email."  *Id.* at 3. And Hiers admitted in his deposition "that the emails in question were still on his computer some time during 'the past year.'"  *Id.*  Defense counsel claims his own search proved fruitless.  *Id.*  Possibly, he says, they were destroyed in 2011.  *Id.* While Jackson does not question his word on that subject, "the fact is that these emails were destroyed after [she] gave notice of her intent to pursue a claim against Defendants in part based on these emails and after she filed her EEOC Charge."  *Id.*

44

Concluding "that Defendants destroyed these emails, deleting them from the computers in question after notice of this litigation, or, possibly, while litigation was pending," *id.*, she wants an order directing their production or granting her spoliation relief.  Doc. 141 at 4-5.  She cites, *inter alia*, *Scruggs v. Int'l Paper Co.*, 2012 WL 1899414 at * 1 (S.D. Ga. May 24, 2012) (spoliation "sanctions extend to negligent, reckless, and intentional evidence destruction").  *Id.* at 5.  She points out that "Defendants' counsel have refused to state whether or when a 'litigation hold' was communicated to Defendants."  *Id.* at 6; *see also* doc. 160 at 1. That, she insists, authorizes this Court to find that the emails' destruction was in bad faith, "particularly in light of Mr. Hiers' unrebutted testimony that the emails existed within the last year, i.e., 2012."  Doc. 141 at 9; *see also* doc. 160 at 2 (citing Hiers and defense witness Stephanie Strong's testimony "that there were multiple emails containing pornographic emails, *none of which have been produced*."); *id.* at 4 (citing non-party witness' testimony about "multiple emails containing pornographic images"); *id.* at 6 (same).  She seeks sanctions. Doc. 141 at 10-11.

Defendants insist that (a) only one email is in issue here, and it apparently transmitted the 13 pornographic images that have otherwise been provided to plaintiff; (b) innocuous reasons exist for the actual, transmitting email's loss, doc. 150-1 at 3-5; and (c) Hiers concedes the images were pornographic, concedes he viewed them, and concedes they were in the workplace.  Doc. 150 at 1-20.

So, defendants conclude, even assuming plaintiff's claim is true (defendants deny this) -- that the transmitting email was intentionally or recklessly or negligently destroyed -- "she, in fact, has the stuff that informs her charge of being exposed to pornography -- the actual images themselves," which another employee has since placed on her own computer.   Doc. 150 at 20.  That is, she has 100% of the information she would otherwise glean from the email itself.  They in effect insist that, other than the emotional impact of being able to wave the paper version of the transmitting email at the jury -- a benefit too consequential to warrant the extraordinary sanction she seeks -- plaintiff has lost nothing here, in contrast to the spoliation cases set forth *supra*.

In a typical spoliation-sanction case there is a clear showing that the matter lost was material and likely would have assisted someone's

case. *See e.g.*, *E.E.O.C. v. Ventura Corp. Ltd.*, 2013 WL 550550 at * 7-8 (D.P.R. Feb. 12, 2013) (spoliation sanction, which may be imposed even if such evidence was mishandled through simple carelessness, applied to employer who destroyed email accounts that contained relevant information to the employee's claims of gender discrimination); *E.E.O.C. v. JP Morgan Chase Bank, N.A.*, ___ F.R.D. ___, 2013 WL 765593 at * 7 (S.D. Ohio Feb. 28, 2013) (spoliation sanction imposed for employer's "routine purge" of electronic records after being placed on notice to preserve by plaintiff's pleadings).

In a sense that has been shown here, but mitigating factors exist. First, Jackson's October 8, 2010 EEOC charge said: "Beginning in September 2005, I was sexually harassed and subjected to a hostile Work environment by Earl (Bubba) Hiers.  This harassment includes, but is not limited to: unwarranted criticism about my physical appearance, and interference with my management duties."  Doc. 47 at 54.  She never mentioned any emails, and did not file this case until after they were deleted in what defendants have shown to be more or less the normal course of business.  Under these circumstances, it was not reckless of counsel to fail to "place a litigation hold" on them.

47

Furthermore, Hiers *admits* that he received porn-mails on the computer shared with plaintiff, so she is free to super-illuminate that fact at trial.   Still, since pornography in its different strains (soft core, hard core, etc.) is often in the eye of the beholder, the evidentiary impact of being able to show the jury exactly what Jackson was forced to endure is worth something.   Subject to a contrary ruling by the district judge at trial, Jackson therefore is free to testify about how graphic and pervasive the emails were, and that the defendants do not deny that they failed to preserve them after she quit and EEOC-charged them with maintaining a hostile sexual environment.   Her motion, then, is **GRANTED** in part and **DENIED** in part.   Doc. 141.

### F.  Text and Social Media Messages

Defendants previously moved to compel Jackson to produce certain text messages in her possession.   Doc. 110.   During her deposition Jackson testified that she had had contact with defendants' employees since she quit.   Doc. 110-4 (deposition excerpts from her full deposition at doc. 101-1).   Defendants sent her written discovery requests aimed at preserving and obtaining copies of those communications, including any electronic text messages.   Doc. 110 at 1-2.   Jackson responded by

invoking the attorney client privilege and otherwise asserting that the request is, *inter alia*, overbroad. *Id.* at 2. Subject to those objections, she insisted that she had no documents not already produced. *Id.*

Still, plaintiff also stood on her overbroad objection, contending that defendants' "request is unlimited in time" and "subject matter." Doc. 127 at 3. It would cover, she claimed, "over 500 employees." *Id.* Plus defendants' request was not qualified "regarding relevance to the harassment or relevance to the emotional or other damages [plaintiff] suffered as a result of the conduct alleged by her." *Id.* at 3-4.

The Court agreed that defendants' request was overbroad. Doc. 132 at 39-42. It also agreed that discovery "is not so liberal as to allow a party to roam in the shadow zones of relevancy and to explore a matter which does not presently appear germane on the theory that it might conceivably become so." *Collins v. Worley Catastrophe Response, LLC*, 2012 WL 1447592 at * 2 (M.D. Fla. Apr. 26, 2012) (quotes and cite omitted). *Id.* at 41. A request so broad could easily ensnare information that is simply not relevant to Jackson's claims.

So, the Court denied the motion but ruled that, within 7 days the defendants could more narrowly re-request the documents consistent

with the foregoing parameters, and that Jackson should respond within 7 days. And, in an effort to curtail further discovery disputes, the Court provided additional guidance in formulating discovery requests in this area.  Doc. 132 at 41-42.

As Jackson now points out, "Defendants did recast their discovery request but, *without* waiting on Ms. Jackson's response, Defendants ask the Court for reconsideration of its Order and to impose sanctions on Ms. Jackson."   Doc. 151 at 1 (emphasis added).   She represents that defendants have complied with this Court's guidance and she "will appropriately respond." *Id.* at 3.

Defendants' motion is both premature and unaccompanied by a "duty to confer" certification.[28]  And defendants' tactic of also calling their motion a "motion for reconsideration" (evidently to skirt the "confer" requirement) is just that: a tactic.  Their motion (doc. 140) is **DENIED**.

---

[28] The duty to confer is mandatory and must be meaningful. *Scruggs v. International Paper Co.*, 2012 WL 1899405 at *1 (S.D. Ga. May 24, 2012).

## II.  CONCLUSION

Plaintiff Lisa T. Jackson's "continued sealing" motion (doc. 144) is **GRANTED** in part and **DENIED** in part. Defendant Hiers' redaction motion (doc. 147) is **DENIED**.  The Clerk shall unseal doc. 132 now and annotate doc. 132's docket entry to reflect that it was originally filed under seal but has been unsealed by this Order.  The Clerk shall also unseal doc. 147 now.  Should no Rule 72(a) objection be filed within 14 days of the date this Order is served, then the Clerk implement the remaining unsealing directives set forth in Part I(A)(4) above.  Otherwise those directives are **STAYED** pending resolution of the Rule 72(a) objection.

Next, the defendants' motions to withdraw their *Ellerth/Faragher* defense is **GRANTED**.  Docs. 133 & 134.  Their reconsideration motion is **GRANTED** in part and **DENIED** in part.  Doc. 135.

The Court **GRANTS** in part and **DENIES** in part plaintiff's contempt/sanctions motion, doc. 163, by **DIRECTING** defendants to immediately provide a copy of the disputed "blooper reel" to plaintiff, who shall either destroy or return it after the conclusion (through any appeal) of this litigation.  The Court **DENIES** defendants' motion for

51

reconsideration and for sanctions.  Doc. 140.  But it **GRANTS** in part and **DENIES** in part plaintiff's motion to compel and for sanctions.  Doc. 141.

Jackson's motion (doc. 157) for "Leave to File Surreply to Reply" is **DENIED** as moot because the parties may file as many reply briefs as they want." *Podger v. Gulfstream Aerospace Corp.*, 212 F.R.D. 609, 609 (S.D.Ga. 2003); *see also* S.D.GA.LOC.CIV.R. 7.6 (authorizing reply briefs but imposing notice requirements and time limits).

Finally, substantial portions of this Court's record have been sealed.  An enormous amount of Court resources have been consumed on preserving the public's common law and First Amendment right to access this Court's records.  There shall be no further filings under seal absent compliance with Local Rule 79.7, or by Order of this Court.

Nevertheless, after the Court's April 3, 2013 Order directed the parties to show cause why that order and prior filings should not be unsealed, defendants filed (and sealed) a Rule 72(a) Objection (doc. 148) to this Court's disqualification ruling.  Plaintiff responded, doc., 162, also under seal.  The parties shall therefore show, within 14 days of the date this Order is served, why those documents should not be unsealed.

**SO ORDERED** this  8th  day of May, 2013.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA