**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | | |
|---|---|---|
| LISA T. JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO.: 4:12-cv-0139 |
| PAULA DEEN; PAULA DEEN | ) | |
| ENTERPRISES, LLC; THE LADY & | ) | |
| SONS, LLC; THE LADY | ) | |
| ENTERPRISES, INC.; EARL W. | ) | |
| "BUBBA" HIERS; and UNCLE | ) | |
| BUBBA'S SEAFOOD AND OYSTER | ) | |
| HOUSE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' BRIEF IN REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS' APPEAL TO THE ARTICLE III JUDGE OF SECTION C OF THE MAGISTRATE'S ORDER DATED MAY 8, 2013 AND INCORPORATED MEMORANDUM OF LAW**

COME NOW Paula Deen, Paula Deen Enterprises, LLC, The Lady & Sons, LLC, The Lady Enterprises, Inc., Earl W. "Bubba" Hiers, and Uncle Bubba's Seafood & Oyster House, Inc., the Defendants in the above-styled action, and file this Brief in Reply to Plaintiffs' Response to Defendants' Appeal to the Article III Judge of Section C of the Magistrate's Order Dated May 8, 2013. As shown in Defendants' Appeal [Doc. 171] and further explained herein, Section C of the Magistrate's May 8, 2013 Order [Doc.165], finding that Defendants' counsel, James P. Gerard, acted in an "HR management role" at the defendant restaurants, is clearly erroneous and contrary to law and must be reversed.

**I.    James P. Gerard's Status Is a Reviewable Issue and the Appeal Is Timely.**

The Magistrate's determination that James P. Gerard acted in an "HR management role" at the defendant restaurants and that communications made to him by the Defendants or their

representatives are therefore not protected by the attorney client privilege is a reviewable issue and was timely appealed.  Gerard's status was not, as Jackson errantly contends, established by an April 3, 2013 Order which would render Defendants' appeal of this issue untimely.

The context in which the April 3, 2013 Order [Doc. 132] was issued and the language contained therein proves the falsity of Jackson's argument that Defendants' appeal of Gerard's status is untimely.  The April 3 Order was entered in response to a Motion for Protective Order filed by Defendants [Doc. 93] and a Motion to Compel filed by Jackson [Doc. 111]. [1]  Jackson's Motion to Compel on the issue of Defendants' attorney-client privilege with Gerard was squarely based upon Defendants' assertion of the *Faragher/Ellerth* defense in their answers.  [See Doc. 111 at pp. 8-9, 19-23].

Defendants did not have an opportunity to respond to Jackson's Motion to Compel [Doc. 111] before the Court issued its April 3 Order.  [See Doc. 135 at p. 2, n. 1].  The April 3 Order specifically relied upon Defendants' assertions of the *Faragher/Ellerth* defenses in its finding that Defendants waived their attorney-client privilege with Gerard by asserting these defenses. However, the April 3 Order also contemplated the withdrawal of the *Faragher/Ellerth* defenses to preserve the attorney-client privilege between Defendants and Gerard:

> The deposition testimony before this Court shows that defendants have affirmed the existence of a complaint mechanism which, **until the defense is formally withdrawn, plaintiff is permitted to litigate as if they will rely upon it at trial** to insist that they did everything they reasonably could do with what information Jackson presented.  [Cit.]

---

[1]  In her Response Brief [Doc. 190] Jackson references a Motion to Compel [Doc. 84] and a Substitute Motion to Compel [Doc. 92] that she filed.  Both of these documents concerned blooper-reel videotapes of Paula Deen and did not address the issues pertaining to Gerard.  Defendants are unsure as to why Jackson cites to these documents and claims that "Plaintiff filed a Motion to Compel essentially the same documents [as Docs. 84, 92] on March 7, 2013 [Doc. 111]."  Jackson's representations concerning Docs. 84 and 92 and their connection to the issue at hand are simply untrue.

[Doc. 132 at p. 19, n. 10] (emphasis added).  The April 3 Order ordered Defendants to make Gerard available for four areas of inquiry:

> (1) to rebut Jackson's claims that she complained to him or others in management about her claims of discrimination and sexual harassment; (2) to testify about complaints of four EEOC claimants in early 2009 who allegedly directed complaints toward Jackson, not Hiers; (3) to speak to any meetings held with Jackson, Hiers, and Schumacher (one following the 2009 EEOC mediations and one in 2010); and (4) to address any other instances involving Gerard, including discrimination complaints from other employees, **so long as they are related to his "in the loop" role <u>in application of the defendants' *Ellerth-Farragher* defense machinery</u>**.

[Doc. 132 at pp. 25-26] (emphasis added). [2]

Heeding the above-quoted language from the April 3 Order and having determined that the *Faragher/Ellerth* defenses would not be relied upon, Defendants formally moved to withdraw the defenses and sought reconsideration and clarification of the April 3 Order on the basis of the withdrawal of the *Faragher/Ellerth* defenses.  [Docs. 133, 134, 135].

On May 8, 2013, the Order on appeal issued.  [Doc. 165].  In the Order, the posture regarding the *Faragher/Ellerth* defenses, Defendants' attorney-client privilege with Gerard, and the subsequent withdrawal of the *Faragher/Ellerth* defenses is acknowledged by the Court:

> As the Court's April 3rd Order noted, defendants' invocation of the *Ellerth/Faragher* defense rendered discoverable information about how management handled employee complaints against harassment.   [Cit.]  Defendants argued, however, that plaintiff went too far by subpoenaing records from and questioning (during a deposition) the corporate defendants' outside counsel, James P. Gerard.  [Cit.]  The Court for the most part ruled in favor of plaintiff to the extent defendants had fused Gerard's counsel role with a management ("Human Resources" or "HR") function. [3]

---

[2]  Defendants had already designated Gerard to testify regarding the first three areas of inquiry in an effort of cooperating with Jackson's counsel.  [Doc. 132, p. 19-20].  Gerard had already deposed on these areas as of the entering of the April 3 Order.  [Id. at p. 18].  The fourth area of inquiry was the only area of inquiry added by the April 3 Order and was specific to the Defendants' assertion of the *Faragher/Ellerth* defense.  [See Id. at p. 26].

[3]   The final sentence of this quotation is a new and errant interpretation by the Magistrate of his April 3 Order.  The April 3 Order is clear that the assertion of the *Faragher/Ellerth* defenses, not any "fused" role held by Gerard, was the basis for permitting Jackson to explore Defendants' attorney-client privileges: "to address any other instances

[Doc. 165, p. 25].

The law is clear that a party has fourteen (14) days from the date of being served with a magistrate's order to appeal to the district court:

> A party may serve and file objections to the order within 14 days after being served with a copy. A party may not assign as error a defect in the order not timely object to. The district judge in the case must consider timely objections and modify or set aside any part of the order that is clearly erroneous or contrary to law.

Fed. R. Civ. P. 72(a); see also 28 U.S.C. § 631(b)(1)(A); S.D. Ga. L.R. 72.2 ("Any party may serve and file objections to a Magistrate Judge's determination made under this rule as provided by Fed. R. Civ. P. 72(a).

The Order on Appeal [Doc. 165] made new and unsupported findings of fact that Gerard held a "fused" role of human resources and corporate counsel within the defendant entities. [4] The Defendants' withdrawal of their *Faragher/Ellerth* made the April 8 Order obsolete because the April 8 Order was specifically dependent upon the assertion of these defenses. The Order on Appeal made unsupported findings of fact to work around the language of the April 8 Order and still allow Jackson to explore Defendants' confidential communications with Gerard. The clearly erroneous findings of fact dovetail with the Magistrate's erroneous finding that Jackson is

---

involving Gerard, including discrimination complaints from other employees, **so long as they are related to his "in the loop" role in application of the defendants' *Ellerth-Farragher* defense machinery**." [Doc. 132 at p. 26] (emphasis added).

[4] Jackson claims in her response brief that the Magistrate made the finding of fact in the April 3 Order that Gerard acted in a management role in the defendant entities and that this finding was not timely appealed. [Doc. 190 at p. 6]. As Defendants have noted, the April 3 Order was dependent upon the *Faragher/Ellerth* defenses in permitting Jackson access to attorney-client privileged communications. Jackson's culling of this single sentence of a footnote from the April 3 Order is yet another attempt by Jackson to mislead the Court. This sentence was dicta in the Order, not a finding of fact. Further, the quote relied upon by Jackson cites to Jackson's Response to Defendants' Motion for Protective Order and Motion to Quash Subpoena. [See Doc. 190 at p. 6]. The citations referenced by the Magistrate are Jackson's arguments that the assertion of the *Faragher/Ellerth* defense constitute a waiver of the attorney-client privilege. [See Doc. 116 at p. 10-11, 14-15]. Jackson's argument that this "finding of fact" is independent of the *Faragher/Ellerth* defenses is grossly misleading.

entitled to Defendants' attorney-client privileged communications with Gerard; a finding that is undoubtedly contrary to law.  The appeal of these issues is timely and Section C of the May 8 Order, which relies upon unsupported and errant findings of fact, should be reversed.

## II.  Defendants Maintain an Attorney-Client Privilege In Their Communications With Gerard.

Gerard was unequivocal in his testimony in two separate depositions that he at all times acted as Defendants' outside legal counsel.  Jackson relies upon speculative testimony, inferences, and guesses to muddle the record regarding Gerard's role.  Worse, Jackson cites incomplete and therefore misleading testimony to create the confusion that Gerard acted in a management role at the defendant entities.  When the complete testimony is shown, it is clear that Gerard did not occupy any management role and at all times acted as Defendants' legal counsel under which Defendants enjoy an attorney-client privilege.

Jackson first relies upon an email between Gerard and Karl Schumacher regarding communicating with HR consultants hired by the defendant entities for the proposition that the Magistrate correctly found Gerard to have a "fused" role.  [Doc. 190, p. 6]. [5]  The email states in pertinent part:

> The HR consultants were in town this week.  Since you have been helping us in this area I suggested that they contact you. … Some items that may need to be discussed is the employee manuals, past legal issues, our recent discussions and your thoughts and concerns.

[Doc. 190 at Ex. A].  Jackson *infers* that this email shows Gerard to have some overarching involvement in the HR functions of the defendant entities, when it only shows that the HR

---

[5] Jackson further argues that this document was improperly withheld under a claim of attorney-client privilege. Again, Jackson misleads the Court and neglects to mention the issue of third-party waiver and that the document was produced once the Court ruled upon the issue of third-party waiver; an issue upon which Defendants believe the Magistrate errantly ruled, but decided to not appeal.  Jackson's false stirring of controversy by conflating the third-party waiver issue is addressed more fully in Section III, below.

consultants potentially wanted to speak with Gerard about the specific issues of employee manuals and past legal issues and a non-specific reference to "recent discussions" and Gerard's "thoughts and concerns."  [Id.].  The email goes no further and does not give any basis for any supposition that Gerard overstepped his role as an outside attorney of ensuring that an employee manual was legally sufficient and speaking to Defendants' HR consultants about Defendants' past legal issues. [6]

Jackson next culls an incomplete quote from Gerard as support for her position that Gerard played a human resources role in the defendant entities.  [Doc. 190 at p. 7].  The recitation of Gerard's full response indicates Jackson's argument is not consistent with the truth:

> Q.  *Was there a complaint procedure within the company for – at that time, to your knowledge, for bringing complaints of harassment or discrimination?*
> A.  *She usually complained to Mr. Schumacher as far as any complaints that she might have had with Mr. Hiers.*
> Q.  *And would Mr. Schumacher then keep you in the loop and inform you of those complaints?*
> A.  *Yes.*
> -------------------------------------------------------------------------------------------------
> Q.  *Okay.*
> A.  *I – I would assume so.  I – **I only know as much as he told me.***
> Q.  *Okay.*
> A.  ***So there might have been things that he did not share with me that I don't know.***

[Doc, 154 at Ex. A, James P. Gerard Dep., p. 13-14] (emphasis added) (dashed line inserted to indicate where the quote culled by Jackson ended).  Gerard's full response indicates that *he does not know what is going on at the restaurants other than what he is told*.  Gerard's other

---

[6]  Jackson has deposed both of the HR consultants, Tanya Mack and David Beroset.  The intrusion into attorney-client privileges on the basis of this email, when Jackson is able to obtain the information from other sources, is both unwarranted and improper.

testimony, ignored by Jackson, further explains his lack of involvement in the Defendants' HR

issues other than as legal counsel:

> Q.   Under the – the way that human resources operated back when Ms. Jackson was working for the company, **were you an individual to whom managerial or other employees could bring complaints of misconduct or mistreatment or things of that sort?**

> A.   **No.**

> Q.   **Are you currently?**

> A.   **No.**

> Q.   Okay.  Which employees could come to you, employees or owners or officers?  Who at the  - the Paula Deen companies is entitled to come to you to address an issue or to raise a complaint?

> A.   I have no idea who they authorize to come to me.

> Q.   Okay.  Do you know if the human resources director –

> A.   Let me – let me say this.  I might correct your misconception.  I don't have an ongoing relationship-

> Q.   Uh-huh.

> A.   - with this company.  **__When there's a problem__ which sporadically occurs, they give me a call.**

> Q.   Okay.

> A.   **It's not like I'm sitting here like when there's a – there's a permanent network between me and them –**

> Q.   Right.

> A.   **- and they're coming in.  It's not that type of relationship.  The relationship is – and this is even when Ms. Jackson was there and now –**

> *is that there were months when I wouldn't hear a thing about what was going on as far as complaints.  It was when something – <u>when an incident occurred, either Karl or Lisa, maybe one or two or three times gave me a call, or there was an EEOC complaint filed, or somebody had a consumer complaint, they called me.</u>  But it was not an ongoing thing where I was getting calls every day or every week or every month.*

[Doc. 154 at Ex. A, pp. 56-57].

Finally, Jackson relies upon speculative testimony by Jody Farmer regarding who investigated Jackson's complaints to hook Gerard as being involved in a human resources capacity.  [Doc. 190, p. 11].  Farmer testified:

> Q.    *Do you know who would have conducted the investigation?*
>
> A.    **No.  I don't know for sure.**  *In my experience, **my judgment** it would be that it would have either been the assistance of the Mackworks consultants, or it was Karl, or it would have been Jim Gerard or at his direction.*

[Doc. 154 at Ex. G, Farmer 30(b)(6) Dep., pp. 57-58] (emphasis added).  Despite testimony from Farmer indicative of the fact that he did not know who investigated Jackson's complaints, Jackson supposes that "Mr. Gerard would likely have played a role in the investigation of specific complaints made by Lisa Jackson."  [Doc. 190, p. 11].  This misleading statement ignores Farmer's testimony indicating his answer was speculative and Gerard's sworn testimony that he did not play any role in investigating Jackson's complaints.  [Doc. 154 at Ex. A, Gerard Dep., pp. 11-14].  It also ignores that Farmer only started working for the company on October 26, 2010, over two months after Jackson's employment ended.  [Doc. 154 at Ex. G, Farmer 30(b)(6) Dep., p. 8; Doc. 47, Para. 19].

The attorney-client privilege extends to "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional

advice." <u>Miccosukee Tribe of Indians of Florida v. United States</u>, 516 F.3d 1235, 1262 (11th Cir. 2008).  The purpose of this privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 389 (1981). The privilege is grounded "'in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure.'" <u>United States v. Almeida</u>, 341 F.3d 1318, 1324 (11th Cir. 2003) (quoting <u>Hunt v. Blackburn</u>, 128 U.S. 464, 470, 9 S.Ct. 125 (1888)). It "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." <u>Upjohn Co.</u>, at 390.  Indeed, "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." <u>Id</u>. at 390-91.

The Magistrate's finding in the May 8 Order that Gerard acted as anything other than legal counsel is clearly erroneous, factually inaccurate, and unsupported by the record.  The Magistrate, by way of his errant and unsupported fact-finding, wholly eliminated Defendants' attorney-client privilege with Gerard when the record is clear that Gerard is outside legal counsel.  The entire notion of the attorney-client privilege and the "full and frank" communications that the privilege encourages is gutted by the May 8 Order.  Defendants here had an expectation that their communications with Gerard were privileged because of the long-standing notion that a client's communications with its attorney are protected.  Had Defendants not had such an expectation of privacy, they would not have spoken freely with Gerard about potential legal issues.  Defendants certainly would not have conversed freely with Gerard had

they expected Jackson to later delve through their confidential communications.  Defendants'
communications with Gerard are protected under the attorney-client privilege and unless
otherwise waived by disclosure to third-parties, the privilege must be preserved.  The
Magistrate's finding to the contrary is clear error and contrary to law.

Perhaps recognizing the clear error underlying the Magistrate's May 8 Order, Jackson
focuses on the burden on the party asserting the attorney-client privilege.  Jackson contends that
Defendants have not,

> offer[ed] testimony from Mr. Gerard or any other witness regarding the role Mr.
> Gerard played with respect to the specific communications at issue and,
> accordingly, there is a failure of proof by Defendants on this initial point.  As a
> result, Defendants' claim of privilege fails irrespective of the question of waiver,
> as they failed to make any effort to meet their evidentiary burden.

[Doc. 190, p. 15-16].  Again, Jackson misstates the import of the Court's May 8 Order.  The May
8 Order does not allow for a document-by-document review of communications between Gerard
and the Defendants because it finds *ipse dixit* that Gerard occupied a fused role of attorney and
human resources management.  The May 8 Order eliminates that threshold matter – Gerard is
Defendants' legal counsel and communications between him and Defendants or their
representatives are privileged.  This Court should correct the Magistrate's clear error on appeal.

## III.   Jackson Includes the Issue of Third-Party Waiver to Create Confusion and an Inference That Defendants Have Acted Improperly.

Jackson makes repeated reference in her brief to documents that have been produced after
originally being withheld under claim of attorney-client privilege.  [Doc. 190, p. 6-7, 16].
Jackson claims regarding one such document, "[O]ne of the documents that they withheld
demonstrates both that Defendants have an overly broad notion of what is protected by the
attorney client privilege and/or attorney work product…"  [Doc. 190, p. 6].  Jackson goes on to

10

question the integrity of Defendants and their counsel: "Defendants have withheld emails … which are not, under any circumstances, subject to any privilege, such that the Court cannot rely on Defendants' *claim* of privilege in the absence of *evidence* that the privilege applies. [Cit.]." [Doc. 190, p. 16] (emphasis in original).

While calling the integrity of Defendants and their counsel into question and claiming they are unworthy of belief by the Court, Jackson omits reference to the fact that the production of these documents was ordered by the Court following extensive briefing by both parties as to the application of the attorney-client privilege when consultants are involved.  [See Docs. 111, 135, 143, 153].  Jackson omits to mention that the documents were produced in compliance with the Court's Order.  [Doc. 165].  Jackson's omission of these key facts is part and parcel of an inaccurate and misleading recitation of the case all while claiming that it is Defendants and their counsel that are unworthy of belief.

## IV. The Disparity of the Magistrate's Treatment of Defendants' Attorney-Client Privilege and Plaintiff's Text Messages to Uncle Bubba's Employees Is Indicative of the Clear Error of the May 8 Order.

The clear error of the May 8 Order is evident when the treatment of Defendants' attorney-client privilege is juxtaposed with the treatment of Jackson's text messages and social media activity.  The Hiers' defendants filed a Motion to Compel and Motion for Sanctions [Doc. 64] seeking the Court to compel Jackson to respond to their document requests and produce text messages between herself and employees of Uncle Bubba's restaurant.  Jackson had refused production of certain text messages between herself and/or Mr. Woolf and various Uncle Bubba's employees on the basis of attorney work product and attorney-client privilege.  [Doc. 64].

The Magistrate denied the Hiers' defendant's motion on a finding that communications between Lisa Jackson and/or Wesley Woolf and *employees of Uncle Bubba's* were protected as attorney work-product apparently upon Jackson's assurances that the text messages constituted nothing of interest to the Defendants.  [Doc. 175, p. 5-6].

> **Jackson assures the Court** that "[a]mid the texts of Ms. Jackson herself delivering general greetings and herself texting in an attempt gain prospective witness assistance, only one text came from the (reluctant) witness himself and a copy of that text has been produced to Defendants. **All of the other texts are communications from Ms. Jackson to this witness. The texts are exclusively "the thought processes of the party. . . ."** Doc. 169 at 4-5 (footnote, cite and brackets omitted). The only other text messages, she asserts, are from a witness who unsuccessfully sought representation from plaintiff's counsel. Id. at 5. Although Jackson believes she is "not required to reveal the names of these witnesses, [she] has disclosed them to minimize and focus the gravamen of her argument that the content of these texts is protected by work product and attorney-client privilege." Doc. 172 at 2.

[Doc. 175, p. 5] (emphasis added).

Defendants find it inexplicable that text messages between either Lisa Jackson or Wesley Woolf *and employees of Defendant Uncle Bubba's* would receive higher protection from the Court than communications between Defendants *and their attorney*.  That is precisely what has happened here, and it is clear error.

Further insight of the disparity of treatment between the parties is also found in comparing the above-quoted language with the language from another of the Magistrate's Orders.[7]  As quoted above, the Magistrate is willing to accept Jackson's assurances regarding the content of the communications sought by the Hiers defendants and to deny the Hiers defendants access to those documents.  [Doc. 175, p. 5].  Comparatively, the Magistrate's May 8 Order states with regard to James P. Gerard, *an officer of this Court*:

---

[7] Defendants further take issue with the Magistrate's gratuitous recitation in the May 8 Order of the results of the Court's independent internet research regarding Paula Deen.  [See Doc. 165, p. 9].

> And if Gerard denies such conversations occurred or did not involve any of Jackson's harassment complaints, then that factual conflict in and of itself is discoverable: **Jackson has the right to try and prove that [Gerard] is misremembering or <u>being untruthful</u> as to this matter.**

[Doc. 165, p. 30] (emphasis added).

## V.    Defendants Have Not Waived Their Attorney-Client Privilege With Gerard.

Yet again, Jackson omits to inform the Court of important details that stand in the way of the representations she makes to the Court.  Defendants have at all times asserted their attorney-client privilege with Gerard and only made Gerard available for deposition as an accommodation to Jackson and with the express provision that there was no waiver of the attorney-client privilege.  In response to Jackson's requests that Gerard be made available for deposition, counsel for Defendants asked Jackson's counsel to explain their basis behind seeking Gerard's testimony and the scope of the testimony sought from Gerard.  (Ex. A, William J. Hunter letter dated February 6, 2013).  Jackson's counsel, Matthew C. Billips, responded in part:

> Regarding Mr. Gerard, however, we seek to depose him and to subpoena to his deposition a copy of his billing records for work done on behalf of any of the Defendants.  The scope of the inquiry will be information known to him which is relevant to your Kolstad/Faragher/Ellerth affirmative defenses.

(Ex. B, Matthew C. Billips letter dated February 15, 2013).  Mr. Hunter responded to Billips February 15, 2013 letter by email:

> As for Jim Gerard, he was outside counsel for these defendants and that is it. While you use the term "consiglierie," (which is primarily defined by on-line dictionaries as an advisor or counselor to capos or other high ranking members of American or Sicilian organized crime families), outside counsel is the only proper term to describe Mr. Gerard's relationship with any of the Defendants.  He has worked on many different matters for these Defendants through the years and at no time was ever an employee of any defendant.  He has at all relevant times been an equity partner in Oliver Maner and Gray LLP now Oliver Maner LLP. **However, in an effort at compromise, <u>and without waiving any attorney client or work product privileges</u>, Mr. Gerard will be produced to testify regarding any investigation he did with regard to any complaints made by**

13

**Lisa Jackson to him of discrimination or harassment.**  As you know, Mr. Gerard was involved in the EEOC claim and you have those documents.

(Ex. C, William J. Hunter email dated February 18, 2013).

Jackson subpoenaed Gerard to appear for deposition and Defendants moved for a protective order and to quash the subpoena.  [Doc. 93].  In their motion, Defendants expressly affirmed their attorney-client privilege with Gerard and asked the Court to issue a protective order that he not be required to testify regarding privileged matters.  [Doc. 93].  It was in this motion that Defendants requested that Gerard's deposition be limited to three limited areas of inquiry to avoid intrusion into their attorney-client privilege.  [Doc. 93, p. 8].  The Court did not rule on Defendants' motion in advance of Gerard's deposition being taken on February 27, 2013, but the examination was limited to the three areas set forth in Defendants' motion.  [See Doc. 154 at Ex. A, Gerard Dep.].  Gerard appeared for a second deposition on May 15, 2013 at the order of the Court.  [Ex. D, Gerard Dep. (Second) (May 15, 2013); Doc. 165].

Context is important, and Jackson's brief repeatedly omits to tell the context in which events occurred.  The history leading up to Gerard's two depositions makes clear that at no time did Defendants waive their attorney-client privilege with regard to their communications with Gerard.  Moreover, Jackson now seeks to use Defendants' efforts at compromise against them.

## VI. Plaintiff Attempts to Project Her Lack of Credibility Upon Defendants.

The deposition testimony taken in this case has not supported the incendiary allegations made in Jackson's Complaint or the representations that Jackson has made in her discovery disclosures. [8]  Despite this, Plaintiff boldly states in her brief that, "Defendants – and their counsel – have denied the truth of Plaintiff's claims, even where they were aware that these

---

[8] Defendants complained of Jackson's witness disclosures in a previous filing.  [Doc. 85].  The crux of Defendants' complaint at that time was that Jackson identified witnesses as having certain knowledge, but the witnesses, when deposed, denied that knowledge.  Many of these witnesses were unavailable to Defendants outside of deposition.

denials were false." [Doc. 190, p. 3]. A closer review of Jackson's allegations, Defendants' answers, the representations made by Jackson in her briefs to this Court, and the deposition testimony shows the extent to which Jackson, having grossly overreached in her Second Amended Complaint, attempts to project her own lack of credibility upon the Defendants. Defendants will address two instances raised by Jackson in her latest brief to this Court [Doc. 190]:

**A.      Second Amended Complaint – Paragraph 21**

Plaintiff represents in her brief that Defendants falsely denied paragraph 21 of Jackson's Second Amended Complaint. [Doc. 190, p. 3]. Jackson alleged:

> Ms. Jackson replaced a General Manager that was allegedly having sexual relationships with servers, a matter disregarded by Bubba Hiers. In a meeting with that General Manager and Ms. Jackson, Paula Deen terminated that General Manager and stated to Bubba Hiers, "if you think I have worked this hard to lose everything because of a piece of pussy, you better think again." Paula Deen continued, "and now I am going to do something I have never done. I am going to put a woman in a man's job." Paula Deen gave Ms. Jackson six months to turn the restaurant from a failure to a success.

[Doc. 47, Para. 21]. Ms. Deen's testimony makes clear that the Deen Defendants' denial of this paragraph of the Second Amended Complaint was appropriate:

> Q.      *And was there a general manager who was – in the early days who was fired from Uncle Bubba's because he was having a relationship with –*
>
> A.      *Yes - -*
>
> Q.      *-- a server?*
>
> A.      *An underage server.*
>
> Q.      *An underage server?*
>
> A.      *Yes.*
>
> Q.      *Okay. And there's a quote attributed to you in the Complaint about that.*

15

A.      Yes.

Q.      *Is that quote accurate?*

A.      *That is, absolutely.  Out of all of the accusations I can say that's the only one –*

        Mr. Franklin:  Well, which quote?  There are about three in that paragraph.  I know the one you're talking about, but let's make sure the record is clear.

        The Witness:   There is one sentence.

Q.      *Okay, what sentence is that?*

A.      *You don't have that in front of you?*

Q.      *I'm looking for it.*

        Mr. Franklin: I do.  Do you want me to show it to her?

        Mr. Billips:      Sure.

        The Witness:   I said that first sentence that's in quotes.  I certainly did.  I said it that day and I would say it again if it applied.

Q.      *Okay.  Would you – could you read –*

A.      ***That other nonsense I did not say.***

(Ex. E, Paula Deen Dep., p. 118-120) (emphasis added). [9]

## B.   Second Amended Complaint Paragraphs 61-62

Jackson alleged at paragraphs 61 and 62 of her Second Amended Complaint:

---

[9]  The inclusion of this statement in and of itself should call Jackson's allegations into question.  This statement has absolutely nothing to do with any type of harassment or discrimination allegedly experienced by Jackson.  This statement is not indicative of the manner in which Jackson was treated by Deen or any other Defendant.  The statement stands for itself – Deen was not willing to allow her work and her businesses to be compromised by a male manager's inability to control his sexual desires.  Jackson's inclusion of this irrelevant statement is indicative of the litigation strategies employed in this case.

61.

The racially discriminatory attitudes pervade the workplace.  An example, showing that Paula Deen holds such racist views herself, occurred after Defendant Deen placed Ms. Jackson in charge of food and serving arrangements for the wedding of her brother Bubba Hiers in February 2007.  When Ms. Jackson asked Ms. Deen what the wedding should have, Ms. Deen replied, "I want a true southern plantation-style wedding."

62.

When asked by Ms. Jackson what type of uniforms she preferred servers to wear, Paula Deen stated, "Well what I would really like is a bunch of little n----s to wear long-sleeve white shirts, black shorts and black bow ties, you know in the Shirley Temple days, they used to tap dance around."  Paula Deen laughed and said "Now that would be a true southern wedding, wouldn't it?  But we can't do that because the media would be on me about that."

[Doc. 47, Para. 61 and 62].  Again, Paula Deen's deposition testimony shows that her denials of

Jackson's outrageous allegations were appropriate:

> Q.    Okay.  So was Lisa ever present when you discussed with Brandon what kind of wedding you'd like to have?
>
> A.    I don't recall that.  I recall – I do recall, once again, in my bathroom at that house, and why we would have been in the bathroom, I was probably filming and changing clothes, that's the only reason why we would have been in that bathroom, they must have run out during my lunch break or something from filming, and I remember us talking about the meal.
>
> And I remember telling them about a restaurant that my husband and I had recently visited.  And I'm wanting to think it was in Tennessee or North Carolina or somewhere, and it was so impressive.  The whole entire wait staff was middle-aged black men, and they had on beautiful white jackets with a black bow tie.  I mean, it was really impressive.
>
> And I remember saying I would love to have servers like that, I said, but I would be afraid somebody would misinterpret.
>
> Q.    The media might misinterpret it?
>
> A.    Yes, or whomever –
>
> Q.    Okay.

17

A.      *-- is so shallow that they would read something into it.*

Q.      *Were they dressed in white shorts and bow ties?*

A.      *No, they were dressed in white jackets.*

Q.      *White jackets?*

A.      *Dinner jackets.*

Q.      *And a bow tie?*

A.      *And a bow tie and black trousers, and they were incredible.*

Q.      *Okay.  And you said something –*

A.      *These were men that had made their living off of service and people in a restaurant.*

Q.      *Right.*

A.      *It was – I was so impressed.*

Q.      *Okay.  And they were all black men?*

A.      *Yes.  Professional servers and waiters.*

Q.      *And when you described it to Miss Jackson, did you mention the race of – well, you had to have mentioned the race of the servers –*

A.      *Of course I would –*

Q.      *-- because that's the part that –*

A.      *-- because that's what we just experienced.*

Q.      *Right.  Do you know what word you used to identify their race?*

A.      *I would have used just what I just told you.*

Q.      *Black or African-American?*

A.      *Black.  I would use the word black.*

Q.     Okay.

A.     I don't usually use African-Americans.

Q.     Okay.

A.     I try to go with whatever the black race is wanting to call themselves at each given time.  I try to go along with that and remember that.

Q.     Okay.  So is there any reason that you could not have done something just like that but with people of different races?

A.     Well, that's what made it.

       Mr. Franklin:  Objection.

       Mr. Withers:   Object to form.

Q      You can answer.

A.     That's what made it so impressive.  These were professional.  I'm not talking about somebody that's been a waiter for two weeks.  I'm talking about these were professional middle-aged men, that probably made a very, very good living –

Q.     Okay.

A.     -- at this restaurant.  They were trained.  The – it – it was the whole picture, the setting of the restaurant, the servers, their professionalism.

Q.     Is there any reason you couldn't have found middle-aged professional servers who were of different races?

       Mr. Franklin:  Objection, relevance.

       The Witness:  Listen, it was not important enough to me to even fight, to reproduce what that restaurant had.  I was just simply expressing an experience that my husband and I had, and I was so impressed.

Q.     Did you describe it as a – that that would be a true southern wedding, words to that effect?

A.     I don't know.

Q.     Do you recall using the words "really southern plantation wedding"?

19

A.      Yes, I did say I would love for Bubba to experience a very southern style wedding, and we did that.  We did that.

Q.      Okay.  You would love for him to experience a southern style plantation wedding?

A.      Yes.

Q.      That's what you said?

A.      Well, something like that, yes.  And –

Q.      Okay.  And is that when you went on to describe the experience you had at the restaurant in question?

A.      Well, I don't know.  We were probably talking about the food or – we would have been talking about something to do with service at the wedding, and –

....

Q.      Is there any possibility, in your mind, that you slipped and used the word "n----r"?

A.      No, because that's not what these men were.  They were professional black men doing a fabulous job.

Q.      Why did that make it a – if you would have had servers like that, why would that have made it a really southern plantation wedding?

        Mr. Franklin:  Objection.  Relevance.

Q.      You can answer.

A.      Well, it – to me, of course I'm old but I ain't that old, I didn't live back in those days but I've seen the pictures, and the pictures that I've seen, that restaurant represented a certain era in America.

Q.      Okay.

A.      And I was in the south when I went to this restaurant.  It was located in the south.

Q.      Okay.  What era in America are you referring to?

20

> A. Well, I don't know.  After the Civil War, during the Civil War, before the Civil War.
>
> Q. Right.  Back in an era where there were middle-aged black men waiting on white people.
> A. Well, it was not only black men, it was black women.
>
> Q. Sure.  And before the Civil War – before the Civil War, those black men and women who were waiting on white people were slaves, right?
>
> A. Yes, I would say that they were slaves.
>
> Q. Okay.
> A. But I did not mean anything derogatory by saying that I loved their look and their professionalism.

(Ex. E, p. 124-131).  The *very specific* allegations made by Jackson are a far cry from what Paula Deen testified occurred.  Jackson alleged specific quotes containing incendiary, racist words – Deen testified of how impressed she was with the professionalism of a restaurant staff at a restaurant she and her husband visited.  Paula Deen specifically testified that she did not use the N-word when describing her experience and that she did not describe the wait staff as alleged by Jackson in her Second Amended Complaint.  Jackson's deposition testimony further indicates the falsity of her incendiary allegations of Deen's use of the N-word during the conversation about Hiers' wedding:

> Q. Up until May 27th, 2010, you had no complaints or problems with Mrs. Deen, did you?
>
> A. No.
>
> Q. She had never indicated any discriminatory bias or prejudice, did she?
>
> A. Yes.  One remark she made at Bubba's wedding planning.
>
> Q. Were you there –
>
> A. Yes.

Q.      -- at the planning?  Now, you tell me, when did that occur and where?

A.      On her back porch.

Q.      Which house, Dogwood?

A.      Dogwood.  We were sitting on the back porch and we asked about the uniforms.  And she made a remark about how she wanted them dressed.

Q.      Who was there?

A.      It was Bubba, and me, and Paula.

Q.      Bubba, you, and who?
A.      Paula.

Q.      Okay.  What did she say about how she wanted them dressed?

A.      Like they used to dress in the Shirley Temple days with the long white shirts and the shorts.  And I remember thinking when she said it that I thought about Dora.

        And I thought, I know she loves – I know you love Dora, and it was like how could – you know, how could she say something like that.  Then a fan rode by on a boat, and she said, well, we know we can't do that because the media would be on us.

        And I just – at that moment thought – it was disappointing, but I still had respect for the position she had offered me and that I was doing there.

Q.      And, but was her comment was that she wanted a wedding back in the Shirley Temple days with blacks wearing what?

A.      White shirts.

Q.      White shirts?

A.      And black pants or black shorts.

Q.      **And that's the sum total of the conversation about that; is that correct?**

A.      **Uh-huh, correct.**

22

[Ex. F, Jackson Dep., p. 226-227] (emphasis added).  The use of the N-word by Deen is glaringly absent from Jackson's sworn testimony, but it remains in her Second Amended Complaint.

The complaints and other filings by Jackson in this case have all been calculated to create a tabloid-type hysteria.  Allegations such as those recited above have nothing to do with federal employment law or gender discrimination and do not move the needle in Jackson's favor for the theories of recovery she asserts.  The Court must look no further than Billips' communications with the National Enquirer regarding the release by a court reporting firm of the videotape of Paula Deen's deposition to see the effects of Jackson's efforts.  (Ex. G, Email from Crites Court Reporting (Diana) to Bill Franklin dated June 12, 2013) (forwarding email from Darryl Wrobel of the National Enquirer stating in part that Billips had approved the release of the video to the National Enquirer).  The Court should also consider Jackson's recent filing into the record of the videotape of Paula Deen's deposition and why it would even be necessary at this point in the litigation to file *the videotape of the deposition* of record. [10]  [Doc. 189].

Jackson's attack on Oliver Maner LLP and Jim Gerard are improper.  The Magistrate has countenanced this type of attack by allowing Jackson and her lawyers to plow ground that should otherwise be off limits because of some unsubstantiated notion that Jim Gerard has been untruthful.  If not this law firm, then Jim Gerard deserves the respect any other officer of the Court maintains. Jim Gerard has not been impeached or anything close to it.  He has no record of lying under oath.  He has not a blemish on his professional résumé.  Defendants will prove to a

---

[10]  The constant complaint from Defendants has been that the Complaint and Jackson's other filing have been for the purpose of stirring public controversy to exert pressure on Defendants.  Jackson showed her intent to follow this strategy in her pre-litigation extortion letter.  [Doc. 6-2, pp. 10-11].  According to the email from the National Enquirer to Critz Court Reporting, the Clerk's office "can and will release that video deposition 90 days after it was filed."  (See Ex. G).  Additionally, defense counsel received word on June 12, 2013 that a reporter for the local CBS affiliate, WTOC, was at the Courthouse reviewing the video of Ms. Deen's deposition.   On the same date, a member of the defense team received a call from the reporter requesting comment on the video.  Defendants cannot envision any purpose behind filing the videotape of Ms. Deen's deposition other than to provide for the dissemination of the video to the media.

jury that Jackson's allegations are misrepresented, deceptive, exaggerated, or fabricated.  These allegations have cost Defendants enormous sums of money, time, and heartache.  The most heinous of the allegations, including the use of the N-word by a national celebrity, were brought without consideration for their truth or falsity and without consideration for whether Jackson even had standing.  The Court and a jury will decide these matters based on the *evidence* Defendants have developed, of which there is plenty.

Jackson's attack on Jim Gerard has no place in this case.  Jackson's willingness to disparage Gerard and this law firm with no evidence to support such allegations is instructive.  It is respectfully hoped that the District Court will not countenance this approach.

WHEREFORE, Defendants respectfully request that the Court consider their appeal and that it vacate and reverse Section C of the May 8, 2013 Order.

(Signature Page Follows)

THIS 17th day of June, 2013.

OLIVER MANER LLP

 /s/ I. Gregory Hodges
WILLIAM P. FRANKLIN, JR.
Georgia Bar No. 274000
I. GREGORY HODGES
Georgia Bar No. 358925
PATRICIA T. PAUL
Georgia Bar No. 697845
WILLIAM J. HUNTER
Georgia Bar No. 141288
GEORGE T. MAJOR, JR.
Georgia Bar No. 619608

218 West State Street
Post Office Box 10186
Savannah, Georgia 31412          *Attorneys for Defendants Paula Deen, Paula*
(912) 236-3311                   *Deen Enterprises, LLC, The Lady & Sons, LLC, and*
                                 *The Lady Enterprises, Inc.*
                                 GILLEN, WITHERS & LAKE LLC

                                  /s/ Thomas A. Withers
                                 THOMAS A. WITHERS
                                 Georgia Bar No. 772250

8 East Liberty Street
Savannah, Georgia 31401
(912) 447-8400                   *Attorney for Defendants Earl W. "Bubba"*
                                 *Hiers and Uncle Bubba's Seafood and*
                                 *Oyster House, Inc.*

25

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| LISA T. JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NO.: 4:12-cv-0139 |
| PAULA DEEN; PAULA DEEN | ) | |
| ENTERPRISES, LLC; THE LADY & | ) | |
| SONS, LLC; THE LADY | ) | |
| ENTERPRISES, INC.; EARL W. | ) | |
| "BUBBA" HIERS; and UNCLE | ) | |
| BUBBA'S SEAFOOD AND OYSTER | ) | |
| HOUSE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

        This is to certify that I have on this day served all the parties in this case in accordance with the directives from the Court Notice Electronic Filing ("NEF") which was generated as a result of electronic filing.

        This 17th day of June, 2013.

                                              OLIVER MANER LLP

                                              /s/ *William P. Franklin, Jr.*
                                              WILLIAM P. FRANKLIN, JR.
                                              Georgia Bar No. 274000
                                              I. GREGORY HODGES
                                              Georgia Bar No. 358925
                                              PATRICIA T. PAUL
                                              Georgia Bar No. 697845
                                              WILLIAM J. HUNTER
                                              Georgia Bar No. 141288
                                              GEORGE T. MAJOR, JR.
                                              Georgia Bar No. 619608

218 W. State Street                           *Attorneys for Defendants Paula Deen, Paula*
P.O. Box 10186                                *Deen Enterprises, LLC, The Lady & Sons,*
Savannah, GA 31412                            *LLC, and The Lady Enterprises, Inc.*
(912) 236-3311

26